# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

Fond Du Lac Bumper Exchange, Inc. and
Roberts Wholesale Body Parts, Inc. on
Behalf of Themselves and Others
Similarly Situated,

     Plaintiffs,

v.

Jui Li Enterprise Company, Ltd., *et al.*,

     Defendants.

CASE NO. 2:09-CV-00852-LA

### SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF THE SHERMAN ACT

Plaintiffs Fond du Lac Bumper Exchange, Inc. and Roberts Wholesale Body Parts, Inc., ("Plaintiffs") bring this action on their own behalf and on behalf of all those similarly situated to recover damages and obtain injunctive relief for Defendants' violations of the federal antitrust laws against Defendants as follows:

### INTRODUCTION

1.   This Second Amended Complaint supersedes all prior complaints filed in this consolidated action, including the First Amended Complaint filed by Fond du Lac Bumper Exchange in Case No. 09-cv-852 on January 8, 2010 and the Complaint in the consolidated action filed by Vehimax International, LLC, Case No. 09-cv-224, on September 3, 2009.

2.   Plaintiffs bring this action individually and on behalf of a Class of plaintiffs consisting of all persons and entities in the United States, including the District of Columbia and Puerto Rico, who purchased aftermarket automotive sheet metal parts ("AM Sheet Metal Parts"), also known as AM crash parts, directly from Defendants starting at least as early as January 1, 2003 through the present (the "Class Period"). AM Sheet Metal Parts include, but are not limited

to, hoods, doors, fenders, bonnets, floor panels, trunk assemblies, trunk lids, tailgates, roof panels, and reinforcement parts.

3.     This lawsuit involves an anticompetitive conspiracy among Defendants to illegally inflate the prices of AM Sheet Metal Parts in blatant disregard of the United States antitrust laws.  Defendants and their co-conspirators agreed to and did in fact fix, raise, maintain and stabilize prices at which AM Sheet Metal Parts would be sold.  Defendants simultaneously conspired to fix output of AM Sheet Metal Parts.

4.     This lawsuit is based on direct evidence demonstrating Defendants' conspiracy to artificially manipulate the market for AM Sheet Metal Parts.  Specifically, Defendants admit that they abandoned competing with one another in favor of an agreement among themselves to cooperate and coordinate in the manufacture and sale of AM Sheet Metal Parts.    This arrangement, explained Raymond Wu, an executive of Defendant Taiwan Kai Yih and president of its parent company, allowed Defendants to escape "malicious price cutting competition," thus achieving very high profitability on AM Sheet Metal Parts.

5.     Through these illegal acts, Plaintiffs, and members of the proposed Class, paid and continue to pay artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for AM Sheet Metal Parts.  Plaintiffs, and the proposed Class, suffered the type of injury that the antitrust laws are designed to prevent.

## JURISDICTION AND VENUE

6.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15 and 26) to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Class by reason of the violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.     This action is also instituted to secure injunctive relief against Defendants to prevent them from further violating Section 1 of the Sherman Act, as hereinafter alleged.

2

8.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

9.     Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, one or more Defendants resided in this district, all Defendants transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

10.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of AM Sheet Metal Parts throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an anticompetitive conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

### Plaintiffs

11.     Plaintiff Fond du Lac Bumper Exchange, Inc. is a corporation duly organized and existing under the laws of the State of Wisconsin with its principal place of business located in Fond du Lac, Wisconsin.  During the relevant period, Plaintiff Fond du Lac Bumper Exchange, Inc. purchased AM Sheet Metal Parts directly from one or more Defendants.  As a result of the alleged conspiracy, Plaintiff Fond du Lac Bumper Exchange, Inc. was injured in its business or property by reason of the antitrust violations alleged herein.

12.     Plaintiff Roberts Wholesale Body Parts, Inc. is a corporation duly organized and existing under the laws of the State of South Carolina with its principal place of business located in Florence, South Carolina. During the relevant period Plaintiff Roberts Wholesale Body Parts, Inc. purchased aftermarket sheet metal parts directly from one or more of the Defendants.  As a

result of the alleged conspiracy, Plaintiff Roberts Wholesale Body Parts, Inc. was injured in its business or property by reason of the antitrust violations alleged herein

## Defendants

## The TYG Defendants

13.     Defendant Taiwan Kai Yih Industrial Co. Ltd. ("TKY") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at 202 Lane 250 Jeng An Road, Tainan 709 Taiwan.  TKY is or has been a wholly or partially owned subsidiary of Tong Yang Industry Co. Ltd., and is part of the "Tong Yang Group" of companies ("TYG").  TYG is one of the largest companies in Taiwan, with US$500 million in annual revenue and 1480 employees.  TYG is traded as a public company on the Taiwan Stock Exchange.  TKY holds itself out as the largest manufacturer of AM Sheet Metal Parts, holding the dominant share of that market.  TKY manufactures AM Sheet Metal Parts in Taiwan and exports them for sale around the world, including the United States.  In fact, TKY's top seven customers are in North America.  TKY shipped and sold over 87% of its product to the United States.  TKY was founded in 1972 and was first traded as a public company on the Taiwan Stock Exchange in 1998.  TKY is publicly traded on the Taiwan Stock Exchange, generates US$185 million in annual revenue and employs approximately 465 people.    During the Class Period, TKY sold AM Sheet Metal Parts to Class members in the United States.

14.     Defendant TYG Products, L.P. ("TYG Products") is a corporation organized and existing under the laws of the State of Texas with its principal place of business located at 1800 North McDonald Street, McKinney, Texas 75069.  During the Class Period, TYG Products manufactured, imported, distributed and sold AM Sheet Metal Parts to Class members in the United States.  TYG Products is a wholly owned subsidiary of TYG. and was established to meet North America market demand.

**The Gordon Defendant**

15.     Defendant Gordon Auto Body Parts ("Gordon Taiwan") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No 48 Nieh His Road, Lu-Tsu Hsiang, Tao-Yuan Hsien, Taiwan.   Gordon Taiwan imports, distributes and sells, throughout the United States, AM Sheet Metal Parts imported from Taiwan. Gordon was established in 1986 and is "one of the biggest manufacturers of metal replacement crash parts in the world…and employs more than four hundred people."   North America is Gordon's "biggest market" and has annual revenues of over US$100 million.   In 2008, Gordon was recognized for providing the U.S. market with more CAPA-Certified parts than any other manufacturer.   The term "Gordon Taiwan" includes any wholly or partly owned subsidiary of Gordon Taiwan involved in the market for AM Sheet Metal Parts whose business operations were controlled by Gordon Taiwan at any time during the Class Period. During the Class Period, Gordon Taiwan sold AM Sheet Metal Parts to Class members in the United States.

**The API Defendants**

16.     Defendant Auto Parts Industrial Ltd. ("API") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No. 456, Sec. 2, Kwoling Rd., 7 Lin, Kwo Ling Li, Jhongli City, Taoyuan County 320, Taiwan.   API was founded in 1979.   Through the 1980s, 1990s and 2000s, API merged with a number of companies engaged in sheet metal manufacturing to become one of the largest manufacturers of AM Sheet Metal Parts.  API employs over 350 people and generates over US$132 million a year in revenue. API imports, distributes and sells throughout the United States AM Sheet Metal Parts imported from Taiwan.  The term "API" includes any wholly or partly owned subsidiary of API involved in the market for AM Sheet Metal Parts whose business operations were controlled by API at any time during the Class Period. During the Class Period, API sold AM Sheet Metal Parts to Class members in the United States.

17.     Defendant Cornerstone Auto Parts, LLC ("Cornerstone") is a corporation organized and existing under the laws of the State of Texas with its principal place of business located at 1801 Royal Lane, #608, Dallas, Texas 75229.  Cornerstone is a wholly owned subsidiary of Defendant API and operates as API's "US business office."  The term "Cornerstone" includes any wholly or partly owned subsidiary of Cornerstone involved in the market for AM Sheet Metal Parts whose business operations were controlled by Cornerstone at any time during the Class Period.  During the Class Period, Cornerstone distributed and sold to Class members throughout the United States AM Sheet Metal Parts.

### The Jui Li Defendant

18.     Defendant Jui Li Enterprise Co. Ltd. ("Jui Li") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No. 22, Kaonan Road, Jenwu Hsiang, 814 Kaohsiung, Kao-hsiung shih, Taiwan.  Jui Li is a leading manufacturer of AM Sheet Metal Parts, which it manufactures in Taiwan and China and exports for sale around the world, including the United States.  Jui Li produces a comprehensive array of AM Sheet Metal Parts including automotive panels, such as doors, hoods, fenders, trunk lids, and floor panels.  Jui Li was established in 1970 and operates plants in Kaohsiung, Hsin-Chu, Hainan and Wuhan.  Jui Li is traded as a public company on the Taiwan Stock Exchange.  Jui Li has annual revenues exceeding US$132 million and employs more than 1000 people. The term "Jui Li" includes any wholly or partly owned subsidiary of Jui Li involved in the market for AM Sheet Metal Parts whose business operations were controlled by Jui Li at any time during the Class Period.  During the Class Period, Jui Li sold AM Sheet Metal Parts to Class members in the United States.

### Agents and Co-Conspirators

19.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were

actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

20. All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

21. Defendants carried out their illegal scheme with the assistance, coordination and cover of several trade industry groups including the Sheet Metal Parts Alliance ("SMPA"), the Taiwan Auto Body Panels Association ("TABPA"), and the Automotive Aftermarket Products Expo ("AAPEX"). The trade groups facilitated the conspiracy, providing platforms for meetings to facilitate output-reduction and price-fixing coordination.

22. On information and belief, various other companies and individuals, not named as Defendants in this Complaint, may have participated as co-conspirators in the acts complained of herein, and performed acts and made statements in furtherance of such conspiracy.

## TRADE AND COMMERCE

23. The activities of Defendants that are the subject of this action are within the flow of, and substantially affected, interstate trade and commerce within the United States, including trade and commerce to, from, and within this District.

24. The automotive aftermarket industry is considerable. Sales of aftermarket automotive products in the United States are in the billions of dollars (US) annually for the over 225 million vehicles operated in the United States.

25. AM Sheet Metal Parts represent a large portion of the entire aftermarket automotive parts market, with over US$400 million in sales in the United States in 2008.

26. The named Defendants manufacture over 95% of all AM Sheet Metal Parts sold in the United States and their anticompetitive conduct substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## THE MARKET FOR AM SHEET METAL PARTS

27.     There are over 225 million vehicles in the United States.  As vehicles age or are involved in collisions, they may require new parts.  The market for replacement parts, otherwise known as the "crash-parts market," is divided into three main areas: (1) original equipment manufacturer parts ("OEM parts"), which are often distributed through the auto manufacturers' own service channels and sold under their brand names, (2) used or refurbished OEM parts; and (3) aftermarket parts, which have the same specifications as OEM parts but are usually not manufactured by OEMs or sold with automaker certification.

28.     AM Sheet Metal Parts represent a significant portion of the entire aftermarket automotive "crash-parts market."  AM Sheet Metal Parts include, but are not limited to, hoods, bonnets, fenders, bumpers, doors, tailgates, roof panels, floor panels and reinforcement parts. AM Sheet Metal Parts prices are less expensive than OEM parts prices because aftermarket companies specialize in such parts and tend to redesign and make more cost efficient changes as compared to the OEM parts, resulting in cheaper prices.

29.     At all relevant times, AM Sheet Metal Parts market has been a highly concentrated oligopoly controlled by the named Defendants.  Defendants' AM Sheet Metal Parts comprise the vast majority (over 95%) of all AM Sheet Metal Parts sold in the United States. This high degree of concentration facilitated the anticompetitive conduct alleged herein because it is relatively easy for a limited group of sellers to reach agreement on output and prices and to monitor adherence to such illegal agreement.

## EVIDENCE OF DEFENDANTS' ILLEGAL CONDUCT

### A Market Highly Conducive to Conspiracy

30.     Beginning in at least 2003, Defendants and their co-conspirators—all of whom are purported horizontal competitors—devised an illegal conspiracy to artificially inflate or maintain prices for AM Sheet Metal Parts.  Defendants facilitated their anticompetitive conspiracy by: (1) creating and participating in anticompetitive joint "alliances" to develop tools

for making AM Sheet Metal Parts, to implement artificial barriers to entry by non-defendants, and to meet and discuss confidential market information, supply chain management and negotiation with customers; (2) engaging in secret meetings where they discussed and entered into illegal pricing and output agreements with each other such as agreeing to "floor prices" below which no Defendant would sell their Parts, agreeing to simultaneous price increases, to be falsely attributed to rising input costs, and enforcing penalties for Defendants that cheated on the agreements; and (3) forming a production arrangement, called the "Unified Tooling" program, to curtail competition for AM Sheet Metal Parts by agreeing to limit the number of Defendants producing Parts. All Defendants participated in the anticompetitive "alliances", meetings or production schemes.

31. An environment conducive to Defendants' conspiracy can be traced back almost 30 years, when many small companies in and around the southern Taiwan city of Tainan grew together to become major international AM Sheet Metal Parts manufacturers. Smaller manufacturers were acquired by Defendants, increasing the market concentration over time. For example, Defendant API acquired at least five AM Sheet Metal Parts manufacturers from 1986 to 2001 to become one of the largest manufacturers of AM Sheet Metal Parts. As a result, the market for AM Sheet Metal Parts in Taiwan became highly concentrated.

32. Today, Taiwan is the biggest and most important production base for AM Sheet Metal Parts in the world. The geographic concentration of a well-established cluster of AM Sheet Metal Parts manufacturers in the southern part of the island is highly conducive to an anticompetitive conspiracy. Raymond Wu, president of TYG, whose AM Sheet Metal Parts arm is Defendant TKY, explained in a 2003 Taiwan Economic News article how the Taiwanese aftermarket parts manufacturers clustering helps them to price in tandem to closely cooperate and "escape blood-shedding price competition":

> Now the world's strongest AM auto-parts production citadel, according to [Raymond] Wu, Taiwan comes close to monopolizing the global AM parts market and is largely able to escape any negative impact from foreign-exchange

fluctuations because almost all major makers in the AM sector are from Taiwan and thus their quotation bases move in tandem, providing strong pricing power.

Wu points out that most local major makers of AM auto parts in southern Taiwan's industry cluster have similar backgrounds. Their founding personnel were previously with traditional makers in the auto sector. They were focused on export sales right from the early years. They gradually expanded production scale with increased global demand, constantly upgrading their production techniques and finished-product quality, constantly accelerating and strengthening their product-development capabilities, and have also become engaged in OE parts supply to international automakers after gaining a solid foothold in the AM market. After about 30 years of strenuous efforts, Wu says, many small companies in and around the southern Taiwan city of Tainan have grown to become major international OE/AM parts suppliers.

[. . .]

Taiwan's AM-parts industry is also now implementing a more sophisticated international marketing strategy, moving away from exclusive reliance on low prices to attract customers. *In the past, Wu explains, most local AM-parts makers competed with one another by cutting prices no matter how strong the global demand was, to "steal" market share from each other, but now the situation has changed, makers have abandoned this approach, and the profit margins of major local AM-parts makers parallel or even outstrip those of high-tech product makers on the island.*

One of the best examples is Taiwan Kai Yih Industrial Co., Ltd., an affiliate of Tong Yang and one of the island's major AM sheet-metal body-parts makers. Kai Yih is a relative newcomer among major counterparts in Taiwan but ***the company skillfully utilizes Tong Yang Group's resources and advantages in mold/die development and closely cooperates with local counterparts to escape the blood-shedding price competition, thus achieving very high profitability***, Wu explains. [emphasis added]

33.     The anticompetitive production arrangement between TYG and Defendant TKY

was described in the same 2003 article as follows:

Wu Jun-ji, chairman of Ta Yih Group, was with Tong Yang earlier in his career before he stepped out of the group to set up one of the island's first motorcycle and auto-lamp factories. *With close ties with Tong Yang, Wu jun-ji insists that all of the affiliates in the Ta Yih Group only produce items that Tong Yang does not, to escape destructive in-group competition. With this tacit understanding between Ta Yih and Tong Yang,* Wu Jun-ji says, the two groups cooperate closely in joint marketing development by sharing marketing expenses and together offering a more comprehensive product line. (emphasis added).

## Anticompetitive Joint "Alliances"

34.     The ties between Defendants are strong.  Since at least 2003, Defendants set up what they call "cooperative initiatives" and "strategic alliances".  Defendants used their cooperative arrangements as opportunities to strengthen their control of the market to collude on AM Sheet Metal Parts and facilitated their conspiracy through these "alliances" with the purpose and effect of carrying out their illegal price-fixing and output scheme.  In fact, TYG said in a 2004 Taiwan Economic News article that, "*Tong Yang does not compete with its major rivals— all from Taiwan, but has been trying to form a strategic alliance to jointly develop the world's largest single market*."  Defendants' engagement in what they called "alliances" provided mechanisms to enter into conspiratorial agreements to jointly develop and market AM Sheet Metal Parts and exchange confidential pricing and output information to increase market power and raise profits.  Defendants' conspiracy worked.  Defendants make up 95% of the total American AM Sheet Metal Parts market and enjoy high profit margins.

35.     Defendants are or have previously been members in a variety of "alliances".  In July 2003, a "strategic alliance" was implemented encompassing Taiwan's major AM Sheet Metal Part manufacturers with the goal of artificially manipulating the U.S. market by restricting competition through joint mold and die development and confidential information exchange.  Alliance members include TYG and Defendants TKY,  Jui Li and Gordon.  By 2004, one Taiwanese auto parts maker claimed that the ratio of jointly developed molds and dies had risen to about 80% and was expected to surpass 90% if the level of cooperation continued to proceed smoothly.

36.     Defendant TKY president, Semon Chen, stated that the alliance partners agreed to develop and share about 80 sets of dies for AM Sheet Metal Parts, thus transforming, at least in part, their former competition into cooperation and expanding Taiwan's share of the global auto-parts market.  Before the alliance, Defendants manufactured these dies separately and competed for sales of the parts to the Class.  Defendant Jui Li's vice president, Lee Jun-de, admits that

makers of the alliance expected to assure a 20% or higher margin for their exports to the U.S. Defendant Gordon reported record high revenues in 2004 and 2005 due to the strategic alliance and its Vice President, Pan Ming-Hsiung, attributed the company's "lucrative" operations to the industrial alliance with other manufacturers in Taiwan, which "*effectively ended the price-cutting competition*."

37.     By 2005, this joint die and mold "alliance" was coined as the "Joint Die-Development Project." Gordon executive Sonny Pan admitted that his company had a development agreement with other Defendants, as opposed to competing with them; thus reducing capacity and choice to the U.S. market. Indeed, the investment expense was reduced to one-third, while profits increased and price competition was eliminated.

38.     These record high revenues were not enough for Defendants; they wanted more. Defendants Gordon, TKY, API and Jui Li formed a "Tooling Alliance" in April 2004, also called the "Unified Tooling" program. Defendants entered agreements that required them to invest a share of the cost of developing the tools used for pressing sheet metal parts. The average price of such tools range from $200,000 to $400,000. Defendants agreed further to stop competing with different tools and work out a production arrangement that ended competition and ensured pricing to customers would not fall below agreed levels. While these agreements were in effect, Defendants' profits were largely escalated. Defendant Gordon's profits rose from 15% to 27.75%. Defendant TKY's profits rose higher than 19%. In 2006 the "Tooling Alliance" agreement was renewed at Defendant Jui Li's suggestion and Defendants Gordon and TKY agreed, sharing the profit equally on more than 30 sets of tools.

39.     In October 2005, Defendants organized yet another "strategic alliance" to enhance cooperation and avoid "malicious" price-cutting competition. The alliance was organized to further strengthen Defendants' market information collection, supply-chain management, negotiating power with foreign customers, and to otherwise increase consolidation of international market power by Defendants. A sophisticated international marketing strategy,

away from exclusive reliance on low prices to attract customers, was implemented. Alliance members include Defendants TKY, Jui Li and API.

40.     In November of 2006, Defendants jointly set up a cooperative arrangement with Taiwan's steel maker, China Steel Corp. ("CSC"). Together, the Defendants and CSC planned to spend at least US$1.96 million in technology development and expected to increase the revenue generated from AM Sheet Metal Parts exports (but not necessarily the volume) by about US$210.84 million per year, for a total of over US$813 million per year. CSC technical vice president Chen Yu-song pointed out that the thrust behind the new alliance was to make their downstream customers (Defendants) more profitable and in turn trigger more purchases from CSC. Participants would experience upgraded engineering techniques and expedited development process, therefore limiting competition in the AM Sheet Metal Parts market. Alliance members include Defendants Gordon, API, TKY and Jui Li.

41.     Defendants facilitated their conspiracy through these alliances with the purpose and effect of illegally fixing output and setting prices among Defendants. Defendants used the alliances as opportunities to collude on AM Sheet Metal parts, especially those sold in the United States.

42.     During the time Defendants engaged in their cooperative arrangements, Defendants abandoned competing to take market share from one another through cutting prices and began cooperating with each other to illegally increase profits. Defendants exchanged confidential pricing information and mapped out comprehensive price fixing and output agreements, including limiting supply. Defendants did this because reducing supply increased Defendants' ability to inflate prices and increase their profit margins. *One Defendant manufacturer claimed that prior to 2003, most Taiwan manufacturers engaged in hard-fought price competition but this resulted in prices that were hardly above cost, and led to extremely thin profit margins. As a result, Defendants conspired to illegally set prices to increase profit.*

43.    Defendants' anticompetitive conduct continues today.  TYG, for example, lists "consolidate AM market through mergers and strategic alliances" as a "strategic direction" in a July 2009 company profile report.

### Conspiratorial Meetings

44.    Since at least 2003, Defendants met and agreed to increase prices simultaneously and limit output.  They did this by exchanging confidential pricing information and enforcing penalties for the Defendants that cheated on the agreements.  For example, in March 2004, Defendants agreed to institute a price hike for AM Sheet Metal Parts sold into the United States, the specific purpose of which was to increase Defendants' margins to 20% to 30%.  Defendants falsely attributed the rising prices to the rising cost of steel.

45.    Defendants also routinely met and agreed, since at least 2003, on a floor price at which they would sell AM Sheet Metal Parts to buyers in the U.S. and a floor price at which they would sell those same Parts to each other.  In order to enforce the price-fixing agreement, Defendants instituted penalties for any company that sold below those prices.

46.    Defendants conspired further to dramatically increase the prices of selected parts. These joint export price hikes were cleverly applied to parts that had the highest potential for competition because they were the products most likely to experience price erosion as a result of that competition.  Defendants raised prices by 5% to 15% for items that suffered weak competitiveness and produced with jointly developed molds and dies.  The increase for highly competitive items, such as doors, fenders and engine hoods, most of which the companies produced with their own molds and dies, were as high as 100%.

47.    In fact, Gordon's own financial statements suggest that the average selling price of its AM Sheet Metal Parts increased 106% during the class period.

48.    On March 13, 2008 in Taipei, Taiwan, Defendants met to discuss their joint pricing and compare their current prices with the prices from the last time they met.  At the meeting, Defendants agreed on prices among themselves along with their effective dates: "(i) the

new price applies to orders made after March 10(including); (ii) if orders are made between Feb 1 to March 9, but delivery date is after April 1 (including), the new price will also apply; (iii) if orders are made between Feb 1 to March 9 and delivery date is before March 31, the old price shall still apply. The new cost will be negotiated and fixed before March 25, [2008]."

49.     Defendants monitored adherence to their illegal agreements to enforce their agreement and avoid price-cutting competition. Defendants required involvement in a comprehensive production scheme, under which each company was assigned to produce parts for car models. The scheme was expected to push profit margins up to 30% from the current level of under 10% and raise prices for consumers.

### Unified Tooling Production Arrangement

50.     Defendants did not limit their artificial manipulation of the relevant market to price agreements. Defendants further effectuated their anticompetitive conspiracy by agreeing to limit capacity and reduce output of AM Sheet Metal Parts. Sonny Pan, president of Defendant Gordon, said that Defendants decided to rebuild the production and marketing order for Taiwan-made sheet metal parts sold in the U.S. and set up a similar production/marketing negotiation mechanism to avoid overlapped production.

51.     As mentioned earlier, Defendants created what is called the "Unified Tooling" program. Under this scheme, Defendants agreed to stop producing AM Sheet Metal Parts that competed with other Defendants to reduce capacity for those products in the relevant market. Instead, by idling some Defendants' tools and/or dies that produced certain AM Sheet Metal Parts, production of those Parts were limited to one or two of the producer Defendants. Thereafter, all orders from Plaintiffs and the Class members for any such product that was produced from "Unified Tooling" were filled with "Unified" Parts that were produced by only one or two of the Defendants.

52.     Defendants would provide a new pricing scheme for such "Unified" Parts.  When the parts became "Unified," their costs dramatically increased and all Defendants sold them at the same fixed price or price range.

53.     Defendants have admitted that prices for "Unified Tooling" parts would be much lower if they were allowed to compete against each other, but that they could not offer lower prices without violating the terms of the price fixing agreement with their competitors.

54.     The number of AM Sheet Metal Parts that fell under the "Unified Tooling" program increased exponentially during the Class Period, from a couple dozen early on to more than 1000 today.  This means that at least 20% of all AM Sheet Metal Parts with currently active SKUs sold in the United States fell under the "Unified Tooling" arrangement or program, and the number continues to rise.

55.     The intended effect of the "Unified Tooling" arrangement was to artificially manipulate the U.S. market for AM Sheet Metal Parts in order to reduce and/or eliminate competition and increase the prices for those Parts.

56.     The actual effect of the "Unified Tooling" arrangement or program on the prices of AM Sheet Metal Parts was profound; prices increased dramatically, by as much as three or four times the pre-Unified price, or more.  For example, a Chevy Cavalier fender that could be purchased from a Defendant for US$9 before it became "Unified" was US$42 after; a Ford Focus hood that was approximately US$63 before it became a "Unified Tooling" was over US$95 after.

57.     The goal of Defendants' conspiracy was to increase their profit margins by two to three-fold.  The conspiracy was successful.  Overall, prices for products that became part of the "Unified Tooling" program increased in price from 20% to 100% and profit margins increased during the Class Period as a result.

## The Conspiracy's Upward Affect on Revenue

58.     Defendants' adherence to their conspiracy had immediate and substantial results. The years leading up to the commencement of Defendants' conspiracy were met with severe competition in the AM Sheet Metal Parts market, eventually incentivizing them to fix prices and control output.   Perhaps most notable was a 1999 Illinois class action against State Farm insurance that had a dramatic effect on the aftermarket automotive parts market.   In 1999, a jury awarded plaintiffs over $1 billion in damages and punitive damages against State Farm for breaching contracts with policy holders when it required the use of non-original equipment parts, including AM Sheet Metal Parts, in the repair of vehicles damaged in crashes.   In the wake of this award, automotive insurance companies suspended the use of AM Sheet Metal Parts in their repairs.   The North America market for AM Parts dropped by about 40% in 2000, resulting in challenging times for Taiwan AM Part suppliers, including Defendants.

59.     In fact, in 2000, only 69% of automotive body repair shops in the United States reportedly used and installed AM Sheet Metal Parts.

60.     Accordingly, Defendants were motivated to coordinate and maintain their conspiracy because of its dramatic upward affect on revenues.   Defendants' revenues jumped considerably each year during their conspiracy.   As a result of the conspiracy, TKY saw a successive rise in sales, ranging from US$60.7 million in 2003 to US$156.7 million in 2005 to US$184 million in 2008—a 260% improvement with steady and significant annual increases. Defendants Gordon, Jui Li, and API saw similar sales growth during those years.

61.     TYG reported revenues from US$124.7 million for the first seven months of 2004, up 10.04% from the year before, a record high.   Defendants Gordon and TKY also reported record highs in 2004 as a result of the strategic alliance in joint die/development and product/marketing and sales.   For instance, Defendant TKY reported revenues of US$13 million in July alone and US$77.5 for the first seven months of 2004, up 42.81% and 17.4%, respectively, from the year before.

62.     In 2005, Defendant Gordon's revenues increased to US$83.6 million, a 300% increase from 2003.  By 2008, Defendant Gordon brought in revenue of US$100.5 million. Gordon attributed its increase in earning and revenue to its strategic alliance with its local counterparts.   Similarly, Defendant Jui Li saw its revenues go from US$48.4 million to US$126.2 million, another 260% improvement, over the same period.

63.     By 2008, 97% of automotive body repair shops in the United States reportedly used and installed AM Sheet Metal Parts.

### AM SHEET METAL PART MARKET CONDITIONS
### FURTHER SUPPORT A CONSPIRACY

### High Barriers to Entry

64.     There are significant barriers to entry in the market for AM Sheet Metal Parts that facilitated Defendants collusion as described herein.   These include: (a) established market positions of the incumbent Defendants; (b) collusive business culture among Taiwanese manufacturers of AM Sheet Metal Parts including Defendants; (c) substantial research and development costs; (d) development and maintenance of a robust distribution system; (e) investment in large tools and dies that can create or "stamp" sheet metal into proper product shapes; and (f) lower design costs based on Defendants' willingness to engage in acts of unfair competition related to patent, trade secret and other intellectual property infringement.

65.     Defendant Gordon vice president Sonny Pan stated that the aftermarket parts business requires large and continuous injections of cash into the development of molds and dies. TYG, which includes TKY itself, identified the AM Sheet Metal Parts industry as having a number of "High Entry Barriers" that make the relevant market extremely difficult for new entrants to penetrate. The entry barriers noted specifically by TYG in its 2006 company overview include:

- High capital costs: The cost of developing one tooling set is estimated to be around US$150,000 to US$180,000;

- Limited available capacity of tooling plants: It is therefore difficult for competitors to secure available tooling development capacity;

- Long development cycle for tooling sets: The average time required for developing one tooling set is established to be 6 months;

- Characteristics of small quantity but multi-type products supply: The ability to offer complete product line-up of collision parts is required to meet global demand of one-stop ordering;

- Quality certification system: CAPA & MQVP systems in North America; and

- Tooling accumulations: Major manufacturers in this industry have more than 20 years experience and have accumulated thousands of toolings.

66.     These substantial barriers to entry facilitated the conspiracy because they enabled Defendants to set supra-competitive prices without fear that new entrants would, or could, come into the market and undercut those prices.

67.     Even if a would-be competitor sought to enter the market, it could not survive because Defendants conspired to temporarily cut the prices of the competing parts sold by the new market entrant.  In addition, the need to obtain various quality certifications for AM Sheet Metal Parts makes it difficult for a would-be competitor with new products to compete.  Once the would-be competitor is sufficiently undercut and eliminated from the market, Defendants resume their conspiracy to artificially raise prices.

## Quality Certification

68.     The two certification systems in North America used by Defendants include CAPA and MQVP.  Statistics compiled by the Insurance Research Committee show that U.S. consumers are much more likely to use non-OEM parts if they bear marks showing CAPA or MQVP approval.  Some insurance companies require them.  Further, certification of AM Sheet Metal Parts is a challenge because it may ostensibly require even higher levels of quality and safety than is required for OEM parts; therefore, Defendants' obtaining of CAPA certification facilitated the maintenance of the illegal price-fixing scheme described herein, as it created further barriers to entry and limited competition.

69.     The Certified Automotive Parts Association ("CAPA") is a non-profit organization established to develop and oversee a test program guaranteeing the suitability and quality of automotive parts.   It ostensibly includes a detailed review and inspection of a participant's factory and manufacturing processes, followed by an analysis conducted by an independent testing laboratory.   The factory and parts continue to purportedly be subject to random inspection by CAPA to ensure quality standards.   All Defendants are participating manufacturers in the CAPA certification program and prominently display, advertise and promote their approval as CAPA-certified parts manufacturers.   In April 2009, Defendant Gordon was recognized by CAPA with an award for providing the U.S. market with the most CAPA parts in 2008.

70.     Manufacturers' Qualification and Validation Program ("MQVP") is another certification program for the quality and safety of non-OEM parts sold in the United States.   The program outlined policies and quality-management practices designed to ensure that repair parts are equal to original parts in form, function, durability and appearance.   Defendants TKY, Gordon Taiwan and Jui Li are participating manufacturers in the MQVP certification programs.

71.     These certification systems are another example of the many entry barriers into the AM Sheet Metal Parts market, which enabled Defendants to engage in their conspiracy without fear of competition from a new market player.

**A Highly Fungible Product**

72.     AM Sheet Metal Parts are a highly fungible product because the manufacturers offer essentially the same products for the same vehicles: hoods, fenders, bumpers, doors, etc. Specifically, AM Sheet Metal Parts are assigned interchangeable part numbers, whereby a single part number is assigned to a sheet metal product manufactured by several Defendants.   For example, when a customer orders a replacement part for a particular make and model of an automobile, the customer typically does not request a certain manufacturer or have a preference

whether the part comes from Defendant TKY, Gordon, API or Jui Li because all AM Sheet Metal Parts are seen as interchangeable by customers.

73.     Absent the alleged conspiracy, purchasers of AM Sheet Metal Parts would have selected a manufacturer based on price, and Defendants would have competed, as they did in the distant past, largely on price.  Price fixing is particularly effective in highly fungible markets for which adequate substitutes do not exist.

### Lack of Available Substitutes

74.     There are no reasonably interchangeable substitutes for AM Sheet Metal Parts. AM Sheet Metal Parts constitute a market distinct from parts supplied by third parties to vehicle manufacturers for incorporation into new vehicles, and also distinct from the market for OEM parts made by the manufacturers of automobiles, or for those manufacturers by third parties.

75.     AM Sheet Metal Parts prices are much lower than OEM part prices.  There is a significant difference in the wholesale price, often as large as 50%-100%, between an OEM part and a comparable AM Sheet Metal Part.  In fact, most insurance carriers who supply coverage for automobile collisions require automotive body shops to purchase and use aftermarket products on repairs paid for by the insurance carriers.  Nationwide Mutual Insurance Co., and Allstate Insurance Co. are two of the largest carriers that require the use of AM Sheet Metal Parts.  The Property and Casualty Insurers Association of American found that non-OEM parts save about $2.8 billion in insurance costs every year.  Accordingly, AM Sheet Metal Parts and OEM parts are not reasonably interchangeable substitutes from the point of view of the purchaser and are not in direct and substantial competition with each other.

76.     For these reasons, and others more fully set forth in this Complaint, the lack of reasonably interchangeable substitutes facilitated the conspiracy because it enabled Defendants to set supra-competitive prices without fear that customers would switch to other alternatives.

## Inelastic Demand

77.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.   Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.   Demand is said to be "inelastic" if an increase in the price of a product results in only a small, if any, decline in the quantity sold of that product.   Demand for AM Sheet Metal Parts is inelastic.   In other words, consumers have nowhere to turn for alternative, cheaper products of similar quality and so they continue to purchase AM Sheet Metal Parts despite a price increase.   As described in detail above and throughout this Complaint, customers for AM Sheet Metal Parts simply lack close substitutes.

78.     Inelastic demand for AM Sheet Metal Parts meant that it was profitable for the cartel to fix output and raise prices.

## DEFENDANTS' ANTITRUST VIOLATIONS

79.     Defendants are, and were at all relevant times, horizontal competitors at the manufacturing level.   Defendants sold and continue to sell their products directly to Plaintiffs and to Class members in the United States.   Defendants, individually and collectively, have conspired to fix the prices of, limit the output of, and artificially manipulate the market for AM Sheet Metal Parts throughout United States.

80.     Beginning at least as early as January 1, 2003 and continuing up to the present, Defendants and their co-conspirators combined and conspired to unreasonably restrain competition for AM Sheet Metal Parts sold in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

81.     The purpose and effect of Defendants' price fixing conspiracy has been to eliminate competition among and between themselves and to eliminate customer choice by establishing artificially high and noncompetitive prices for AM Sheet Metal Parts in the United

States. This price fixing agreement constitutes a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1) in that it eliminates competition and customer choice.

82. From at least January 1, 2003 through the present, Defendants engaged in extensive price fixing of AM Sheet Metal Parts. Defendants' unlawful conspiracy had the effect of, among other things, raising the prices of those products, reducing capacity and eliminating competitors from the market, thereby further restraining trade in the importation, distribution and sale of AM Sheet Metal Parts throughout the United States.

83. Defendants conspired and cooperated with each other during the Class Period to escape price competition in the AM Sheet Metal Parts market, thus achieving very high profitability.

84. Defendants' illegal scheme resulted in decreased supply and objectively calculable inflated prices to Plaintiffs and Class members in the United States. This result is the type of injury that the antitrust laws were designed to prevent.

## ANTICOMPETITIVE EFFECTS OF VIOLATION ON PLAINTIFFS AND THE CLASS

85. The conduct of Defendants described herein has produced antitrust injury, and unless restrained, will continue to produce the following anticompetitive effects, among others:

(a) Competition in the importation, distribution and sale of AM Sheet Metal Parts in the United States has been and continues to be substantially and unreasonably restricted, lessened, foreclosed and eliminated;

(b) barriers to entry into the production, distribution and sale of AM Sheet Metal Parts in the United States have been raised;

(c) prices for customers seeking AM Sheet Metal Parts in the United States have risen and will continue to do so;

(d) customers seeking AM Sheet Metal Parts in the United States are, and will be, deprived of choice with respect to price and vendor/manufacturer; and

(e)     the importation, distribution and sale of AM Sheet Metal Parts in the United States will continue to be artificially restrained.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

86.     Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

87.     Defendants falsely attributed the cause for the price increases as higher input costs, such as the costs of steel from sources in the U.S. and China, with the intention of concealing the true nature of their coordination.

88.     Neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were fixing prices or setting output.  Accordingly, Plaintiffs and Class members could not have discovered the violations alleged herein until shortly before filing this Complaint. Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

89.     Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed by, *inter alia*: (a) meeting secretly to discuss prices, customers and markets of AM Sheet Metal Parts sold in the United States and elsewhere; (b) using methods of communication in furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving pretextual reasons for price increases on AM Sheet Metal Parts; and (d) agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

90.     For example, Defendants repeatedly blamed increasing steel prices as a reason for increasing AM Sheet Metal Part prices.  The truth, however, was that the cost of sheet metal purchased by Defendants as an input for AM Sheet Metal Parts did not correspond to the

Defendants' price increases for AM Sheet Metal Parts. Defendants used steel prices as a subterfuge for the true reasons behind their price increases during the Class Period.

91.     Moreover, Defendants' other costs of production, like labor costs, fell during the Class Period.

92.     As a result of Defendants' and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class's claims have been tolled. Plaintiffs and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws. Plaintiffs could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

93.     Because the contract, combination, or conspiracy was kept secret by Defendants, Plaintiffs were unaware of the fact that prices of AM Sheet Metal Parts were secretly raised, fixed, maintained or stabilized as alleged herein.

94.     As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting the causes of action by Plaintiffs and the members of the Class.

## CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States, and its territories and possessions, that purchased AM Sheet Metal Parts directly from a Defendant between at least as early as January 1, 2003 and the present (the "Class Period"). This class excludes any judicial officer who is assigned to hear any aspect of this action, governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

96. Plaintiffs believe that there are at least hundreds of Class members as above described, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members in impracticable.

97. There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a) Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of AM Sheet Metal Parts and/or engaged in output restriction for those products sold in the United States, and its territories and possessions.

(b) The identity of the participants in the conspiracy;

(c) The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

(f) The effect of Defendants' conspiracy on the prices of AM Sheet Metal Parts sold in the United States and its territories and possessions during the Class Period; and

(g) The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

98. Plaintiffs are direct purchasers of AM Sheet Metal Parts and their interests are coincident with and not antagonistic to those of the other members of the Class. Plaintiffs are members of the Class, and have claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the Class. In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

99. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

100.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

101.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

102.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, and prosecution as a class action will eliminate the possibility of repetitious litigation.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## <u>CAUSE OF ACTION</u>

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1

103.     Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

104.     Beginning at least as early as January 1, 2003, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and stabilize prices for AM Sheet Metal Parts in the United States, and its territories and possessions, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

105.   The contract, combination and conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise and maintain, or stabilize prices for AM Sheet Metal Parts and engage in output restriction for those products in the United States, its territories and possessions.

106.   In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators unlawfully combined and conspired to, among other acts:

(a)   agree to charge prices at certain levels and otherwise to fix, increase, maintain and stabilize prices of AM Sheet Metal Parts;

(b)   agree to limit output of AM Sheet Metal Parts;

(b)   exchange information on prices and sales volumes;

(c)   implement and monitor the conspiracy among cartel members;

(d)   market AM Sheet Metal Parts as being available at the agreed upon prices; and

(e)   sell AM Sheet Metal Parts at the agreed-upon prices.

107.   The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreements to fix, maintain, raise and stabilize prices of AM Sheet Metal Parts and allocate the market for those products.

108.   The conspiracy had its intended effect, as Defendants benefited from their collusively-set price raises, as described herein.

109.   Defendants' unlawful conduct resulted in artificially high prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for AM Sheet Metal Parts.

110.   Plaintiffs and members of the Class paid more for AM Sheet Metal Parts than they would have paid in a competitive marketplace.

111.   Plaintiffs seek to recover for these overcharge damages.

112.   As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses

and property, in amounts which are presently undetermined. Plaintiffs' injuries consist of paying higher prices to purchase AM Sheet Metal Parts than would have been paid absent Defendants' conduct. Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray as follows:

A.     That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

C.     That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

D.     That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner:

(1)     continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)     communicating or causing a communication to any other person engaged in the manufacture, distribution or sale of any relevant product except to the extent necessary in connection with a bona fide sales transaction between the parties to such communications.

E.     That Plaintiffs and members of the Class have such other, further and different

relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

Dated:  August ___, 2011                              Respectfully submitted,

By:  s/ Jason S. Hartley
Jason S. Hartley
Jason M. Lindner
**STUEVE SIEGEL HANSON, LLP**
550 West C Street, Suite 610
San Diego, CA  92101
Telephone:     (619) 400-5822
Facsimile:      (619) 400-5832

Vincent J. Esades
Rachel L.B. Stoering
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Avenue
Minneapolis, MN  55403
Telephone:     (612) 338-4605

*Direct Purchaser Plaintiffs interim co lead counsel*

K. Scott Wagner (SBN 1004668)
**HALE & WAGNER, S.C.**
839 North Jefferson Street, Suite 400
Milwaukee, WI  53202
Telephone:     (414) 278-7000
Facsimile:      (414) 278-7590

*Direct Purchaser Plaintiffs interim liaison counsel*

Patrick J. Stueve
Eric L. Dirks
**STUEVE SIEGEL HANSON, LLP**
460 Nichols Road, Suite 200
Kansas City, MO  64112
Telephone:     (816) 714-7100
Facsimile:      (816) 714-7101

Joseph R. Saveri
Eric B. Fastiff
**LIEFF CABRASER HEIMANN &**
  **BERNSTEIN, LLP**
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA  94111-3339
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

Michael P. Lehmann
Jon T. King
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:    (415) 633-1908
Facsimile:    (415) 358-4980

Jason A. Zweig
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY  10022
Telephone:    (212) 687-1980
Facsimile:    (212) 687-7714

Bonny E. Sweeney
**COUGHLIN STOIA GELLER RUDMAN &**
  **ROBBINS, LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:    (619) 231-1058
Facsimile:    (619) 231-7423

Christopher M. Burke
**SCOTT + SCOTT LLP**
6424 Santa Monica Boulevard
Los Angeles, CA  90038
Telephone:    (213) 985-1274
Facsimile:    (213) 985-1278

Susan G. Kupfer
Joseph Barton
**GLANCY BINKOW & GOLDBERG LLP**
One Embarcadero Center, Suite 760
San Francisco, CA  94111
Telephone:    (415) 972-8160
Facsimile:    (415) 972-8166

Douglas A. Millen
**FREED KANNER LONDON & MILLEN**
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:      (224) 632-4500
Facsimile:      (224) 632-4521

**Attorneys for Plaintiffs**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 3, 2011, I electronically served the following documents:

- **SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR VIOLATION OF THE SHERMAN ACT**

on counsel for each party via the Court's Electronic Case Filing system.

Dated:  August 3, 2011

By: s/Jason S. Hartley
Jason S. Hartley
STUEVE SIEGEL HANSON LLP
550 West C Street, Suite 610
San Diego, CA 92101
**Telephone**:     (619) 400-5822
**Facsimile**:     (619) 400-5832
**Email**:  hartley@stuevesiegel.com