# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| FOND DU LAC BUMPER EXCHANGE INC., AND ROBERTS WHOLESALE BODY PARTS, INC. ON BEHALF OF ITSELF AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) ) | CASE NO.: 2:09-cv-00852-LA |
| PLAINTIFFS, | ) ) | |
| V. | ) ) | |
| JUI LI ENTERPRISE COMPANY LTD., ET AL., | ) ) ) | |
| DEFENDANTS. | ) ) ) | |

## EXPERT REPLY REPORT OF RUSSELL L. LAMB, Ph.D.

**Senior Vice President**
Nathan Associates Inc.
1777 North Kent St
Suite 1400
Arlington, VA 22209

November 24, 2015

# Table of Contents

I. Introduction and Conclusions.....................................................................................1

   *Background*.........................................................................................................1

   *Conclusions* ......................................................................................................4

II. Dr. Ordover Misconstrues the Allegations and My Assignment in This Case .................10

   *Dr. Ordover's understanding as to the nature of the alleged price-fixing conspiracy is incorrect*..................................................................................................10

III. Nothing in Dr. Ordover's Report Leads Me to Change My Conclusion That Common Evidence Demonstrates That the Alleged Misconduct Would Have Artificially Inflated Prices for AM Sheet Metal Parts..........................................................................12

   *Nothing in Dr. Ordover's Report contradicts my conclusion that AM Sheet Metal Parts are commodity products that are interchangeable across Defendants* ...........................12

   *Dr. Ordover does not dispute that there was static or declining demand for AM Sheet Metal Parts*..............................................................................................14

   *Common evidence demonstrates that the Defendants had excess capacity for the production of AM Sheet Metal Parts*......................................................................................15

   *My multiple regression analysis demonstrates that AM Sheet Metal Part prices were artificially inflated due to the alleged misconduct* ................................................15

IV. Nothing in Dr. Ordover's Report Leads Me to Change My Conclusion That Common Evidence Demonstrates That the Artificially-Inflated Prices That Arose as a Result of the Alleged Misconduct Were Paid by All, or Nearly All, Proposed Class Members ................16

   *Dr. Ordover misunderstands my conclusion regarding the existence of a pricing structure* ...16

   *Dr. Ordover's comparisons of AM Sheet Metal Parts subject to tooling agreements and parts not subject to tooling agreements are meaningless.* .................................................18

   *Dr. Ordover's approach of analyzing changes in residual prices is wrong as a matter of economics and econometrics* ........................................................................19

   *Dr. Ordover's correlation analysis of changes in residuals is flawed*......................21

   *Dr. Ordover's test of the effectiveness of the Defendants' price announcements in 2004 and 2008 is flawed*..................................................................................24

   *Customers could not have avoided paying artificially-inflated prices because Defendants had a dominant share of the market for AM Sheet Metal Parts* ........................................29

   *Dr. Ordover does not dispute that barriers to entry into the AM Sheet Metal Parts industry exist; his observations support my conclusion that significant barriers to entry facilitated successful collusion in this industry* ..................................................32

V. Nothing in Dr. Ordover's Report Leads Me to Change My Conclusion That Class-Wide Damages May be Measured Using Formulaic Methods .............................................33

   *Dr. Ordover wrongly claims that multiple regression analysis cannot be used to calculate class-wide damages* ......................................................................................33

   *It is inappropriate to add a time trend variable to my regression model*..................33

*The U.S. steel price is a reliable measure of material cost and the Taiwanese steel import price is highly correlated with the U.S. steel price* ....................................................................35

**VI. Conclusion**.................................................................................................................................36

# I. Introduction and Conclusions

*Background*

1.     I am the same Russel Lamb who previously filed an expert report concerning class certification issues in this matter ("Lamb Report"[1]), filed on July 14, 2015. I was deposed by Counsel for Defendants[2] on October 1, 2015.[3] A copy of my C.V., including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this Expert Reply Report as Appendix A.

2.     In the Lamb Report, I was asked to analyze whether all members of the proposed Class[4] would have been injured as a result of a price-fixing conspiracy for aftermarket automotive sheet metal parts ("AM Sheet Metal Parts")[5] such as the one alleged here. To perform my analysis, I considered (i) whether common evidence demonstrates that the alleged misconduct would have resulted in artificially-inflated prices in the market generally; and (ii) whether common evidence demonstrates that the artificially-inflated prices resulting from the alleged misconduct would have been paid by all, or nearly all, proposed Class members. I concluded that common evidence and methods demonstrate that the alleged misconduct inflated the prices for AM Sheet Metal Parts paid by all, or nearly all, members of the proposed Class above the level that would have prevailed but for the alleged misconduct. My conclusion was based on the following:

    a.  Common evidence demonstrating that AM Sheet Metal Parts are commodity products and the AM Sheet Metal Parts produced by different Defendants are

---

[1] Expert Report of Russell Lamb, July 14, 2015 (hereafter "Lamb Report").
[2] The Defendants in this matter include Taiwan Kai Yih Industrial Co. Ltd. ("TKY"); TYG Products, L.P. and Tong Yang Industry Co. Ltd. (collectively, "TYG"); Gordon Auto Body Parts ("Gordon"); Auto Parts Industrial Ltd. ("API"); Cornerstone Auto Parts, LLC ("Cornerstone"); and Jui Li Enterprise Inc. and Jui Li Enterprise Co. Ltd. ("Jui Li"). See United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange Inc. and Roberts Wholesale Body Parts, Inc. on Behalf of Themselves Others Similarly Situated, Plaintiffs, v. Jui Li Enterprise Company Ltd., et al., Defendants., Second Amended Class Action Complaint for Damages and Injunctive Relief for Violation of the Sherman Act, Case No. 2:09-CV-00852-LA, filed August 3, 2011 (hereafter "Complaint") at ¶¶13-18. I understand that Defendants TKY, TYG and Gordon have settled with Plaintiffs. Unless otherwise specified, when this report refers to Defendants, it includes both Defendants that have settled and Defendants that have not settled.
[3] Deposition of Russell L. Lamb, dated October 1, 2015 (hereafter "Lamb Deposition").
[4] I have been instructed by Counsel for Plaintiffs that Plaintiffs seek to certify the following proposed Class: All persons and entities in the United States, its territories and possessions, that purchased AM Sheet Metal Parts directly from a Defendant between at least as early as January 1, 2003 and September 4, 2009 (the "Class Period"). This class excludes any judicial officer who is assigned to hear any aspect of this action, governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.
[5] I understand that for the purposes of this litigation, "AM Sheet Metal Parts include, but are not limited to, hoods, doors, fenders, bonnets, floor panels, trunk assemblies, trunk lids, tailgates, roof panels, and reinforcement parts." See Complaint at ¶2.

interchangeable.[6] Common evidence demonstrates that because the AM Sheet Metal Parts produced by different Defendants were interchangeable, in the absence of the alleged misconduct, Defendants would have competed primarily on the basis of price, rather than non-price factors. This class-wide evidence shows that but for the alleged misconduct, prices for AM Sheet Metal Parts would have been lower than they actually were.

b. Evidence, common to the proposed Class as a whole, demonstrating that demand for AM Sheet Metal Parts was either declining or static during much of the proposed Class Period.[7] As a result, in the absence of the alleged misconduct, Defendants would have competed with each other on the basis of price in order to increase their sales of AM Sheet Metal Parts. This common evidence thus shows that given this heightened competition, in the absence of the alleged misconduct, prices for AM Sheet Metal Parts would have been lower than they actually were.

c. Evidence, common to the proposed Class as a whole, demonstrating that the Defendants had excess capacity for the production of AM Sheet Metal Parts.[8] Absent a cartel, the combination of excess capacity and flat or declining demand should lead to declining prices rather than the price increases that occurred during the proposed Class Period.

d. I also developed a multiple regression analysis, which is common to the proposed Class as a whole, demonstrating that prices for AM Sheet Metal Parts were artificially inflated above the prices that would have prevailed but for the alleged misconduct.[9] The results of my multiple regression analysis, especially the overcharge I measured, reflecting the artificial inflation of prices above what they would have been but for the alleged misconduct, indicate that proposed Class members were overcharged as a result of the alleged misconduct.

e. Evidence, common to the proposed Class as a whole, showing that pricing in this industry is not random, but rather that there is a pricing structure.[10] Where there

---

[6] Lamb Report at ¶¶8a, 25-31.
[7] Lamb Report at ¶¶8b, 32-39.
[8] Lamb Report at ¶¶8c, 40-42.
[9] Lamb Report at ¶¶8d, 43-46.
[10] Lamb Report at ¶¶8e, 47-55.

2

is a pricing structure, any factor (such as the alleged misconduct) which artificially inflates prices generally, would result in higher prices that are broadly experienced by purchasers. As a result, given the pricing structure, if there was a conspiracy to inflate prices in the market, the artificially-inflated prices for AM Sheet Metal Parts would have been paid by all, or nearly all, proposed Class members (i.e., no proposed Class member could have avoided the artificially inflated prices that arose as a result of the Defendants' alleged misconduct).

f.  Class-wide evidence showing that the market for AM Sheet Metal Parts is concentrated in the hands of the Defendants, and there is not a competitive fringe outside of the alleged Cartel that could have supplied AM Sheet Metal Parts in large enough quantities to allow purchasers to avoid the artificially-inflated prices.[11] This common evidence confirms my finding that proposed Class members would not have had sufficient bargaining power relative to Defendants to avoid the artificially-inflated prices that arose as a result of the Defendants' alleged misconduct.

g.  Evidence, common to the proposed Class as a whole, establishing that there are no available economic substitutes for AM Sheet Metal Parts in the marketplace.[12] This common evidence confirms my finding that proposed Class members would not have had sufficient bargaining power relative to Defendants to avoid the artificially-inflated prices that arose as a result of the Defendants' alleged misconduct.

h.  Evidence, common to the proposed Class as a whole, establishing that there are significant barriers to entry in the market for AM Sheet Metal Parts.[13] The existence of significant barriers to entry confirms my finding that proposed Class members would not have had sufficient bargaining power relative to Defendants to avoid the artificially-inflated prices that arose as a result of the Defendants' alleged misconduct.

---

[11] Lamb Report at ¶¶8f, 56-61.
[12] Lamb Report at ¶¶8g, 62-71.
[13] Lamb Report at ¶¶8h, 72-78.

3.      In addition, I determined that that there is a formulaic method based on standard econometric techniques available to measure overcharges suffered by proposed Class members as a result of the alleged misconduct.[14] I implemented multiple regression analysis, based on the evidence available to date, to measure, on a preliminary basis, the amount by which proposed Class members were overcharged on their purchases of AM Sheet Metal Parts manufactured, produced, or supplied by the Defendants.  This measure of the overcharge (17.54 percent) represents the difference between what proposed Class members actually paid during the proposed Class Period and what they would have paid in a market free from the alleged misconduct, holding all other factors constant.

4.      Since preparing the Lamb Report, I have been asked by Counsel for Plaintiffs to review the expert report submitted by Dr. Janusz Ordover ("Ordover Report"[15]).  In particular, I was asked to consider Dr. Ordover's criticisms of the Lamb Report in order to determine if anything in the Ordover Report would cause me to change my conclusions.  I was asked to prepare this Expert Reply Report, which responds to the Ordover Report. Attached as Appendix B is a list of the additional materials relied upon that were not listed in Appendix B to the Lamb Report.  A complete list of the materials I have relied upon in forming my opinions is contained in Appendix B.

*Conclusions*

5.      Based on my review of the Ordover Report and Dr. Ordover's deposition testimony,[16] and the further analyses and research into the market for AM Sheet Metal Parts I undertook as part of my response to Dr. Ordover's opinions, as well as my training and experience in economics and econometrics, I  have reaffirmed the conclusions set forth in the Lamb Report.

6.      In particular, I have evaluated Dr. Ordover's opinions of my analysis and have concluded the following:

a.  Based on a review of the Ordover Report and Dr. Ordover's deposition testimony, it is evident that Dr. Ordover has a fundamental misunderstanding about both the allegations in this case and the analysis that I performed in the Lamb Report.  Dr. Ordover misconstrues the allegations as limited to tooling agreements on select

---

[14] Lamb Report at ¶80.
[15] Expert Report of Janusz Ordover, October 13, 2015 (hereafter "Ordover Report").
[16] Deposition of Janusz A. Ordover, dated November 9, 2015 (hereafter "Ordover Deposition").

parts and discrete agreements to raise prices in 2004 and 2008.[17] In so doing, Dr. Ordover spends considerable effort attempting to disprove a strawman that a conspiracy that was narrowly focused on specific products or on specific time periods would necessarily result in impact for all products and all time periods. While I demonstrated in the Lamb Report that all, or nearly all, proposed Class members would have been impacted by the price-fixing conspiracy alleged by Plaintiffs, Dr. Ordover never evaluates the conspiracy as alleged by Plaintiffs. Therefore, he has no rebuttal to my conclusions that the alleged price-fixing conspiracy, if proven to be true, would result in artificially-inflated prices paid by all, or nearly all, proposed Class members.

b. Nothing in the Ordover Report leads me to change my conclusion that common evidence demonstrates that the alleged misconduct would have artificially inflated prices for AM Sheet Metal Parts.

    i. Dr. Ordover's conclusions regarding the lack of interchangeability across AM Sheet Metal Parts with different Partslink numbers[18] are based on his faulty understanding of the alleged conspiracy and are, therefore, irrelevant. Dr. Ordover does not deny that AM Sheet Metal Parts are commodity products that are interchangeable for a given Partslink number and CAPA certification.[19]

    ii. In the Lamb Report, I concluded that the static or declining demand for AM Sheet Metal Parts that occurred during the proposed Class Period increased the likelihood that the alleged conspiracy would succeed. Dr. Ordover ignores my conclusions regarding demand and does not dispute that there was static or declining demand for AM Sheet Metal Parts.

    iii. In the Lamb Report, I concluded that there was excess capacity for the production of AM Sheet Metal Parts and that this excess capacity would, absent the alleged collusion, contribute to downward price pressure. Dr.

---

[17] Ordover Report at ¶¶12-15, Footnote 6.
[18] Ordover Report at ¶13a. "universal parts numbering system for the identification of aftermarket collision replacement parts." See http://partslink.org.
[19] Ordover Deposition at 88:23-89:13. CAPA is a certification establishing objective, measurable quality standards and specifications. See www.capacertified.org/about-capa/what-we-certify-2/.

5

Ordover admitted at his deposition that he has done no analysis of whether there was excess capacity.[20] Furthermore, Dr. Ordover is wrong as a matter of economics on the role that excess capacity would play in a competitive environment absent the alleged conspiracy.

iv.  The results of the multiple regression analysis I presented in the Lamb Report demonstrate that prices for AM Sheet Metal Parts were artificially inflated compared to what they would have been but for the alleged misconduct. Incorporating Dr. Ordover's only modification to my analysis, the improper inclusion of a trend variable (to address assumed cost reductions which were unsubstantiated by any data whatsoever), still produces a positive and statistically significant overcharge coefficient.

c.  Nothing in the Ordover Report leads me to change my conclusion that common evidence demonstrates that the artificially-inflated prices that arose as a result of the alleged misconduct were paid by all, or nearly all, proposed Class members.

i.  Dr. Ordover demonstrates a fundamental misunderstanding of my conclusion regarding the existence of pricing structure. In the Lamb Report, I concluded that the AM Sheet Metal Parts industry exhibits a pricing structure in which an external force, such as the alleged misconduct, that artificially inflates prices generally, is likely to raise prices to all members of the proposed Class.[21] Dr. Ordover mischaracterizes my analysis as a "two-step" process in which the Defendants' alleged misconduct first impacted a subset of products and was then "propagated" to a broader set of products.[22] Furthermore, Dr. Ordover is wrong in asserting that the allegations require me to establish that there is a correlation among prices across AM Sheet Metal Parts (that is, that the price of a fender, for example, is correlated with the price of a tailgate).[23]

---

[20] Ordover Deposition at 91:19-22.
[21] Lamb Report at ¶45.
[22] Ordover Deposition at 41:1-18.
[23] Ordover Report Footnote 5.

6

ii.  All of Dr. Ordover's analyses comparing AM Sheet Metal Parts subject to tooling agreements and AM Sheet Metal Parts not subject to tooling agreements are meaningless.[24] These analyses focus on whether an overcharge on a specific part is "propagated" to all other parts. Because the allegations in this case are for a broad-based conspiracy, my assignment was not to examine the effect of a part-specific agreement.

iii.  Dr. Ordover's approach of basing his analyses on changes in so-called "residual prices"[25] rather than examining actual prices is unreliable and wrong as a matter of economics and econometrics. Furthermore, in addition to being conceptually wrong, Dr. Ordover makes several mathematical errors in his calculation of residual prices.

iv.  Dr. Ordover's correlation analyses are fundamentally flawed. Dr. Ordover wrongly analyzes correlations of changes in his flawed measure of residual prices rather than correlations of actual prices.[26] The prices that proposed Class members paid for AM Sheet Metal Parts are in fact highly correlated. In addition, there is a high correlation between prices charged across manufacturers of AM Sheet Metal Parts with the same Partslink number.

v.  Dr. Ordover's "tests" of whether the 2004 and 2008 price increase announcements resulted in impact are flawed. First, Dr. Ordover analyzes changes in residual prices instead of changes in prices. Because Dr. Ordover misunderstands the allegations in this case, he wrongly concludes that for the alleged conspiracy to have been effective, the overcharge would have had to have increased after these price increase announcements. On the contrary, the 2004 and 2008 announcements are evidence of the broader conspiracy over the entire proposed Class Period alleged by Plaintiffs such that there is no particular reason to expect these events to be associated with increases in the Class Period overcharge. Moreover, Dr. Ordover's residual prices are not a proper measure of the

---

[24] Ordover Report at ¶¶25-30.
[25] Ordover Report at ¶¶42-47; Ordover Deposition at 101:24-117:15.
[26] Ordover Report at ¶¶49-50, 55; Ordover Deposition at 110:21-111: 2.

overcharge. Second, proof of conspiracy does not require actual prices to increase during the proposed Class period. The proper comparison is between actual prices and the prices that would have existed but for the alleged misconduct. Nevertheless, a proper analysis of prices around the 2004 and 2008 events demonstrates that there are indeed widespread increases in prices.

vi. While Dr. Ordover claims to estimate product-specific and customer-specific overcharges after making "slight modifications" to my model, the regression that he runs produces coefficients with no economic meaning and which cannot be considered estimates of the overcharge.[27] Thus, these coefficients have no relevance to the question of whether all, or nearly all, proposed Class Members were impacted by the alleged conspiracy. Dr. Ordover's additional conclusion that his analysis demonstrates that the overcharge is not constant across customers and products is based on his misapplication of the F-Test.[28]

vii. In the Lamb Report, I concluded that one piece of evidence that proposed Class members could not have avoided paying the artificially-inflated prices is that the Defendants had a dominant share of the market for AM Sheet Metal Parts.[29] Nothing in Dr. Ordover's report or testimony causes me to change my opinion. Dr. Ordover does not dispute that the Defendants dominate the production of AM Sheet Metal Parts.[30] Moreover, Dr. Ordover's claim that Original Equipment Manufacturer ("OEM") parts are economic substitutes for AM Sheet Metal Parts[31] is wrong as a matter of economics.

viii. In the Lamb Report, I demonstrated that barriers to entry in the AM Sheet Metal market were one factor that prevented customers from avoiding the

---

[27] Ordover Report at ¶¶69-74.
[28] Ordover Report, p. 47, Footnote 84.
[29] Lamb Report at ¶¶56-61.
[30] Ordover Report at Footnote 9i.
[31] Ordover Report, p. 10, Footnote 9ii.

8

impact of price increases.  Dr. Ordover does not dispute the presence of barriers to entry and, in fact, provides further support for my conclusion.[32]

d.  Nothing in the Ordover Report leads me to change my conclusion that class-wide damages may be measured using formulaic methods.

    i.  Dr. Ordover wrongly claims that my multiple regression analysis cannot be used to calculate class-wide damages because of what he claims are variations across customer and product-specific overcharges.[33]  The presence of a pricing structure, in combination with the common evidence summarized above, means that all, or nearly all, customers would have paid higher prices.  Dr. Ordover's analysis incorrectly concludes that there is variation in the overcharge.  Furthermore, it is well-accepted, even by the sources that Dr. Ordover relies on in his report, that multiple regression analysis can be used to calculate aggregate damages.[34]

    ii.  Dr. Ordover does not properly justify the inclusion of a trend variable in the model.  While Dr. Ordover claims that the trend variable is controlling for an increase in productive efficiency,[35] my review of actual data on Taiwanese Labor Productivity reveals that no such trend exists.

    iii.  Dr. Ordover's criticism of my reliance on U.S. steel prices as a cost variable is misguided.  While Dr. Ordover argues that the price Defendants paid to China Steel Corporation would have been a more appropriate cost variable,[36] he provides no evidence that this steel cost measure would change any of my conclusions if it were available.  Furthermore, Dr. Ordover ignores the fact that the high correlation between U.S. and Taiwanese steel prices indicate that U.S. steel prices are a reliable cost measure to include in my multiple regression analysis.

---

[32] See Ordover Report, p, 52, Footnote 93.
[33] Ordover Report at ¶¶64-68.
[34] Ordover Report at ¶65.
[35] Ordover Report at ¶¶77-79.
[36] Ordover Report at ¶81.

## II. Dr. Ordover Misconstrues the Allegations and My Assignment in This Case

7. Dr. Ordover consistently misrepresents both the Plaintiffs' allegations concerning the Defendants' conduct that is alleged to have resulted in artificially-inflated prices and my assignment in this case.[37]

*Dr. Ordover's understanding as to the nature of the alleged price-fixing conspiracy is incorrect*

8. In the Second Amended Complaint, Plaintiffs allege that Defendants engaged in anticompetitive collusive behavior to artificially inflate or maintain prices for AM Sheet Metal Parts.[38] The Complaint describes an alleged conspiracy that began in at least 2003 and applied generally to all AM Sheet Metal Parts.[39] As I stated in the Lamb Report, for purposes of determining injury and impact, I assumed that the allegations described in the Complaint are true. I did not, however, assume that the allegations resulted in injury to all members of the proposed Class. Instead of properly assuming that the price-fixing conspiracy alleged to have been in place throughout the Class Period for all AM Sheet Metal Parts actually occurred, Dr. Ordover assumes "that Defendant manufacturers of AM Sheet Metal Parts jointly agreed **at some points during the Class Period** to elevate prices **of some parts** to direct purchasers."[40] Specifically, Dr. Ordover assumes that the conspiracy was limited to (1) two discrete events where Defendants agreed to increase prices and (2) explicit agreements ("tooling agreements") that restricted output and fixed prices of certain AM Sheet Metal Parts.[41] Each of these assumptions contradicts the overall nature of the conspiracy as alleged in the Complaint and results in conclusions that are baseless and irrelevant to the issue at hand.[42] Dr. Ordover limits his analysis to the tooling agreements and two discrete events: one that occurred in March/April

---

[37] Ordover Report at ¶¶4,16-17; Ordover Deposition at 41:4-18, 61:23-62:16.

[38] Complaint at ¶3.

[39] Complaint at ¶¶30-35. See also, United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange, Inc. and Roberts Wholesale Body Parts, Inc. on Behalf of Themselves Others Similarly Situated, Plaintiffs, v. Jui Li Enterprise Company Ltd., et al., Defendants, Memorandum in Support of Direct Purchaser Plaintiffs' Motion for Class Certification, Case No. 2:09-CV-00852-LA, July 14, 2015 (hereafter "Plaintiffs' Memorandum"), p. 12.

[40] Ordover Report at ¶4 (emphasis added).

[41] Ordover Report at ¶¶2.a and 2.b.

[42] The Complaint states that Defendants *"facilitated* their anticompetitive conspiracy" by creating tooling alliances, meeting to establish price floors and penalties, and restricting output through the Unified Tooling program. See Complaint at ¶30 (emphasis added). See also, Plaintiffs' Memorandum, p. 12.

of 2004 ("2004 event") and one that occurred in March of 2008 ("2008 event").[43] Although Dr. Ordover acknowledged at his deposition that the allegations are not limited to the 2004 and 2008 events, he limits his analysis to these specific events.[44] Viewed properly, these events are evidence of the Defendants' coordinated pricing and are examples of the price-fixing conspiracy that is alleged to have occurred throughout the Class Period. Dr. Ordover's failure to evaluate the entirety of the price-fixing allegations results in improper conclusions regarding common impact.

9.      Dr. Ordover makes similar restrictive assumptions with respect to the effect of the Defendants' allegedly anticompetitive tooling agreements on the market for AM Sheet Metal Parts. It is my understanding that the Defendants entered into tooling agreements that restricted output by designating certain manufacturers to be the sole producers of a particular AM Sheet Metal Part.[45] These agreements are another example of the type of coordination that facilitated Defendants' alleged collusion to maintain artificially-inflated prices. Dr. Ordover erroneously assumes that the parts subject to the tooling agreements are the only parts directly targeted by the alleged conspiracy. The Ordover Report incorrectly states, without citation, that "Plaintiffs claim that these discrete tooling agreements impacted all or virtually all purchases by all or virtually all class members…"[46] On the contrary, although the discrete tooling agreements apply to specific AM Sheet Metal Parts, the Complaint identifies a broad pattern of cooperation among the Defendants.[47]

10.     Dr. Ordover incorrectly claimed at his deposition that I undertook a "two-step process" whereby I first concluded "that there was harm in some parts or some customers" before concluding "that these kind of effects would spread or propagate throughout all the customer base or distributor base."[48] I did not perform any analysis resembling the two-step process portrayed by Dr. Ordover. Instead, the two-step process described in the Lamb Report consists of first, determining whether prices paid by proposed Class members were artificially inflated due to the alleged conspiracy, and, second, examining whether these inflated prices were widespread across Class members. Nowhere in the Lamb Report or my deposition testimony did

---

[43] Ordover Report at ¶2; Ordover Deposition at 64:4-10.
[44] Ordover Deposition at 84:5-14.
[45] Complaint at ¶51.
[46] Ordover Report at ¶16.
[47] Complaint at ¶¶30-35.
[48] Ordover Deposition at 41:1-18.

11

I claim that the alleged conspiracy was limited to certain parts or certain customers. Because the alleged conspiracy covered all customers and all products, Dr. Ordover is wrong that it is necessary to show that the tooling agreements artificially raised prices on certain parts that were subject to the tooling agreement and that these artificially-increased prices caused prices of all other parts to rise.[49] Dr. Ordover's flawed conclusions arise from his fundamental misunderstanding that the alleged misconduct is limited to the joint tooling agreements and the 2004 and 2008 price increases, as opposed to a broad agreement to fix prices, as contained in Plaintiffs' Complaint.

### III. Nothing in Dr. Ordover's Report Leads Me to Change My Conclusion That Common Evidence Demonstrates That the Alleged Misconduct Would Have Artificially Inflated Prices for AM Sheet Metal Parts

11.     After reviewing the Ordover Report and Dr. Ordover's deposition testimony, I have confirmed my opinion that common evidence demonstrates that the alleged misconduct elevated prices for AM Sheet Metal Parts. My opinion is based on my determination that AM Sheet Metal Parts are commodity products that are interchangeable, that the industry is characterized by declining demand, that there is excess capacity in this industry, and on the results of my multiple regression analysis, indicating that, absent the alleged conspiracy, AM Sheet Metal Part prices would have been lower than the actual prices paid by members of the proposed Class. Dr. Ordover does not dispute any of these conclusions. In fact, the Ordover Report presents additional evidence, in the form of multiple regression analysis, demonstrating that prices were artificially inflated as a result of the Defendants' allegedly anticompetitive conduct.[50]

*Nothing in Dr. Ordover's Report contradicts my conclusion that AM Sheet Metal Parts are commodity products that are interchangeable across Defendants*

12.     Dr. Ordover does not deny that AM Sheet Metal Parts are commodity products that are interchangeable for a given Partslink number and CAPA certification. Dr. Ordover's conclusions regarding the lack of interchangeability across different Partslink numbers are meaningless.

---

[49] Ordover Report at ¶16.
[50] Ordover Report at ¶79.

Case 2:09-cv-00852-LA     Filed 11/25/15     Page 16 of 67     Document 813-1

13.     Economists refer to a product as a "commodity" when it is uniform in quality with little brand differentiation. In a competitive environment, commodity products are more likely to be subject to significant price competition because manufacturers are unable to distinguish their products or compete on other attributes. As I explained in the Lamb Report, the commodity nature of AM Sheet Metal Parts makes the existence of the alleged misconduct more likely.[51] Although Dr. Ordover accepts my definition of the AM Sheet Metal Parts at issue in this case and acknowledges that, using this definition, AM Sheet Metal Parts are interchangeable, he claims that parts "are heterogeneous and not generally substitutable from the standpoint of users."[52] This contradiction appears to be related to Dr. Ordover's misunderstanding of the nature of the alleged conspiracy and his incorrect interpretation of interchangeability.

14.     AM Sheet Metal Parts are designed to replace an original automotive part that was damaged or destroyed due to collision or use. Each product must conform to precise specifications that correspond to the OEM part that was originally contained in the vehicle. As I explained in the Lamb Report, the Partslink program created by manufacturers of AM Sheet Metal Parts provides a universal numbering system that identifies each replacement part as being compatible with the original part.[53] All parts that are identified by the same Partslink number, regardless of the manufacturer, are interchangeable and are designed to fit a particular vehicle's make, model and year. Since Dr. Ordover adopted my definition of an AM Sheet Metal Part that is based on a unique Partslink specification, an AM Sheet Metal Part must, by definition, be fully interchangeable across manufacturers.[54] Dr. Ordover's insistence that parts are heterogeneous and not interchangeable refers to the obvious fact that AM Sheet Metal Parts, while interchangeable within a Partslink specification, are not homogeneous across product categories. As the Ordover Report notes "[f]enders are not substitutes for tailgates and neither are substitutes for hoods...."[55] Contrary to Dr. Ordover's assertion, substitutability across product categories is not relevant because, as explained above, the Defendants are alleged to have engaged in a conspiracy to elevate prices over all parts.

---

[51] Lamb Report at ¶25.
[52] Ordover Report at ¶10, Footnote 20.
[53] Lamb Report at ¶¶15-16.
[54] Two products with the same Partslink number could differ if one is CAPA certified and one is not. Both Dr. Ordover and I account for CAPA certification in defining a particular AM Sheet Metal Part. See Ordover Report, p. 18, Footnote 26.
[55] Ordover Report, ¶ 13.a.

13

15.     Another point of agreement between the Lamb Report and Dr. Ordover's report that illustrates how AM Sheet Metal Parts are an interchangeable commodity is the degree to which Defendants purchased parts from each other. In the Lamb Report, I explained how branding is not part of the AM Sheet Metal Parts industry and that Defendants often purchased parts from each other.[56] Dr. Ordover also indicates that Defendants considered parts to be interchangeable when he describes how tooling agreements allowed Defendants to purchase parts from each other and sell them under their own label.[57]

16.     In the Lamb Report, I presented additional evidence that manufacturers' brands are not relevant to consumers' purchasing decisions and that products with the same Partslink number are easily interchangeable. Industry reports and the Defendants' own documentation refer to AM Sheet Metal Parts as indistinguishable products with no brand recognition.[58] Dr. Ordover does not deny this evidence or dispute the conclusion I drew from it.

*Dr. Ordover does not dispute that there was static or declining demand for AM Sheet Metal Parts*

17.     In an industry in which demand for a commodity product is static or declining, competitive forces put downward pressure on prices as firms compete to "steal" market share in order to increase or maintain sales. As I explained in the Lamb Report, static demand also enables firms to monitor a price-fixing or output restricting agreement since cheating in the form of increasing production and sales by one firm is lost sales to another.[59] In the Lamb Report I concluded that demand for AM Sheet Metal Parts was stable or declining during the proposed Class Period.[60] This conclusion is consistent with both industry analyst reports and evidence from Defendants' statements that lament the "ever-narrowing present demand" with "flat or slight downturn in sales."[61]

18.     As I explained in the Lamb Report, there is substantial evidence that the AM Sheet Metal Parts industry possesses characteristics of a mature industry.[62] In a mature industry, new distribution channels that might allow firms to increase sales have been exhausted and firms

---

[56] Lamb Report at ¶¶28, 30.
[57] Ordover Report, p. 20, Footnote 34.
[58] Lamb Report at ¶28. A document produced by API noted that an industry marketing practice "delivers the message that all Taiwan manufactured parts are the same." See Cornerstone0000061-77 at 65.
[59] Lamb Report at ¶33.
[60] Lamb Report at ¶¶33-39.
[61] Lamb Report at ¶35.
[62] Lamb Report at ¶¶37-39.

facing weak demand typically capture market share through price competition.[63] Dr. Ordover does not contest my conclusion that the AM Sheet Metal Parts industry is mature and that demand for AM Sheet Metal Parts was stable or declining during the proposed Class Period. Dr. Ordover also does not dispute that these industry characteristics "are conducive to an effective cartel."[64]

*Common evidence demonstrates that the Defendants had excess capacity for the production of AM Sheet Metal Parts*

19.     As I explained in the Lamb Report, excess capacity in a competitive market for a commodity product puts downward pressure on price as manufacturers would attempt to increase their sales by lowering prices.[65] In his report, Dr. Ordover claims to need empirical support for this economic principle.[66] Dr. Ordover is wrong as a matter of economics on the role that excess capacity plays in a competitive market.[67] In addition, Dr. Ordover ignores the evidence I cited in support of my conclusion that the AM Sheet Metal Parts industry has excess capacity and he admits that he done no analysis of capacity in the industry.[68] Dr. Ordover's claim that there is no empirical support for the effect that excess capacity has on prices or the existence of excess capacity in the AM Sheet Metal Parts industry is unfounded.[69]

*My multiple regression analysis demonstrates that AM Sheet Metal Part prices were artificially inflated due to the alleged misconduct*

20.     In the Lamb Report, I explained how my multiple regression analysis demonstrates that the alleged conspiracy artificially inflated AM Sheet Metal Part prices.[70] Dr. Ordover's only modification to my multiple regression model, the improper inclusion of a trend variable, which he defends using inaccurate anecdotal evidence of decreasing labor costs, still results in a positive and statistically significant estimate of the overcharge.[71] Thus, even taking Dr. Ordover's modification at face value, my conclusion stands that multiple regression analysis is

---

[63] Lamb Report at ¶37; Philip Kotler and Kevin Lane Keller, Marketing Management, Fourteenth Edition, Prentice Hall, 2012 , p. 313.
[64] Ordover Report at ¶12.
[65] Lamb Report at ¶40.
[66] Ordover Report at Footnote 9iii.
[67] Robert Pindyck and Daniel Rubinfeld, Microeconomics, Sixth Edition, Pearson Prentice Hall, 2005, pp. 588-589.
[68] Ordover Deposition at 91:19-22
[69] See Lamb Report at ¶¶40-42.
[70] Lamb Report at ¶80-88.
[71] Ordover Deposition at 80:19-81:12.

evidence, common to the Class as a whole, which demonstrates that prices were artificially inflated as a result of the alleged misconduct. In Section V below, I respond to Dr. Ordover's specific criticisms of my multiple regression model and explain that the econometric model that I put forth is well-specified and that regression analysis is an appropriate and well-accepted method used to estimate class-wide damages.

21.     In a non-collusive market, especially where the product is a commodity, economic theory predicts that stable or declining demand and excess production capacity should lead to decreasing prices. Instead, as demonstrated by my multiple regression analysis and corroborated by Dr. Ordover in his report, the Defendants' alleged anticompetitive conduct resulted in a statistically significant overcharge, after controlling for market factors unrelated to the conspiracy.

## IV. Nothing in Dr. Ordover's Report Leads Me to Change My Conclusion That Common Evidence Demonstrates That the Artificially-Inflated Prices That Arose as a Result of the Alleged Misconduct Were Paid by All, or Nearly All, Proposed Class Members

22.     There is nothing in the Ordover Report that causes me to change my conclusion that the supra-competitive prices resulting from the alleged misconduct were paid by all, or nearly all, proposed Class members. Dr. Ordover's criticisms of my analysis are misguided because he fundamentally mischaracterizes the allegations, presents fundamentally flawed and mathematically incorrect correlation analyses, and analyzes the economic substitutability between AM Sheet Metal Parts and OEM parts in a way that is both incomplete and speculative.

*Dr. Ordover misunderstands my conclusion regarding the existence of a pricing structure*

23.     I explained in the Lamb Report that the existence of a pricing structure in a market means that the prices paid by different purchasers for the same product from a single seller, or for the same product from different sellers, tend to move together over time.[72] In the Lamb Report, I presented an analysis illustrating how prices for the top 20 AM Sheet Metal Parts paid by the top 10 customers move together over time.[73] Dr. Ordover's conclusion that prices for different AM Sheet Metal Parts are not always highly correlated is meaningless. Furthermore, Dr. Ordover's

---

[72] Lamb Report at ¶47.
[73] Lamb Report at ¶54, Appendices C1-C20.

correlation analysis is based on changes in residual prices rather than actual prices, which makes his analysis incapable of determining whether actual prices move together over time. A correlation analysis of actual prices demonstrates that prices paid by different purchasers for the same product from a single seller, or for the same product from different sellers, do exhibit high correlations.

24.     Evidence supporting my conclusion regarding the existence of a pricing structure was not limited to the pricing charts included in Appendix C of the Lamb Report.[74] I further explained that in a market with common demand and supply factors, such as the market for AM Sheet Metal Parts, there is likely to be a structure to prices such that any force that artificially raises the price for a given product generally, above what that price would have been in the absence of such force, would result in all, or nearly all, purchasers of that product paying a higher price than they otherwise would have paid.[75] I explained that the interchangeability of AM Sheet Metal Parts within the same Partslink number and CAPA certification status means that AM Sheet Metal Parts would have been impacted by demand forces in a common manner.[76] Also, I explained that supply factors are the same across Defendants and that there is evidence that the prices Defendants set to U.S. customers were based primarily on raw material costs and the exchange rate.[77]

25.     In the Lamb Report, I also explained how the Defendants' use of OEM prices as a reference point in setting prices for AM Sheet Metal Parts is consistent with the existence of a pricing structure. For example, Joseph Yang of TKY and Richard Wang of Gordon each testified that they typically set prices for AM Sheet Metal Products at levels that are 20 percent to 30 percent of OEM part prices.[78] Dr. Ordover ignores this evidence and claims that the extent to which the prices of individual AM Sheet Metal Parts are tied to OEM prices is irrelevant to whether or not there is a pricing structure.[79] Dr. Ordover reasons that if the OEM prices of various sheet metal parts are not correlated, then the AM Sheet Metal Part prices will be similarly uncorrelated.[80] However, if Defendants use a percentage of the corresponding OEM

---

[74] Lamb Report at ¶¶48-53.
[75] Lamb Report at ¶¶48-50.
[76] Lamb Report at ¶¶27-30, 49.
[77] Lamb Report at ¶50.
[78] 30(b)(6) Deposition of Richard Wang, February 17, 2012 at 154:18-155:2; 30(b)(6) Deposition of Joseph Yang, February 16, 2012 at 124:1-125:10.
[79] Ordover Report at ¶36.
[80] Ordover Report at ¶36.

17

price as a reference point for all AM Sheet Metal Parts, any increase in this reference point resulting from the alleged conspiracy would affect all AM Sheet Metal Parts.

26. Dr. Ordover claims that prices are individually negotiated, which he argues is inconsistent with the existence of a pricing structure.[81] However, Dr. Ordover ignores the evidence I presented in the Lamb Report indicating that such negotiations involve the use of reference pricing. The use of reference pricing in customer negotiations leads to prices that move together over time across customers even if there are differences in the levels of prices.[82] It is widely recognized that when prices are negotiated based on a reference price, and the reference price is artificially inflated by anticompetitive conduct, the prices paid by customers are higher than they otherwise would have been.

27. Dr. Ordover incorrectly bases his pricing structure analysis on so-called "residual prices" instead of analyzing actual prices. As I explain below, Dr. Ordover's analysis of residual prices is fundamentally flawed as a matter of economics and econometrics. Dr. Ordover attempts to justify replacing actual prices with residual prices when analyzing pricing structure by arguing that it is necessary to remove common market factors and analyze only the portion of price that cannot be explained by common market forces. However, Dr. Ordover's removal of common market factors demonstrates a fundamental misunderstanding of my conclusion regarding pricing structure.

*Dr. Ordover's comparisons of AM Sheet Metal Parts subject to tooling agreements and parts not subject to tooling agreements are meaningless.*

28. At his deposition, Dr. Ordover admitted that his "main interest" in completing his assignment was to analyze the effects of the tooling agreements.[83] Dr. Ordover claims that Plaintiffs' allege that discrete tooling agreements impacted all, or virtually all, purchases from all, or virtually all, customers.[84] In fact, Dr. Ordover apparently thinks that my analysis was designed to show that "narrowly focused" anticompetitive harm on certain AM Sheet Metal Parts was "propagated" to all other AM Sheet Metal Parts.[85] As a result of Dr. Ordover's misunderstanding, much of his report evaluates whether artificially-inflated prices that were a

---

[81] Ordover Report at ¶54.
[82] Lamb Report at ¶53.
[83] Ordover Deposition at 30:8-31:2.
[84] Ordover Report at ¶16.
[85] Ordover Deposition at 76:23-77:13.

18

result of the tooling agreements would cause prices for products not subject to the tooling agreements to also be artificially inflated. However, Dr. Ordover's analysis is irrelevant for determining whether the alleged conspiracy would impact all, or nearly all, proposed Class members. The alleged misconduct was not limited to the tooling agreements. Instead, the alleged misconduct included a broad-based conspiracy over the entire proposed Class period. The existence of tooling agreements are just one factor, as stated in the Complaint, that "facilitated [Defendants'] anticompetitive conspiracy."[86] There is no reason to expect the alleged conspiracy to affect only, or even primarily, parts that were subject to tooling agreements and Dr. Ordover has provided no empirical analysis to suggest otherwise.

*Dr. Ordover's approach of analyzing changes in residual prices is wrong as a matter of economics and econometrics*

29.     Instead of analyzing changes in actual prices, Dr. Ordover analyzes changes in "unexplained" prices (i.e., prices that cannot be explained by competitive market forces), which he calls "residual prices."[87] Dr. Ordover claimed that his residual prices consist of two terms: the conspiracy term and the residual term of the regression model ("regression residual").[88] The regression residual is the difference between the observed value of the dependent variable and the value predicted using the estimated regression model.[89] Dr. Ordover incorrectly suggests that his residual prices need to be highly correlated in order for the alleged misconduct to result in common impact.[90]

30.     Dr. Ordover is effectively treating residual prices as a measure of transaction-specific overcharges because he considers whether there was an increase in the residual price as evidence of whether there was an impact from the allegedly anticompetitive conduct.[91] However, Dr. Ordover's residual price is not an estimate of individual overcharge. Rather, it is a flawed, artificial measure that Dr. Ordover constructs for which Dr. Ordover provides no valid economic justification. Every estimated regression model has a residual, which reflects factors that may

---

[86] Complaint at ¶30.
[87] Ordover Report at ¶42.
[88] Ordover Deposition at 110:15-20, 100:10-17, 101:24-102:15.
[89] Anderson, Sweeney, Williams, Camm, and Cochran, *Essentials of Statistics for Business and Economics*, Cengage Learning, 2015, 7th ed., p. 572. Fumio Hayashi, Econometrics, Princeton University Press, 2011, p. 15-18. Peter Kennedy, *A Guide to Econometrics*, The MIT Press, 5th ed., 2003, p. 12.
[90] Ordover Report at ¶42.
[91] Ordover Report at ¶60.

impact prices but are unobserved or unobservable.[92] The regression residual excludes the portion of price that can be explained by the supply and demand factors, the customer and product fixed effects, as well as the conspiracy variable in my regression model. Because the regression residual excludes the conspiracy variable, there is no reason to expect that the regression residual has anything to do with the overcharge as opposed to other factors that cannot be explained by a well-specified regression model. At his deposition, Dr. Ordover appeared to acknowledge that changes in the residual price do not reflect changes in the overcharge, stating that "the overcharge may be increasing or some other facts may be going on as well at the same time, we just don't know because there is the residual that we don't explain."[93] Dr. Ordover has provided *no* support from peer reviewed economics or econometrics literature for using either the magnitude of changes in residual prices or correlations of changes in residual prices to evaluate the impact on prices from anticompetitive activity.

31.     If Dr. Ordover had successfully removed the common factors from his residual prices, the correlation in residual prices would be determined by the correlation in the regression residual term.[94] It is inappropriate to evaluate correlations of the regression residual to assess the existence of a pricing structure in the AM Sheet Metal Parts market or any other market because there is no reason as a matter of econometrics to expect there to be a high correlation on the element of price that cannot be explained by a model. At his deposition, Dr. Ordover claimed that the reason he used residual prices instead of actual prices is because he wanted to "avoid the problem of spurious correlation."[95] However, Dr. Ordover misuses the concept of spurious correlation. A correlation could be considered spurious if two prices moved together despite not having a true economic relationship.[96] But Dr. Ordover's conclusion that the prices of AM Sheet Metal Parts would be correlated because of common market factors means by definition that the relationship is not spurious. Dr. Ordover's correlation analysis based on changes in residual prices is incorrect as a matter of economics and econometrics and renders the results of his residual price correlation analyses meaningless.

---

[92] William Greene, *Econometric Analysis*, 6th ed., Prentice Hall, 2003, p. 9; Mittelhammer, Judge and Miller, *Econometric Foundations*, Cambridge University Press, 2000, p. 36.
[93] Ordover Deposition at 135:20-136:2.
[94] Because Dr. Ordover's residual prices do not actually remove common factors, the correlation in the residual prices depends on more than just the regression residual. See Appendix C for details on the technical errors that Dr. Ordover made in his calculation of residual prices.
[95] Ordover Deposition at 107:25-108:6.
[96] Macfie, Brian P. and Philip Nufrio, Applied Statistics for Public Policy, M.E. Sharpe, 2006, p. 412.

32.     Dr. Ordover also includes exhibits purportedly demonstrating "considerable" heterogeneity in residual price movements across categories of AM Sheet Metal Parts.[97] These exhibits are meaningless because they are based on irrelevant residual prices and are comparisons across different AM Sheet Metal Parts. However, even taken at face value, the exhibits lead to the opposite of Dr. Ordover's conclusion. For example, Ordover Exhibit 3B shows that a majority of the residual prices of AM Sheet Metal fenders moved in the same direction as the average residual price change of fenders.[98] Likewise, Ordover Exhibit 4 shows that a majority of residual prices for products not subject to tooling agreements moved in the same direction as the average residual price change of products that were subject to tooling agreements.[99]

33.     Dr. Ordover's approach of basing his analyses on changes in so-called "residual prices" rather than examining actual prices is unreliable and wrong as a matter of economics and econometrics.

*Dr. Ordover's correlation analysis of changes in residuals is flawed*

34.     Dr. Ordover claims that there is little correlation between changes in prices paid by customers for the top 20 AM Sheet Metal Parts. However, Dr. Ordover did not examine actual prices of AM Sheet Metal Parts in his analysis. Instead, Dr. Ordover bases his conclusion on his unreliable examination of changes in residual prices.

35.     I demonstrate the errors in Dr. Ordover's analysis by conducting a form of scientific experiment called a simulation study. Specifically, I created datasets that contain prices for two hypothetical products (i.e., product A and product B). These prices are created using a regression equation containing a demand variable, a cost variable, a conspiracy indicator, and an error term.[100] In this data generating process, the demand, cost, and conspiracy variables have the

---

[97] Ordover Report at ¶¶43-46, Exhibit 3B and Exhibit 4.
[98] Exhibit 3B reports that 44 percent of fender residual prices were either unchanged or moved in the opposite direction of the average residual price change of hoods so 56 percent $(100 - 44)$ of fender residual prices moved in tandem with the average residual price change of hoods.
[99] Exhibit 4 reports that 45 percent of residual prices of parts not subject to tooling agreements were either unchanged or moved in the opposite direction of the average residual price change of parts subject to tooling agreements so 55 percent $(100 - 45)$ of residual prices of parts not subject to tooling agreements moved in tandem with the average residual price change of parts subject to tooling agreements.
[100] Specifically, I generated panel data sets using the formula
$lnP = 0.21 \cdot \ln D + 0.14 \cdot \ln C + 0.15 \cdot Conspiracy + \varepsilon$. The random error term for each product is simulated using a random normal distribution that has mean zero and variance $\sigma^2$. For each product, I simulated prices for 480 transactions, and I assigned 240 of these transactions to be in the conspiracy period. I simulated the dataset 100

same impact on the prices of product A and product B; the only difference between the two prices is due to the random error term that captures the unobserved market factors. By design, there is a common conspiracy effect on the two products as well as common supply and demand effects. If Dr. Ordover's conclusions were right, the correlation between the changes in the residual prices would be higher than 0.8. But this is not the case. My simulation results in Figure 1 below indicate that the correlation coefficients of changes in the residual prices are small. The value of a simulation experiment is that it allows me to control the behavior of the data analyzed in order to highlight the errors in Dr. Ordover's flawed and unreliable analysis. Even though the data used in the simulation experiment is created to ensure pricing structure exists and there is a common impact of the conspiracy, there is not high correlation (by Dr. Ordover's standard) between the changes in residual prices during the Class Period. [101] Dr. Ordover's correlation of changes in residual price is always low, as one would expect.

36.    Even the correlation of actual prices will not necessarily be high by Dr. Ordover's standard. The results in Figure 1 show that the correlation between the two prices decreases as the variance of the error term increases. When the variance is small, e.g., lower than 0.001, the price correlation can be higher than 0.8, which Dr. Ordover says is a "high" correlation[102]; when the variance increases to 0.005, the price correlation can drop to below 0.5.

**Figure 1: Correlation of Prices and Changes in Residual Prices in a Simulated Dataset**

| Variance ($\sigma^2$) of the error term | Correlation Coefficient of Actual Prices | Correlation Coefficient of Dr. Ordover's Residual Prices |
|---|---|---|
| 0.0005 | 0.9038 | 0.1541 |
| 0.001 | 0.8252 | 0.0836 |
| 0.0025 | 0.6455 | 0.0213 |
| 0.005 | 0.4808 | 0.0239 |

The simulation uses 100 datasets for each variance level. The correlation coefficients are averages over those 100 simulated datasets. The correlation coefficients are for the 240 class-period observations only.

---

times each for four levels of variance: 0.0005, 0.001, 0.0025, and 0.005. The signal-to-noise ratios I calculated for these four levels of variance were 21.7307, 10.8653, 4.3461, and 2.1731, respectively.

[101] In Dr. Ordover's calculations of correlation coefficients, he incorrectly did not limit his analysis to the Class Period. There would be some degree of correlation in residual prices just as a result of moving from the class period where the conspiracy variable takes on a value of one to the benchmark period where the conspiracy variable takes on a value of zero.

[102] Dr. Ordover's standard for a high correlation is incorrect. Dr. Ordover justifies his standard on whether one price can accurately predict another price. However, my conclusion regarding pricing structure is not that one price can predict another price. Rather, it is that prices tend to move together over time.

22

37.     As discussed above, Dr. Ordover's residual price is an improper and unscientific measure for purposes of assessing the existence of a pricing structure in the AM Sheet Metal Parts market. I have recalculated the correlation coefficients for the top 20 AM Sheet Metal Parts by replacing Dr. Ordover's changes in residual prices with actual prices. As shown in Figure 2 below, after correcting for Dr. Ordover's conceptual error, I find that there are high correlations between prices paid by customers for the top 20 AM Sheet Metal Parts.

**Figure 2: There is Significant Correlation Between Prices Paid by Customers for Top 20 AMSM Products**

| Correlations between All Customers of Top 20 Parts | Monthly Prices | Quarterly Prices |
|---|---|---|
| Fraction of Correlation Coefficients more than 0.8 | 37% | 55% |
| Fraction of Correlation Coefficients more than 0.7 | 52% | 70% |
| Fraction of Correlation Coefficients more than 0.5 | 77% | 91% |

Like Dr. Ordover, I only calculate correlation coefficients for average monthly prices between two customers for a product if the number of overlapping months equaled 30 or more.

38.     I understand Defendants have argued that LKQ/Keystone is unlike other purchasers of AM Sheet Metal Parts due to its size and its business relationships with the Defendants.[103] However, I have compared pricing for LKQ/Keystone and the average prices for other proposed Class members and find that the prices paid by LKQ/Keystone move together with the prices paid by other proposed Class members. Specifically, for each AM Sheet Metal Parts purchased by LKQ/Keystone, I calculated the correlation coefficients between monthly LKQ/Keystone prices and the average price paid by all other proposed Class members. For products where there were at least 30 overlapping months, I found that 77 percent of these correlation coefficients are higher than 0.5, 52 percent are higher than 0.7, and 37 percent are higher than 0.8. These correlation coefficients demonstrate that regardless of any market power held by LKQ/Keystone, the prices LKQ/Keystone paid for AM Sheet Metal Parts were influenced by the same factors as the prices paid by proposed Class members.

39.     It is not necessary to demonstrate that there is a correlation across products in order to reach the conclusion that there is a pricing structure that would lead to impact for all, or nearly all, proposed Class members if the alleged misconduct occurred. Dr. Ordover's insistence on

---

[103] United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange Inc. and Roberts Wholesale Body Parts, Inc. on Behalf of Themselves Others Similarly Situated, Plaintiffs, v. Jui Li Enterprise Company Ltd., et at., Defendants., Defendants Auto Parts Industrial Ltd., Cornerstone Auto Parts, LLC And Jui Li Enterprise Company, Ltd's Memorandum In Opposition To Direct Purchaser Plaintiffs' Motion For Class Certification, (Case No. 2:09-CV-00852-LA) filed October 13, 2015.

23

examining correlations across products is based on his misunderstanding of my assignment, which he incorrectly thinks is to examine whether the impact on a subset of products would "propagate" to other products. Therefore, all of Dr. Ordover's correlation analyses comparing AM Sheet Metal Parts with different Partslink numbers are irrelevant.[104]

40.     In the Lamb Report, I demonstrated that for a given Partslink number, the prices for AM Sheet Metal Parts sold by the Defendants move together. In Figure 3 below, I calculate correlation coefficients using actual prices, rather than Dr. Ordover's improper measure of changes in residual prices, and find that the correlations are high.

**Figure 3: There is Significant Correlation Between Prices Charged by Defendants for Top 20 AM Sheet Metal Products**

| Correlations between All Defendants of Top 20 Parts | Monthly Prices | Quarterly Prices |
|---|---|---|
| Fraction of Correlation Coefficients more than 0.8 | 54% | 64% |
| Fraction of Correlation Coefficients more than 0.7 | 74% | 71% |
| Fraction of Correlation Coefficients more than 0.5 | 88% | 86% |

Like Dr. Ordover, I only calculate correlation coefficients for average monthly prices between two Defendants for a product if the number of overlapping months equaled 30 or more.

*Dr. Ordover's test of the effectiveness of the Defendants' price announcements in 2004 and 2008 is flawed*

41.     Despite Plaintiffs' allegation that Defendants met repeatedly to discuss and coordinate pricing,[105] Dr. Ordover specifically examines only two events: the agreement made among the Defendants in March/April of 2004 to raise prices by 20 percent to 30 percent and the agreement made in March of 2008 to implement another across-the-board price increase. Dr. Ordover's conclusions are based on his incorrect understanding that other than the tooling agreements, the alleged conspiracy is restricted to two discrete events and his application of an erroneous standard by which to measure antitrust injury.

42.     Antitrust injury is measure of the difference between the actual price (which is alleged to have been artificially inflated) and the price that would have existed but for the alleged misconduct. It is not necessary for actual transaction prices, which Dr. Ordover did not even examine, to have increased following the 2004 and 2008 events. While a price increase announcement can serve to raise transaction prices, announcements can also be used to prevent

---

[104] See Ordover Report at Exhibits 5-7.
[105] See Complaint at ¶44 and Plaintiffs' Memorandum, pp. 3, 8-11.

prices from declining or to even slow the rate of decline that would have happened but-for the announcement. Price announcements are also used as a means of communicating among Defendants. They can signal price-stabilization efforts such that prices are higher than they would be without such coordinated action or serve as a reminder that the conspiracy is in effect and defectors will be punished. Concluding that there is no class-wise impact because actual (or residual) prices did not respond is naive at best or deliberately misleading.

43. Finally, I would not expect AM Sheet Metal Part prices to increase during the economic downturn of 2007 and 2008 even if the Defendants were conspiring to fix prices. It is highly likely that the effects of the conspiracy during the Great Recession allowed Defendants to stabilize prices or moderate the rate of decline.

44. While it is not necessary to find that there were actual price increases following the 2004 and 2008 events to reach a conclusion that all, or nearly all, customers were impacted, I have examined actual prices and found that the vast majority of customers purchasing the same product before and after the events paid a price increase. Specifically, for each combination of customer and AM Sheet Metal Part, I calculated the average price in the month preceding the event and in the six months following the event. As shown in Figure 4 below, in 2004, of all of the customers that purchased the same AM Sheet Metal Parts before and after the event, only two of them did not have at least one product where the average price was higher after the event. Likewise, in 2008, only seven customers that purchased the same AM Sheet Metal Parts before and after the event did not have at least one product where the average price was higher after the event.

**Figure 4: Count of Customers Experiencing a Price Increase on at Least One Product**

| Change in Price | March 2004 | | March 2008 | |
|---|---|---|---|---|
| | Count | Share of Customers | Count | Share of Customers |
| Increase | 63 | 97% | 94 | 93% |
| No Increase | 2 | 3% | 7 | 7% |

The average price of a given customer-product combination in March of 2004 or 2008 compared to the average price of the same customer-product combination over the following 180 days.

45. Dr. Ordover incorrectly evaluates the effectiveness of the 2004 and 2008 events using residual prices. Dr. Ordover observes that "residual" prices for many AM Sheet Metal Parts

either fell or did not change in the months following the 2004 and 2008 events and concludes that the alleged conspiracy therefore could not have had a class-wide impact.[106] According to Dr. Ordover, if the 2004 and 2008 events were "successful" they would have resulted in increased residual prices which Dr. Ordover conflates with increased overcharges. It is inaccurate to interpret residual prices of my regression as a measure of the overcharge. Rather, the estimated overcharge of my regression is determined by the coefficient on the conspiracy variable. The regression residual term represents the portion of price that is not captured by the variables included in my multiple regression analysis and there is no reason to expect that this unexplained portion of price is a measure of the effect of the alleged misconduct. In addition, because the alleged misconduct is not limited to the 2004 and 2008 events, there is no particular reason to expect the overcharge to increase following these events. Furthermore, according to the Complaint, the Defendants specifically attributed the planned price hike in the 2004 event to the increased cost of steel.[107] Since a steel price index is included in my regression, the residual price (by design) ignores this effect and provides an inaccurate measure of the conspiracy's effect. Dr. Ordover's conclusions are fundamentally flawed and misleading. Nothing about his analysis of residual prices following the Defendants' price announcements in 2004 and 2008 changes my opinion concerning class-wide impact.

*Customer-specific and product-specific overcharges are wrong as a matter of econometrics*

46.     Dr. Ordover presents a series of regression analyses in which he estimates what he calls customer-specific and product-specific overcharges.[108] Dr. Ordover claims that he demonstrated a lack of common impact because not all of his estimated coefficients are positive and statistically significant.[109] Dr. Ordover is wrong that my regression model assumed "that the alleged conduct impacted all or nearly all purchases by all or nearly all members of the class."[110] The purpose of my regression analysis is two-fold. First, the regression analysis provides evidence that the alleged misconduct had the effect of artificially raising prices generally. Second, the regression analysis provides a formulaic method of estimating damages on a class-

---

[106] Ordover Report at ¶¶58-60.
[107] Complaint at ¶44.
[108] Ordover Report at ¶¶68-69; Dr. Ordover claims that his methodology is recognized in "the economics literature" as a way to test for common impact. However, Dr. Ordover's only citation is an article in the *George Mason Law Review*. See Ordover Report ¶68; Cremieux, Pierre, Ian Simmons, and Edward A. Snyder, "Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis," *George Mason Law Review*, 2010, Vol. 17, No 4, pp. 939-967.
[109] Ordover Report at ¶69.
[110] Ordover Report at ¶66.

wide basis. It is not necessary for all products and all customers to have identical overcharges for the regression analysis to be used for these purposes. After I established through the regression analysis and other evidence common to the Class that the alleged misconduct resulted in artificially inflated prices generally, I concluded, through evidence common to the Class, that the alleged misconduct would have impacted all, or nearly all, proposed Class members. This common evidence included the existence of a pricing structure; the Defendants' dominant share of AM Sheet Metal Part sales, the barriers to entry; and lack of economic substitutes. Thus, only Dr. Ordover is attempting to use regression analysis as a way to prove whether the conspiracy affected each part and each customer.

47.     Dr. Ordover's regression analysis is incapable of determining whether all products or all customers are overcharged because the coefficients he estimates cannot properly be considered measures of the overcharge. In his deposition, Dr. Ordover admits that he does not consider the overcharge coefficients that are estimated by his modified regressions to be reliable estimates of overcharge.[111] If Dr. Ordover's coefficients are not reliable estimates of product-specific or customer-specific overcharge, then they cannot be used to determine whether all or nearly all products were impacted by the alleged misconduct, or more importantly, whether all, or nearly all, proposed Class members were impacted by the alleged misconduct.

48.     Without properly controlling for customer-specific or product-specific demand, it is not possible for Dr. Ordover to obtain a well-specified estimate of customer-specific or product-specific overcharges.[112] I understand that In Re: Air Cargo, the Court rejected a similar analysis put forth by the Defendants' expert whose individual customer overcharge coefficients were deemed unreliable estimates of the overcharge for any individual customer. As the magistrate judge stated, because the Defendants' expert's models "pair globally-specified coefficients with specific or local subsets of data, these regressions are fundamentally misspecified."[113] Dr. Ordover's analysis suffers from the same fundamental flaw. The demand variable in my regression is a monthly measure of automobile crashes.[114] Automobile crashes is an appropriate demand variable to measure demand for AM Sheet Metal Parts as a whole but it is not an

---

[111] Ordover Deposition at 155:8-19, 158:13-23.
[112] Dr. Ordover's individual product and customer overcharge coefficients are also flawed because he improperly adds a trend variable.
[113] United States District Court Eastern District of New York, In Re Air Cargo Shipping Services Antitrust Litigation, MDL No. 1775, Report and Recommendation, Pohorelsky M.J., October 14, 2015, p. 28.
[114] Lamb Report at ¶94.

appropriate measure of demand variable for any specific AM Sheet Metal Part or for any specific customer of AM Sheet Metal Parts. For example, to attempt to use regression analysis to determine the overcharge of a specific AM Sheet Metal Part, the demand variable should reflect the crashes for the specific make and model of automobile of the AM Sheet Metal Part. As further evidence that the coefficients that Dr. Ordover estimates cannot be considered reliable estimates of the overcharge, I note that Dr. Ordover finds individual customer overcharges as low as -120 percent which would mean that but-for prices would have been 120 percent more than actual price[115] Any suggestion that but-for the alleged conspiracy an individual customer would have been paying more than double the price actually paid is absurd and demonstrates that the Dr. Ordover's coefficients are not measuring the effect of the conspiracy.

49.     Dr. Ordover's methodology of testing whether all or virtually all customers have positive and statistically significant overcharge coefficients based on an exercise of interacting the overcharge coefficient and customer fixed effects is unreasonable and would lead to a conclusion that there is no common impact in almost every instance. In his deposition, Dr. Ordover claims that the analysis of calculating individual customer overcharge coefficients and finding all or virtually all of them to be positive and statistically significant is "the gold standard" for a finding of common impact and should be implemented whenever there is sufficient data. Dr. Ordover admits that he does this analysis whenever he can and does not recall ever performing an analysis that meets his "gold standard."[116]

*Dr. Ordover improperly relies on a misapplication of the F-Test*

50.     Dr. Ordover conducted a statistical test that he claims rejects the proposition that all products had identical overcharges.[117] Similarly, he claims that a statistical test rejects the proposition that all customers had identical overcharges.[118] Dr. Ordover's statistical tests are flawed and do not provide meaningful information to the question of whether all or nearly all class members were impacted by the alleged misconduct.

---

[115] Backup to Ordover Report, Exhibit 10. The individual customer is Unicity Import & Export Corp ("Unicity"). A review of Unicity's transactions reveals that all of its Class period transactions took place during an approximate three month window from April 10, 2007 to July 11, 2007 and that Unicity did not have more than three Class period transactions for any individual AM Sheet Metal Part. This lack of sufficient data is another reason that Dr. Ordover's analysis cannot provide reliable estimates of individual customer overcharges.
[116] Ordover Deposition at 159:7-161:15.
[117] Ordover Report, p. 43, Footnote 73.
[118] Ordover Report, p. 47, Footnote 84.

51.    Dr. Ordover misstates the conclusions of his F-tests in his report.[119] While the F-statistic may be an appropriate test statistic to compare two models under certain conditions and in certain contexts, one should take care to draw the right conclusions from conducting such a test. The F-test used by Dr. Ordover is a joint hypothesis test.[120] In a regression model, one can test a hypothesis on a single regression coefficient to determine whether that coefficient is equal to a specified value.[121] Similarly, instead of testing a hypothesis involving a single coefficient, we can test hypotheses about more than one coefficient in a multiple regression model. In the present context, the relevant joint hypothesis that Dr. Ordover tests is that the coefficients on each of the interacted variables are all statistically equivalent. However, the F-test does not shed any light on how many of these restrictions failed or which specific restriction(s) failed.

52.    It is easy to determine the exact number of restrictions tested by Dr. Ordover in each of his F-tests. There are 2,462 product overcharge coefficients (i.e., the coefficients on 2,462 interactions between the overcharge variable and product fixed-effect variables) that are restricted to be equal.    However, the F-test does not tell us which of these coefficients differed or by what amount. In other words, even if the coefficient is equal for 2,461 products and different for just *one* product, the F-statistic might still reject the hypothesis of equal coefficients. Similarly there are 126 restrictions that are simultaneously tested for Dr. Ordover's customer coefficient F-Test. Thus, even if the coefficient is equal for 125 customers and different for just *one* customer, the F-Statistic might still reject the hypothesis of equal coefficients.

*Customers could not have avoided paying artificially-inflated prices because Defendants had a dominant share of the market for AM Sheet Metal Parts*

53.    Coordinated behavior among firms to maintain supra-competitive prices is easier when, as is the case for AM Sheet Metal Parts, the industry is dominated by a few firms. Evidence provided in the Lamb Report indicates that 95 percent of all U.S. sales of AM Sheet Metal Parts are from manufacturers from Taiwan.[122] Dr. Ordover does not dispute this conclusion. Furthermore, Defendant Jui Li reports that U.S. customers were concerned about "monopoly by the four [defendant] companies."[123] Dr. Ordover does not dispute this evidence nor does he

---

[119] Ordover Report, p. 47, Footnote 84.

[120] Ordover Report, p. 47, Footnote 84.

[121] In this regard, when one talks about statistical significance of a regression coefficient, it involves testing the hypothesis that the true value of that coefficient is equal to zero.

[122] Lamb Report at ¶57.

[123] Lamb Report at ¶59.

dispute the conclusion from a trade press article that "the four companies have the power to control the market price."[124]

54.     To the extent that smaller firms operate outside of the collusive agreement (in the "competitive fringe" of the industry), I explain in the Lamb Report how a "pricing umbrella" can ensure that members of the proposed Class could not have avoided the artificially-inflated prices that resulted from the alleged misconduct. A pricing umbrella refers to the ability of non-conspirators to mimic the pricing behavior of the dominant colluding firms and price their products at (or slightly below) the fixed, collusive price.[125] Firms in the competitive fringe have incentive to maximize profits and match the price established by the dominant manufacturers. I opined (and Dr. Ordover does not dispute) that Defendants dominated the market for AM Sheet Metal Parts and provided a pricing umbrella for firms operating at the competitive fringe of the industry.

55.     Although Dr. Ordover does not dispute evidence that Defendants had a dominant share of AM Sheet Metal Part sales, his expert report claims that OEM parts (replacement parts that are produced by original equipment manufacturers) compete with AM Sheet Metal Parts and OEM part prices constrain AM Sheet Metal Part prices.[126] As explained in the Lamb Report, although OEM parts and AM Sheet Metal Parts might be functional substitutes (that is, they perform the same function) they are not economic substitutes.

56.     There is no doubt that OEM parts are functional substitutes for AM Sheet Metal Parts; however, there is substantial evidence that OEM parts and AM Sheet Metal Parts are not economic substitutes. As I explain in the Lamb Report, there are substantial price differentials (defendants often sold AM Sheet Metal Parts at prices that were 25 percent to 50 percent lower than OEM part prices). Moreover, insurance companies' cost-cutting policies that *require* collision repair companies to use AM Sheet Metal Parts instead of OEM parts.[127] As stated in the Lamb Report, the vast majority of repairs that are covered by insurance require the use of non-OEM replacement parts. This means that there is a lack of economic substitutability between OEM parts and AM Sheet Metal Parts.[128] The Ordover Report confirms the importance of

---

[124] Lamb Report at ¶59.
[125] Lamb Report at ¶60.
[126] Ordover Report, Footnote 9.
[127] Lamb Report at ¶65.
[128] Lamb Report at ¶66.

insurance regulations in determining if products are economic substitutes when it describes how "the ability of downstream customers to substitute between certified parts and non-certified parts was constrained by insurance companies' rules that sometimes required only certified parts to be used."[129]

57.    Dr. Ordover claims that "OEM parts were used more often than AM Sheet Metal Parts to repair at least some categories of vehicles" and uses this evidence to conclude that "the prices of AM Sheet Metal Parts were constrained by the prices of OEM parts."[130]  He cites evidence that in 2004, for example, 32 percent of aftermarket fenders and 52 percent of hoods were produced by original equipment manufacturers to support his claim that OEM parts are substitutes for AM Sheet Metal Parts.[131]  The Ordover Report ignores the fact that these shares are based on revenues and not unit sales.  Thus, the figures are skewed by the relatively high price for OEM parts (compared to AM Sheet Metal Parts) and the evidence is misleading.

58.    In defending his claim that OEM parts are economic substitutes to AM Sheet Metal Parts, Dr. Ordover admits there is a substantial price differential between OEM parts and AM Sheet Metal Parts but claims that doesn't matter "if a material number of customers considered prices of AM Sheet Metal Parts to be only marginally lower than prices of OEM parts after adjusting for quality" because "those customers likely would be willing to switch to OEM parts in the event of even a small increase in the relative price of AM Sheet Metal Parts."[132]  This tautology does not address the fundamental issue with respect to commodity products: economic substitutability.[133]  The extent to which consumers would switch to OEM parts if the alleged price-fixing agreement succeeded in maintaining supra-competitive prices on AM Sheet Metal prices cannot be analyzed with hypotheticals.  While the Lamb Report contains evidence of the lack of economic substitutability between AM Sheet Metal Parts and OEM parts, the Ordover Report speculates and presents a scenario in which "at least some customers" consider OEM parts to be substitutes and "OEM parts potentially belong in the relevant antitrust market."[134]  Dr. Ordover's thought experiment in which some customers might switch to OEM parts if AM Sheet

---

[129] Ordover Report, p. 24, Footnote 43.
[130] Ordover Report, p. 10, Footnote 9.
[131] Ordover Report, Footnote 9 states that Footnote 11 contains "evidence that OEM parts were, in fact, economic substitutes for AM Sheet Metal Parts." Footnote 11 cites a Frost and Sullivan "North American Collision Replacement Body Panel Aftermarket," 2005, pp. 3-10.
[132] Ordover Report, p. 12, Footnote 11.
[133] If one *assumes* that some customers are likely to switch to an OEM part, then the products are, by definition, economic substitutes.
[134] Ordover Report, pp. 11-12, Footnotes 9 and 11.

Metal Parts were priced at a supra-competitive level is not only speculative, it contradicts evidence that customers (and insurance companies) who purchase AM Sheet Metal Parts do not substitute OEM parts.

*Dr. Ordover does not dispute that barriers to entry into the AM Sheet Metal Parts industry exist; his observations support my conclusion that significant barriers to entry facilitated successful collusion in this industry*

59.     As explained in the Lamb Report, a cartel can only maintain a price-fixing agreement when potential entrants are prohibited from selling products at the competitive price.[135]  Supra-normal profits are an incentive for new firms to enter a market, undercut the prevailing price and still earn significant profits.  Factors that prohibit new firms from entering an industry ("barriers to entry") facilitate successful collusion.  In the Lamb Report, I identified a number of significant barriers to entry that exist for the production of AM Sheet Metal Parts.  One characteristic of the industry that inhibits new entry is the prohibitively high capital investment required to produce sheet metal parts.  As noted in the Lamb Report, Defendants' documents and industry analysts consistently refer to high and significant barriers to entry especially with respect to research and development, economies of scale, the high cost of developing molds and dies, and the difficulty for new entrants to access capacity for tooling plants.[136]  Dr. Ordover's observations about high capital costs and economies of scale in the AM Sheet Metal Parts industry are consistent with my analysis of barriers to entry.  Dr. Ordover emphasized the high costs (between 7 – 10 million NTD) of molds and states that the agreements reduced manufacturing costs "by concentrating production in one location, which permitted the designated manufacture to produce a part in larger batches, which in turn reduced costs."[137]  As I explained in the Lamb Report, evidence of barriers to entry in the AM Sheet Metal Parts industry demonstrates common impact as individual consumers could not have avoided the artificially-inflated prices by purchasing from non-colluding new entrants.[138]

---

[135] Lamb Report at ¶72.

[136] Lamb Report at ¶¶72-76. "Economies of scale" refers to the ability of a larger firm to produce output at lower average costs; costs fall as output increases.

[137] Ordover Report at ¶19 and Footnote 32.  This is an example of economies of scale.

[138] Lamb Report at ¶¶72, 78.

# V. Nothing in Dr. Ordover's Report Leads Me to Change My Conclusion That Class-Wide Damages May be Measured Using Formulaic Methods

60.     There is nothing in the Ordover Report that causes me to change my conclusion that my multiple regression provides a formulaic method to measure class-wide damages. Dr. Ordover has no basis to say that the regression cannot estimate average overcharges if the overcharges are not identical for every customer and product. Dr. Ordover's modification of adding a trend is not supported by the empirical evidence of actual labor productivity. The U.S. steel price that I include in my regression is appropriate.

*Dr. Ordover wrongly claims that multiple regression analysis cannot be used to calculate class-wide damages*

61.     Dr. Ordover claims that my regression analysis cannot be used to calculate the average overcharge because his F-Tests reject uniform overcharges for customers and products. As I explained above, Dr. Ordover's use of the F-Test is fundamentally flawed and cannot determine whether the overcharges for each customer or each product are identical. More importantly, it is unnecessary for overcharges to be uniform across customers and products for my regression analysis to provide a reliable estimate of aggregate class-wide damages. It is widely recognized that regression analysis of the type I performed is an accepted methodology for calculating aggregate damages.[139]

*It is inappropriate to add a time trend variable to my regression model*

62.     Dr. Ordover modifies my regression model by adding a time trend, purportedly to better control for cost reduction through automation and manufacturing process innovations.[140] However, this modification is unjustified and thus produces an unreliable estimate of the overcharge.

63.     Dr. Ordover's only justification for adding a time trend is anecdotal evidence of declining cost due to increased productivity.[141] But Dr. Ordover's speculation is contradicted by the Labor Productivity Index of Manufacture of Motor Vehicles and Parts published by National Statistics,

---

[139] Elsewhere in his report, Dr. Ordover appears to acknowledge that the type of regression analysis that I performed can be used to calculate aggregate class-wide damages, stating that "a regression model of the sort used by Dr. Lamb estimates average damages…" Ordover Report at ¶65.
[140] Ordover Report at ¶¶70, 77-78.
[141] See Ordover Report, Footnote 78 and ¶77.

Republic of China (Taiwan).[142]  As shown in Figure 5 below, the Labor Productivity Index

increased only slightly from 2003 to 2004 and then declined sharply for five years in a row from

2004 to 2008.  After hitting the bottom at the beginning of 2009 due to global economic

recession, it bounced back in 2010 and remained relatively stable throughout 2011 and 2012.  It

is evident that the labor productivity of the Motor Vehicle and Parts manufacture sector in

Taiwan had ups and downs during the relevant time period and does not exhibit the time trend

suggested by Dr. Ordover.

**Figure 5: Taiwanese Labor Productivity Index
of Manufacture of Motor Vehicles and Parts**



64.     Dr. Ordover speculates, without analyzing Defendants' cost data, that Defendants'

manufacturing costs were actually declining between 2003 and 2012.[143]  The speculative nature

of his analysis is embodied in the many specifications he experimented with, including a linear

---

[142] Data source: http://eng.stat.gov.tw/lp.asp?ctNode=1615&CtUnit=765&BaseDSD=7&mp=5, Time Series, Item:
Manufacture of Motor Vehicles and Parts, Class: Indexes of Labor Productivity.
[143] Dr. Ordover testified that it "was just quite fine to allow the trend because that's consistent with what I was told
by industry people that they were doing all kinds of innovations in terms of reducing the cost of building the mold
and as well as manufacturing the part".  See Ordover Deposition at 122: 6-12.

trend, a logarithmic trend, and a quadratic trend.[144] Cycling through various functional forms is not a valid approach to asses a model's robustness, but rather is merely a data mining exercise that sound econometric analysis should try to avoid. This data mining approach highlights Dr. Ordover's inability to observe and characterize the changes in the manufacturing costs of AM Sheet Metal Parts during the relevant period.

65.    Furthermore, Dr. Ordover speculates that there were efficiency gains from the tooling agreements that were passed, at least partially, to customers in the form of lower prices.[145] Dr. Ordover performed no pass-through analysis to support this argument. I understand that the Direct Purchaser Plaintiffs have alleged that the tooling agreements were part of the alleged misconduct to raise prices.[146] Dr. Ordover's pass-through argument would only make sense if there were no agreements among the Defendants to raise prices of AM Sheet Metal Parts. Given that the central issue of this litigation is whether there were agreements to raise prices above their competitive level, assuming efficiency gains were passed, at least partially, to customers in the form of lower prices is illogical as a matter of economics.

66.    In conclusion, Dr. Ordover's time trend variable is an incorrect measure of changes in productivity and manufacturing costs of AM Sheet Metal Parts. Adding time trend variables to my damages model is not supported by factual evidence and leads to an econometric model that produces unreliable results.

*The U.S. steel price is a reliable measure of material cost and the Taiwanese steel import price is highly correlated with the U.S. steel price*

67.    In my multiple regression analysis, I included the U.S. steel price as a measure for raw material costs.[147] Dr. Ordover claims that the U.S. steel price does not properly control for the cost of steel purchased by Defendants and that I have not provided evidence that the cost of steel purchased by Defendants in Taiwan was correlated with the U.S. steel price. However, as I explained at my deposition, the U.S. steel price is a reliable measure of cost because will be highly correlated with the price that Defendants paid to China Steel Corp.[148] Dr. Ordover has

---

[144] See Ordover Report, Footnote 96.
[145] See Ordover Report at ¶78.
[146] Complaint at ¶¶27-32.
[147] Lamb Report at ¶95.
[148] Lamb Deposition at 122:12-125:8.

provided no empirical analysis to confirm his speculative criticism regarding my steel price variable.

68.    While the price of steel that Defendants paid to China Steel Corp. is unavailable, I have instructed my staff to download the Taiwanese steel import price that is publically available and examine whether it has a high correlation with the U.S. steel price, after taking into account the exchange rate between the Taiwanese dollar and U.S. dollar. As expected, the correlation between the natural logarithm of the Taiwanese steel import price and the natural logarithm of the U.S. steel price is over 0.9. This high correlation confirms that the U.S. steel price is a reliable source of raw material cost for my regression model.

## VI. Conclusion

69.    I have reviewed the report of Dr. Janusz Ordover and have considered his criticisms of my analyses in order to determine if any of those criticisms cause me to change the opinions I reached in the Lamb Report. I discussed above the numerous flaws in Dr. Ordover's analysis and the resulting opinions expressed in his report, including his misconstrued interpretation of Plaintiffs' allegations in this matter and inappropriate use of "residual prices" to assess the existence of a pricing structure. Based on my review of Dr. Ordover's report, Dr. Ordover's deposition testimony, the Lamb Report, and the further analyses and research into the market for AM Sheet Metal Parts I undertook as part of my response to Dr. Ordover's opinions, as well as my training and experience in economics and econometrics, I have reaffirmed the conclusions set forth in the Lamb Report. In particular, I have reaffirmed my conclusions that (1) common evidence demonstrates that the Defendants' alleged price-fixing conspiracy artificially inflated prices for AM Sheet Metal Parts above the level that would have prevailed but for the alleged misconduct; (2) common evidence shows that the artificially-inflated prices resulting from the alleged conspiracy were paid by all, or nearly all, proposed Class members; and (3) there is a formulaic method based on standard econometric techniques available to measure overcharges suffered by proposed Class members in the aggregate as a result of the alleged misconduct.

36

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of November, 2015, at Hilton Head Island, South Carolina.

Russell L. Lamb, Ph. D.

# Appendix A

# Russell Lamb, Ph.D.

Senior Vice President
Nathan Associates Inc.
Phone: (703) 615-3474
Email: rlamb@nathaninc.com

## Professional Summary

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages in U.S. District Court. He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing. He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters. In addition, he has provided expert advice to client attorneys at all levels of the litigation. Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets, and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada. For example, in *In re Aftermarket Automotive Lighting Products Antitrust Litigation*, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid." In certifying the Class in *In re: Titanium Dioxide Antitrust Litigation*, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case." In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis." In *In re: Puerto Rican Cabotage Litigation*, the Court held that "Dr. Lamb [had] set forth a reputable and workable model for determining damages as to individual class members." In certifying the class in *Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al.*, the Court held that "Dr. Lamb [had] presented a plausible class-wide method of proof." In certifying the class in *Eugene Allan, et al., v. Realcomp II, Ltd., et al.*, the Court held that "the Plaintiffs have produced sufficient evidence that common proofs will yield a finding of class-wide damages that predominates over any specific individualized damages. The

Lamb Report and Lamb Reply are sufficient to establish this fact." Furthermore, Dr. Lamb was the Indirect Purchaser Plaintiffs' expert in the *In re: Polyurethane Foam Antitrust Litigation* matter, which was certified by the Court in April 2014.

With regard to agricultural economics, Dr. Lamb has a particular expertise in agricultural markets and has undertaken extensive original research and econometric analysis on markets for agricultural commodities. His articles on agricultural economics have been published in peer-reviewed journals, trade press, and major newspapers. Dr. Lamb regularly presents at conferences on topics including the state of the U.S. Economy and farm policy.

Prior to rejoining Nathan Associates, Dr. Lamb established the Arlington, VA office of Advanced Analytical Consulting Group where he served as a Principal, as well as the Washington, DC office of Econ One where he served as Managing Director and DC Office Head. In these positions, he developed and managed a practice of ten litigation professionals. He earlier served as an Assistant Professor of Agricultural Economics and faculty member of the Graduate Group in Economics at North Carolina State University and as an Economist and Senior Economist in the Federal Reserve System of the United States, at the Federal Reserve Board and the Federal Reserve Bank of Kansas City.

Dr. Lamb received his Ph.D. in Economics from the University of Pennsylvania.

## Education

- Ph.D., Economics, University of Pennsylvania, 1994
- M.A., Economics, The University of Maryland, 1989
- B.A., Economics, The University Tennessee, 1987

## Expert Testimony Offered

**2015**  *Thomas Mervyn v. Atlas Van Lines, Inc., et al.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:13-CV-03587
- Expert Declaration, September 3, 2015
- Opinion concerning data issues
- Retained by Miller Law LLC

*Thomas Mervyn v. Nelson Westerberg, Inc.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:11-CV-06594
- Expert Report, July 27, 2015
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.*

- United States District Court Western District of Washington at Seattle
- No. 2:12-cv-01181-BJR
- Expert Report, March 23, 2015
- Testified at deposition, May 21, 2015
- Opinion concerning damages issues
- Retained by Nix, Patterson & Roach, L.L.P. and Kessler Topaz Meltzer & Check, LLP

*BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.*

- In the Circuit Court for Cocke County, Tennessee
- Civil Action No. 32941-II
- Expert Report, January 23, 2015
- Opinion concerning impact and damages issues
- Retained by Miller Law LLC

*In Re: Domestic Drywall Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2437 13-MD-2437
- Trial Expert Report, January 23, 2015
- Reply Expert Report, April 23, 2015
- Testified at deposition, February 25, 2015
- Opinion concerning merits issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC, Berger & Montague, P.C., and Spector Roseman Kodroff & Willis, P.C.

*In Re: Processed Egg Products Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2002
- Expert Declaration, January 22, 2015
- Expert Reply Declaration, April 3, 2015
- Testified at deposition, May 7, 2015
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Straus & Boies, LLP

**2014** *In Re: Class 8 Transmission Indirect Purchaser Antitrust Litigation*

- United States District Court for the District of Delaware

- Civil Action No. 11-cv-00009 (SLR)
- Declaration, November 3, 2014
- Reply Declaration, March 6, 2015
- Trial Declaration, March 27, 2015
- Trial Reply Declaration, July 2, 2015
- Testified at deposition, December 17, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Glancy Binkow & Goldberg LLP

*Mark S. Wallach, et al., v. Eaton Corporation, et al.*

- United States District Court District of Delaware
- Civil Action No. 10-260-SLR
- Expert Report, November 3, 2014
- Expert Reply Report, March 6, 2015
- Trial Expert Report, March 27, 2015
- Trial Expert Reply Report, July 2, 2015
- Testified at deposition, December 16, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding direct purchasers
- Opinion concerning merits and damages issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC

*Sheridan Chevrolet Cadillac Ltd., et al., v. Furukawa Electric Co. Ltd., et al.*
*Ontario Superior Court of Justice*
*Court File No. CV-12-446737-00CP*

*Sheridan Chevrolet Cadillac Ltd., et al., v. Mitsubishi Electric Corporation, et al.*
*Ontario Superior Court of Justice*
*Court File No. CV-14-496994-00CP*

- Expert Report, October 14, 2014
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*Resco Products, Inc., v. Bosai Minerals Group Co., Ltd., et al.*

- United States District Court for the Western District of Pennsylvania
- Civil Action No.: 2:06-cv-325-JFC
- Expert Report, September 24, 2008
- Expert Report, September 29, 2014
- Supplemental Expert Report, December 15, 2014

- Testified at deposition, February 13, 2015
- Opinion concerning damages
- Retained by Boies, Schiller & Flexner LLP

*Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*

- United States District Court Eastern District of Wisconsin
- Case No.: 2:09-cv-00852-LA
- Affidavit, August 1, 2014
- Affidavit, November 4, 2014
- Declaration, April 24, 2015
- Expert Report, July 15, 2015
- Testified at deposition, October 1, 2015
- Opinion concerning class certification and damages issues
- Opinion concerning Defendants' replacement data
- Opinion concerning Defendant and LKQ transaction-level data
- Retained by Stueve Siegel Hanson, LLP

*Meredith Corporation, et al., v. SESAC, LLC, et al.*

- United States District Court for the Southern District of New York
- 09 Civ. 9177 (PAE)
- Expert Report, July 10, 2014
- Opinion concerning class certification issues
- Retained by Weil, Gotshal & Manges LLP

*Janet Skold, et al., v. Intel Corporation, et al.*

- Superior Court of the State of California for the County of Santa Clara
- Case No. 1-05-CV-039231
- Expert Report, June 14, 2007
- Testified at deposition, August 31, 2007
- Testified at deposition, January 10, 2014
- Opinion concerning class certification issues
- Opinion concerning damages issues
- Retained by Girard Gibbs LLP

**2013** *William P. Elliott v. Delhaize America, Inc., d/b/a Food Lion, LLC*

- United States District Court Eastern District of Virginia Alexandria Division
- Civil Action No. 1:12-CV-01426-LO-TRJ
- Expert Report Concerning Damages, July 5, 2013
- Testified at deposition, September 16, 2013
- Opinion concerning damages
- Retained by EvansStarrett PLC

*Charles Benson, et al. v. Dean Foods Company, et al.*

- United States District Court Eastern District of Tennessee at Greenville
- No. 2:13-CV-00026
- Declaration, June 14, 2013
- Opinion concerning size of commerce at issue
- Retained by Gordon Ball Law Firm

*In Re: Polyurethane Foam Antitrust Litigation*

- United States District Court Northern District of Ohio Western Division
- MDL No. 2196
- Declaration, June 11, 2013
- Reply Declaration, October 23, 2013
- Trial Declaration, March 18, 2014
- Reply Trial Declaration, June 30, 2014
- Testified at deposition, August 20, 2013
- Testified at deposition, November 20, 2013
- Testified at class certification hearing, January 15, 2014
- Testified at deposition, April 14, 2014
- Testified at deposition, July 14, 2014
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues
- Retained by Miller Law LLC

*Jabo's Pharmacy, Inc., et al. v. King Pharmaceuticals, Inc.*

- In the Circuit Court for Cocke County, Tennessee
- No.: 31,973 (Class Action)
- Expert Affidavit, May 10, 2013
- Reply Affidavit, August 22, 2013
- Testified at deposition, May 30, 2013
- Opinion concerning class certification issues
- Retained by Hausfeld LLP

*In Re: Skelaxin (Metaxalone) Antitrust Litigation*

- United States District Court Eastern District of Tennessee at Chattanooga
- Lead Case No.: 2:12-cv-4
- MDL Case No.: 1:12-md-2343
- Expert Declaration, May 6, 2013
- Reply Declaration, August 13, 2013
- Testified at deposition, May 30, 2013
- Opinion concerning class certification issues for indirect purchaser for resale plaintiffs
- Retained by Hausfeld LLP

*Amvac Chemical Corporation v. RedEagle International LLC*

- Before the American Arbitration Association

- Case No.: 16 171 00285 11
- Testified at trial, April 10, 2013
- Retained by McKenna Long & Aldridge LLP

**2012** *Thomas Boland, v. Consolidated Multiple Listing Service, Inc., et al.*

- United States District Court for the District of South Carolina
- Case No.: 3:09-1335-SB
- Expert Report, December 10, 2012
- Affidavit, March 15, 2013
- Testified at deposition, January 10, 2013
- Opinion concerning class certification
- Retained by Goldman Scarlato Karon & Penny, P.C.

*David Osmun, et al., v. Cadbury Adams Canada Inc., et al.*
*Ontario Superior Court of Justice*
*Court File No.: 08-CV-347263PD2*

*Jacob Stuart Main, et al., v. Cadbury Schweppes Plc, et al.*
*In the Supreme Court of British Columbia*
*S078807 (Vancouver Registry)*

*Gaetan Roy v. Cadbury Adams Canada Inc., et al.*
*Canada Superior Court ( Province of Quebec, District of Quebec)*
*No.: 200-06-000094-071*

- Expert Report, September 24, 2012
- Opinion concerning pass-through
- Retained by Sutts, Strosberg, LLP

*Eugene Allan, et al., v. Realcomp II, Ltd., et al.*

- United States District Court for the Eastern District of Michigan Southern Division
- Case No.: 2:10-cv-14046
- Expert Report, August 1, 2012
- Reply Expert Report , October 26, 2012
- Testified at deposition, September 14, 2012
- Opinion concerning class certification and damages issues
- Retained by Goldman Scarlato Karon & Penny, P.C.

*Nancy Jean Adams v. Apple, Inc., et al.*

- Ontario Superior Court of Justice
- Court File No.: CV-12-17511
- Expert Report, July 12, 2012
- Opinion concerning class certification issues
- Retained by Sutts, Strosberg, LLP

*Animal Science Products, Inc., et al., v. China National Metals & Minerals Import & Export Corporation, et al.*

- United States District Court District of New Jersey
- Expert Affidavit, May 24, 2012
- Retained by Boies, Schiller & Flexner LLP

*In Re: Titanium Dioxide Antitrust Litigation*

- United States District Court of Maryland (Northern Division)
- Case No.: 10-cv-00318-RDB
- Expert Declaration, February 22, 2012
- Expert Rebuttal Declaration, July 24, 2012
- Expert Trial Report, October 1, 2012
- Trial Expert Rebuttal Report, February 18, 2013
- Testified at deposition, April 20, 2012
- Testified at deposition, August 6, 2012
- Testified at deposition, November 9, 2012
- Testified at deposition, March 5, 2013
- Opinion concerning class certification issues
- Opinion concerning merits and damages issues
- Retained by Gold Bennett Cera & Sidener LLP

**2011** *Brokers' Services Marketing Group, LLC, et al., v. Cellco Partnership*

- United States District Court District of New Jersey
- Expert Report, October 14, 2011
- Retained by Hagens Berman LLP

*Westminster Mutual Insurance Company, v. TYC Brother Industrial Co. Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No.: 62732
- Expert Report, September 14, 2011
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*CEMEX Caracas Investments B.V. and CEMEX Caracas II Investments B.V., v. The Bolivarian Republic of Venezuela*

- Before the International Centre for Settlement of Investment Disputes ("ICSID")
- Expert Report, September 6, 2011 (with Dr. Juan F. Riveros, Ph.D.)
- Opinion concerning the value of the operating assets of CEMEX Venezuela
- Retained by Curtis, Mallet-Prevost, Colt & Mosle LLP

*Henry Kahwaty, v. LECG, LLC and LECG Corporation*

- Before PAX ADR

- Expert Report, August 22, 2011
- Opinion concerning damages arising from a breach of contract dispute
- Retained by Katz, Marshall & Banks, LLP

*David Osmun, et al., v. Cadbury Adams Canada Inc., et al.*

- Ontario Superior Court of Justice
- Court File No.: 08-CV-347263PD2
- Expert Report, August 12, 2011
- Opinion concerning class certification issues
- Retained by Sutts, Strosberg, LLP

*Danny Lynn Electrical & Plumbing, et al., v. Veolia ES Solid Waste Southeast, Inc., et al.*

- United States District Court, Middle District of Alabama, Northern Division
- Case No. 2:09cv192-MHT
- Expert Report, July 19, 2011
- Testified at deposition, August 2, 2011
- Retained by McCallum Methvin & Terrell, P.C.

*Daesang Corporation against The NutraSweet Company, NutraSweet IP Holdings, Inc. and, Sweeteners Holdings Korea LTD.*

- International Court of Arbitration International Chamber of Commerce
- Reference: 15 641 / VRO
- Written Testimony, May 31, 2011
- Testified at Tribunal Hearing, July 21, 2011
- Response to the opinions of Daesang's economic expert
- Retained by NutraSweet

*In Re: Aftermarket Automotive Lighting Products Antitrust Litigation*

- United States District Court, Central District of California
- Case No. 09-ML-2007 GW (PJWx)
- Expert Report, September 24, 2010
- Expert Reply Report, June 24, 2011
- Expert Trial Report, March 29, 2013
- Expert Trial Rebuttal Report, June 7, 2013
- Expert Declaration, July 8, 2013
- Testified at deposition, April 19, 2011
- Testified at deposition, April 24, 2013
- Testified at class certification hearing, July 25, 2011
- Opinion concerning class certification issues and class-wide damages
- Retained by Stueve Siegel Hanson, LLP

*BabyAge.com, Inc. and The Baby Club of America, Inc., v. Toys "R" Us, Inc., d/b/a Babies "R" Us, et al.*

- United States District Court for the Eastern District of Pennsylvania
- C.A. No. 2:05-06792-AB
- Expert Report, December 15, 2009
- Reply Report, February 4, 2011
- Testified at deposition, May 12-14, 2010
- Testified at deposition, February 23, 2011
- Opinion concerning antitrust liability and damages
- Retained by Berger & Montague, P.C.

*Thomas L. Logue, et al., v. West Penn Multi-List, Inc. et al.*

- United States District Court for the Western District of Pennsylvania
- Case No.: 2:10-cv-0451
- Expert Report, January 12, 2011
- Testified at deposition, January 26, 2011
- Opinion concerning class certification issues
- Retained by Goldman Scarlato & Karon, P.C.

*In Re: Puerto Rican Cabotage Antitrust Litigation*

- United States District Court for the District of Puerto Rico
- Master Docket No. 08-md-1960 (DRD)
- Affidavit, October 28, 2010
- Affidavit, January 10, 2011
- Opinion concerning the total monetary value of an option in the settlement agreements with the defendants
- Opinion concerning the monetary value of an option elected by the plaintiffs in the settlement agreements with the defendants
- Retained by Grant & Eisenhofer, P.A.

## Professional Experience

### Economic Consulting Positions

**Nathan Associates, Inc.**, Arlington, VA, *Senior Vice President*, January 2013 – present

**Advanced Analytical Consulting Group**, Inc., Washington DC area, *Principal*, March 2011 – January 2013

**Econ One Research**, Inc., Washington, DC, *Managing Director and D.C. Office Head*, July 2006 March 2011

- Opened and staffed the DC office; managed office affairs on a daily basis

- Retained as an expert witness for damages and class certification issues in antitrust, breach of contract, product liability and RICO cases; representative testimony includes determination of liability and damages in a case involving resale price maintenance in consumer products, class certification in a horizontal price-fixing case involving international travel in the airline industry, class certification in a consumer class action involving RICO claims in state court

- Industry pre-litigation analyses for consumer products, chemicals, and other industries

**Navigant Consulting, Inc.**, Washington, DC, *Associate Director*, February 2006 – July 2006

- Case manager for damages analysis in asbestos litigation and personal injury claims

**Nathan Associates, Inc.**, Arlington, VA, *Managing Economist*, July 2004 – February 2006

- Case manager for economic analysis of class certification and damages issues in antitrust and RICO cases involving the chemical, consumer products and tobacco industries
- Retained as expert on damages for direct purchasers of NBR in the Crompton Global Settlement; submitted an Affidavit on damages and appeared before the Special Master for the Crompton Global Settlement (the Hon. Kenneth Feinberg)

**Board Membership**

- Board of Advisors, American Antitrust Institute, Washington, DC
- Department of Economics Advisory Council, University of Tennessee, Knoxville, *Chairman*, Spring 2006 – April 2011

**Teaching Positions**

- **The George Washington University**, Washington, DC, *Adjunct Assistant Professor of Economics*, Fall 2004 – present
- **North Carolina State University (NCSU)**, *Assistant Professor* (Department of Agricultural and Resource Economics), Fall 1999 – Spring 2004
- **The University of Pennsylvania**, *Adjunct Instructor*, Summer 1990 – Spring 1994

**Additional Teaching Experience**

- The Wharton School Evening Division, Philadelphia, PA, summer 1993
- Rutgers University, Camden, NJ, summer 1993
- Philadelphia College of Textiles and Science, Philadelphia, PA, fall 1992
- The Pennsylvania State University, Media, PA, 1991
- St. Mary's College of Maryland, St. Mary's City, MD, summer 1989
- The University of Maryland University College, College Park, MD, 1988-1989

**Courses Taught**

- Managerial Economics for MBA students (George Washington University)
- Law and Economics (George Washington University)
- Intermediate Microeconomics – graduate level (George Washington University)
- Latin American Economic Development (George Washington University)

- International Trade: Theory and Policy (George Washington University)
- International Finance: Theory and Policy (George Washington University)
- Agricultural Production and Supply – Ph.D. field course (North Carolina State University)
- U.S. Agricultural Policy (North Carolina State University)
- Microfinance: Theory, Practice and Regulation (Superintendencia de Banca y Seguros)
- Statistical Analysis for Economics (University of Pennsylvania)
- Principles of Microeconomics (University of Maryland, St. Mary's College of Maryland)
- Principles of Macroeconomics (University of Pennsylvania, The Wharton School, Penn State University)
- Fundamentals of Micro/Macro Economics (University of Maryland)
- Environmental and Natural Resource Economics (Rutgers)

## Federal Reserve Experience

**Federal Reserve Bank of Kansas City**, *Senior Economist* (Jan. 1998 – Aug. 1999), *Economist* (Jan. – Dec. 1997)
- Analysis of regional, macroeconomic developments in agriculture, and energy
- Research on public policy towards agriculture in the U.S., especially the impact of farm policy reform
- Briefings to the Bank president and outside groups on the regional economy, agriculture, agricultural trade

**Board of Governors of the Federal Reserve System**, *Economist,* June 1994 – Dec. 1996
- Analysis of macroeconomic conditions, commodity markets and prices (CPI, PPI, Core prices)
- Forecasting of agricultural output, prices, and income
- Briefings to the Board of Governors on agriculture and food-price developments

## Other Consulting Experience

**World Perspectives, Inc., 2003 - 2004**
- Analysis of  trade barriers for U.S. exports of feed ingredients, pet food ingredients, and food ingredients
- Analysis of the impact of a Free Trade Area of the Americas on U.S. soybean producers
- Analysis of the potential for U.S. Halal-certified meat exports to the Middle East

**Womble Carlyle Sandridge & Rice, LLP, 2003 - 2004**
- Provided expert testimony related to the estimation of business profitability

**Smith-Moore, 2002 - 2003**

- Provided economic analysis of the U.S. Tobacco Program

**Superintendencia de Banca y Seguros (Lima, Peru), 1998 - 2000**

- Developed and taught a class on Microfinance issues (in English) to students enrolled in a training program for bank examiners; the program was sponsored by the Inter-American Development Bank.

**World Bank, Africa Technical Department, 1992 – 1993**

- Summarized and provided an overview of data available on African economic and social indicators

**ACG-Afrique, January 1993**

- Provided critical review of a study document outlining the impact of structural adjustment on African agriculture

## Professional Organizations

- National Association for Business Economics
- American Economic Association

## Papers, Publications and Speeches

### Papers Published in Refereed Journals

- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, 32:1 (2006) pp. 84-97

- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, 26:1 (Winter 2006) pp. 159-177

- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics*, 1(2004) pp. 7-16

- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics*, 85(2) (May 2003) pp 359-371

- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics*, 71 (2003) pp. 71-95

- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics*, 24 (2002) 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics*, 22 (2000) 271-298

- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics*, 22 (2000) 102-119

- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics*, 76 (1997) 367-373

**Non-refereed Publications, Articles and Editorials**

- "The Predominance Requirement for Antitrust Class Actions – Can Relevant Market Analysis Help?" (with Jeffrey Leitzinger) American Bar Association – Section of Antitrust Law, *Economics Committee Newsletter*, Spring 2007, pp. 17-22

- "Reform of U.S. Farm Policy in an Integrating World Economy," forthcoming in *Developing Countries in the WTO System*, published by Rowman & Littlefield, 2006

- "New Farm Economy," *Regulation*, Winter 2003-2004, Washington, DC: Cato Institute for Public Policy Research (2003)

- "What Road Will U.S. Economy Take in 2003?" *Southeast Farm Press*, February 5, 2003

- "Fast Track for the Tax Cuts," guest editorial, *News and Observer* (Raleigh, NC), January 18, 2003

- "The 2002 Farm Bill," (with Blake Brown and Michele Marra) *NC State Economist*, November/December 2002

- "Economy-minded Tax Cuts: Bush's Reductions Provided the Boost to Lift U.S. From Recession," guest editorial, *News and Observer* (Raleigh, NC), July 2, 2002

- "Policy Only Effective if Farm Economy is Recognized," special report to *Feedstuffs*, June 5, 2000

- "Aid During Crisis of Little Long-term Help to Farmers," guest editorial, *Kansas City Star*, August 23, 1999

- "Survey of Agricultural Credit Conditions," Federal Reserve Bank of Kansas City, *Regional Economic Digest*, various issues, 1997-1999

- "U.S. Agriculture at the Crossroads in 1999," *Economic Review,* Federal Reserve Bank of Kansas City, 84 (1999)

- "Can U.S. Oil Production Survive the 20th Century?" *Economic Review,* Federal Reserve Bank of Kansas City, 84 (1999)

- "Will the Tenth District Catch the Asian Flu?" (with Ricardo Gazel) *Economic Review,* Federal Reserve Bank of Kansas City, 83 (1998)

- "From the Plains to the Plate: Can the Beef Industry Regain Market Share?" (with Michelle Beshear) *Economic Review,* Federal Reserve Bank of Kansas City, 83 (1998)

- "U.S. Agriculture: Another Solid Year in 1998?" (with Mark Drabenstott) *Economic Review,* Federal Reserve Bank of Kansas City, 83 (1998)

- "How Will the 1996 Farm Bill Affect the Outlook for District Farmland Values?" *Economic Review,* Federal Reserve Bank of Kansas City, 82 (1997).

- "Food Prices and the Farm Sector," monthly *Greenbook* (various issues, 1994-1996), Federal Reserve Board of Governors, Washington, DC

- "Hedge to Arrive Contracts," Memo to the Board of Governors, Federal Reserve Board of Governors, Washington, DC, June 5, 1996

- "Prices in the May Greenbook," Federal Reserve Board of Governors, Washington, DC, May 19, 1996
- "Prices in the March Greenbook," Federal Reserve Board of Governors, Washington, DC, March 24, 1996
- "Commodity Price Developments," Weekly memo to the Board of Governors, Federal Reserve Board of Governors, Washington, DC, August 1994 – December 1996

**Conference Presentations**

- "Class Action Developments," panelist at the American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC, December 4, 2012
- "Consequences for Antitrust Thought and Practice," presented at the American Antitrust Institute Invitational Symposium: Antitrust Challenge of Multi-Channel Distribution in the Internet Age, Washington, DC, June 22, 2011
- "The U.S. Economy in the Year Ahead," presented at the Long Company Annual Conference, Chicago, IL, September 11, 2009 and September 19, 2008
- "The U.S. Economic Outlook," presented at the Industry Outlook Conference, Chicago, IL, October 17, 2006 and October 18, 2005
- "How Will the Economy Impact Your Business?" presented at the Long Company Annual Conference, Las Vegas, NV, August 14, 2004
- "Focus on The Economy" presented at *Milling and Baking News* annual Purchasing Managers' Conference, Kansas City, MO, June 14, 2004, June 10, 2003 and June 11, 2002
- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Chicago, IL, October, 2003
- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Breckenridge, CO, April 7, 2002
- "The U.S. Economic Outlook: The Cost of Terror," presented at the Southern Agricultural Outlook Conference, Atlanta, GA, September 24, 2001
- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO, June 5, 2001
- "The Great American Growth Machine," presented at the Southern Agricultural Outlook Conference, Atlanta GA, September 27, 2000
- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO, June 6, 2000
- "The Outlook for the U.S. Pork Sector," presented to the Industry Outlook Conference, Las Vegas, NV, April 17, 2000
- "The National Economic Outlook: The Road Ahead," presented to the Food Industry Outlook Conference, Breckenridge, CO, April 11, 1999

- "Farm Policy for the New Millennium," presented to Federal Reserve Bank of Kansas City, Division of Bank Supervision and Regulation, Bank Examiners' Annual Training Conference, January 7, 1999

- "The Impact of the 1996 Farm Bill on Farmland Values," (with Jason Henderson) first place poster presentation at the annual meetings of the American Agricultural Economics Association, Salt Lake City, August 4, 1998

- "A Note on the Inverse Productivity Relationship," presented at the annual meetings of the Western Economic Association International, Seattle, July 1997

- "Off-farm Labor Supply and Fertilizer Use in the Semi-Arid Tropics of India," presented at the annual meetings of the American Agricultural Economics Association, August 1995

- "Prices for Food-Away-From-Home and Core Inflation: Some Empirical Relationships," (with James E. Kennedy) presented at the Federal Reserve System Committee on Agriculture, Richmond, VA, October 1995

- "Some Simple Dynamics of Farming," presented at the annual meetings of the American Agricultural Economics Association, Orlando, August 1993

- "Structural Adjustment and Food Security," (with W. Graeme Donovan), presented at the annual meetings of the American Agricultural Economics Association, Orlando, August 1993

- "Structural Adjustment and African Agricultural Supply Response to Exchange Rate and Price Movements," (with W. Graeme Donovan), presented at the annual meetings of the Southern Agricultural Economics Association, Tulsa, January 1993

**Other Presentations**

- Panelist, "Antitrust Class Actions – Where Are We? A 360 Degree Perspective," NYSBA Annual Antitrust Law Section Meeting," January 30, 2014

- Panelist, Retrospective on the Baby Products Litigation, ABA Section of Antitrust Law: Pricing Conduct Committee, July 31, 2013

- Panelist, Economic Forecasting Summit, Northern Indiana Workforce Investment Board, Inc., March 29, 2007

- "The Welfare Benefits of USDA Beef Quality Certification Programs" (with Peyton Ferrier), presentation memo, 2007

- "Reform of U.S. Farm Policy in an Integrating World Economy," presented to the Cordell Hull Institute, Trade Policy Roundtable on Reform of U.S. Farm Policy and the WTO System, Washington, DC, March 31, 2006

- "The Case for a Market-forces Farm Policy in the U.S." presented at the Cordell Hull Institute Trade Policy Roundtable, Washington DC, May 26, 2005

- "How Will the Economy Impact Your Business?" presented at the Apple Processors Association annual meeting, Homewood Resort, June 20, 2004

- "The U.S. and International Economic Outlook," presented at the AgFirst Loan Officer's Seminar, Atlanta, GA, October 30-31, 2002
- "Will the U.S. Economy Bounce or Crawl?" presented to the Eastern Bankruptcy Institute, North Myrtle Beach, SC, June 1, 2002
- "The U.S. Economic Outlook and Agriculture," presented to the National Pork Producers Pork Action Group, Washington, DC, April 10, 2002
- "The U.S. Economic Outlook" presented to the Risk Management Associates, Raleigh, NC, February 7, 2002
- "The U.S. Economic Outlook: The Cost of Terror," presented at the National Pork Producers Pork Action Group, Marco Island, FL, November 14, 2001
- "Consolidation in Agriculture and the Role of Public Policy," paper presented to the Southern Extension Meetings, Williamsburg, VA, June 13, 2000
- "The New Farm Economy," presented at the annual meetings of the National Association of County Agricultural Agents, Omaha, NE, September 14, 1999
- "Regional Economic Update," presented to bankers in Kansas, Nebraska, Missouri, and Oklahoma as part of the Regulatory Update Seminar, Federal Reserve Bank of Kansas City, April 1999
- "The National Economic Outlook," presented to Oklahoma State University Advanced Cattle Management Seminar, Stillwater, OK, March 11, 1999
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, November 13, 1998
- "Can the Tenth District Survive the Asian Flu?" The Federal Reserve Bank of Kansas City Economic Forums, nine presentations to bankers in Wyoming, Oklahoma, and New Mexico, September 21 - October 21, 1998
- "The Impact of Asian Economic Developments on Tenth District Agriculture," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, January 30, 1998
- "The Outlook for the Nebraska Economy," The Federal Reserve Bank of Kansas City: Nebraska Economic Forums, six presentations to bankers in Nebraska, October 6 - 15, 1997
- "Update on the Macroeconomy and Special Briefing on Forecast Performance at the Kansas City Fed," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, August 13, 1997
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, May 14, 1997 and March 21, 1997
- "Producer Prices, Retail Sales, and Agricultural Commodity Markets," presented to the Board of Governors of the Federal Reserve System, July 15, 1996

## Referee Experience

Referee for the following academic journals:

- World Development, 1993
- Journal of Development Economics, 1994, 1995
- International Economic Review, 1995
- Journal of Human Resources, 1997
- Journal of Business and Economics Statistics, 1997
- American Journal of Agricultural Economics, 1999, 2001, 2002
- Agricultural Economics, 2000, 2001, 2004
- Agricultural Finance Review, 2000, 2004
- Review of Agricultural Economics, 2000, 2002, 2004
- Journal of Agricultural and Resource Economics, 2000, 2001, 2002
- Emerging Markets Review, 2001
- Contemporary Economic Policy, 2004

## Fellowships, Honors and Awards

### Fellowships

- Departmental Fellowship, University of Pennsylvania, 1989-1990
- Dean's Fellowship, University of Pennsylvania, 1991-1992
- Graduate School Fellowship, University of Maryland, College Park, 1987-1989

### Honor Societies and Professional Organizations

- Phi Eta Sigma National Honor Society
- Mortar Board National Honor Society
- Golden Key National Honor Society
- Vice President for Professional Activities, Delta Sigma Pi

### Awards

- Top Graduate in Liberal Arts, University of Tennessee, Knoxville, Spring 1987
- Chancellor's Citation for Extraordinary Professional Promise, University of Tennessee, Knoxville
- Chancellor's Citation for Outstanding Academic Achievement, University of Tennessee, Knoxville
- First place poster presentation, American Agricultural Economics Association annual meetings, August 1998 (with Jason Henderson)
- Honorable mention, American Agricultural Economics Association, Essay for the 21st Century, 2001, "A Market Forces Policy for the New Farm Economy"

- Honorable mention, American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work on In Re Titanium Dioxide Antitrust Litigation matter)

**External Funding**

- "Unmanufactured Flue-Cured Tobacco Exports and the Export Component of the Quota Formula." $13,890 NC Tobacco Foundation. With Blake Brown 2000/2001.

## Professional Activities and Services

**Graduate Student Advising**

M.A. degree, North Carolina State University

- Joe Weinberg (Political Science)

Master of Economics, North Carolina State University

- William Pole (2000)
- Dwight Wilder (Chairman, 2002)
- Adrian Atkeson (2002)
- Sarah Spivey
- Li Zhang (Chairman, 2003)
- Nia Atmadja (2003)

Doctor of Philosophy, North Carolina State University

- William Deese (2003)
- Peyton Ferrier (Chairman, 2004)
- Yang Wang (2003)
- Bobby Huggett (2003)
- Syed Wadood (Chairman, 2004)
- Henry Kuo

## Economic and Statistical Modeling Skills

- Experience with all major statistical software including SAS, STATA, LIMDEP and C++; applied econometric modeling skills in damage analysis of consumer industries, chemicals industries, and agricultural markets, correlation analysis for class certification.

# Appendix B

## Materials Relied Upon

In addition to the materials listed in Appendix B to the Lamb Report, I also rely upon the following:

## Pleadings and Legal Correspondence

United States District Court Eastern District of New York, In Re Air Cargo Shipping Services Antitrust Litigation, MDL No. 1775, Case No. 1:06-md-01775-JG-VVP, Report and Recommendation, October 15, 2014

United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc. v. Jui Li Enterprise Company, Ltd., et al., Case No. 2:09-CV-00852-LA, Memorandum in Support of Direct Purchaser Plaintiffs' Motion for Class Certification, filed July 14, 2015

United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc. v. Jui Li Enterprise Company, Ltd., et al., Case No. 2:09-CV-00852-LA, Expert Report of Russell Lamb, filed July 14, 2015

United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc. v. Jui Li Enterprise Company, Ltd., et al., Case No. 2:09-CV-00852-LA, Defendants Auto Parts Industrial Ltd., Cornerstone Auto Parts, LLC and Jui Li Enterprise Company, Ltd.'s Memorandum in Opposition to Direct Purchaser Plaintiffs' Motion for Class Certification, filed October 13, 2015

United States District Court Eastern District of Wisconsin, Fond du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc. v. Jui Li Enterprise Company, Ltd., et al., Case No. 2:09-CV-00852-LA, Expert Report of Janusz Ordover, filed October 13, 2015

## Depositions

Deposition of Russell L. Lamb, October 1, 2015
Deposition of Janusz A. Ordover, November 9, 2015

## Third Party Materials

Websites

http://www.capacertified.org/about-capa/what-we-certify-2/

Data

National Statistics, Republic of Taiwan, Manufacture of Motor Vehicles and Parts, Indexes of Labor Productivity

Academic Literature

A. Colin Cameron and Pravin K. Trivedi, *Microeconometrics Using Stata*, Stata Press, 2009

Brian P. Macfie and Philip M. Nufrio, *Applied Statistics for Public Policy*, M.E. Sharpe, 2006

David Anderson, Dennis Sweeney, Thomas Williams, Jeffrey Camm, James Cochran, *Essentials of Statistics for Business and Economics*, Seventh Edition, Cengage Learning, 2014

Fumio Hayashi, *Econometrics*, Princeton University Press, 2011

Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fourth Edition, Cengage Learning, 2009

Peter Kennedy, *A Guide to Econometrics*, Fifth Edition, MIT Press, 2003

Pierre Cremieux, Ian Simmons, and Edward A. Snyder, "Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis", *George Mason Law Review*, Vol 17, No 4, 2010

Ron C. Mittelhammer, George G. Judge, and Douglas J. Miller, *Econometric Foundations*, Cambridge University Press, 2000

# Appendix C

# Mathematical Appendix

1.      Dr. Ordover commits a series of mathematical errors in calculating the "residual prices" using my regression model.

2.      The regression model I described in the Lamb Report, illustrated below, uses the natural logarithm of actual transaction prices ("$ln(P)$") as the dependent variable and the natural logarithms of three variables: the number of monthly motor vehicle crashes in the U.S., steel costs in the U.S., and the exchange rate between the Taiwanese dollar and U.S. dollar, as the explanatory variables. In addition, my model includes indicator variables for the top 10 customers, the conspiracy effect, and the impact of whether an AM Sheet Metal Part was CAPA certified, Partslink fixed effects and an error term ("$\varepsilon$").[1]

$$ln(P) = \beta_1 \, ln(Crashes) + \beta_2 \, ln(Steel\ Costs) + \beta_3 \, ln(Exchange\ Rate) +$$
$$\alpha \, Conspiracy\ Indicator + Top\ 10\ Customer\ Fixed\ Effects +$$
$$\theta \, CAPA\ Certified\ Indicator + Partslink\ Fixed\ Effects + \varepsilon \qquad [1]$$

3.      In order to calculate his residual prices, Dr. Ordover first predicts but-for log prices ("$\widehat{ln(P)}$") using the estimated regression equation illustrated below.[2] As shown, his calculation omits the Partslink fixed effects in my regression model, and therefore results in mathematically incorrect estimates of predicted but-for log prices.

$$\widehat{ln(P)} = \widehat{\beta_1} \, ln(Crashes) + \widehat{\beta_2} \, ln(Steel\ Costs) + \widehat{\beta_3} \, ln(Exchange\ Rate) +$$
$$Top\ 10\ \widehat{Customer\ Fixed\ Effects} + \hat{\theta} \, CAPA\ Certified\ Indicator \qquad [2]$$

4.      In order to predict but-for prices using predicted but-for *log* prices, the correct transformation is

$$\hat{P} = exp\left[\widehat{\beta_1} \, ln(Crashes) + \widehat{\beta_2} \, ln(Steel\ Costs) + \widehat{\beta_3} \, ln(Exchange\ Rate) +\right.$$
$$\left.Top\ 10\ \widehat{Customer\ Fixed\ Effects} + \hat{\theta} \, CAPA\ Certified\ Indicator\right] \cdot$$
$$\left(N^{-1} \sum_{j=1}^{N} exp(\hat{\varepsilon}_j)\right) \qquad [3]$$

---

[1] See Lamb Report at ¶¶92-101.
[2] See Dr. Ordover's backup material 3_Calculate_Residual_Prices.do.

where $N^{-1} \sum_{j=1}^{N} \exp(\hat{\varepsilon}_j)$ is an estimate of the mean of the exponentiated residuals, known as the "nonlinear correction term."[3] Dr. Ordover failed to apply the nonlinear correction term. As a result, he incorrectly calculated the predicted but-for price using the following formula, which generates a biased estimate for the but-for price.

$$\hat{P} = exp\left[\widehat{\beta_1}\ ln(Crashes) + \widehat{\beta_2}\ ln(Steel\ Costs) + \widehat{\beta_3}\ ln(Exchange\ Rate) + \right.$$
$$\left. Top\ 10\ \widehat{Customer\ Fixed\ Effects} + \hat{\theta}\ CAPA\ Certified\ Indicator\right] \qquad [4]$$

5.     Dr. Ordover then computes his residual price as the difference between the actual transaction price ("$P$") and the incorrectly calculated but-for price ("$\hat{P}$") as follows.

$$P - \hat{P} = exp\left[\widehat{\beta_1}\ ln(Crashes) + \widehat{\beta_2}\ ln(Steel\ Costs) + \widehat{\beta_3}\ ln(Exchange\ Rate)\right.$$
$$+ \hat{\alpha}\ Conspiracy\ Indicator + Top\ 10\ \widehat{Customer\ Fixed\ Effects}$$
$$+ \hat{\theta}\ CAPA\ Certified\ Indicator + Partslink\ \widehat{Fixed\ Effects} + \hat{\varepsilon}\left.\right]$$
$$- exp\left[\widehat{\beta_1}\ ln(Crashes) + \widehat{\beta_2}\ ln(Steel\ Costs)\right.$$
$$+ \widehat{\beta_3}\ ln(Exchange\ Rate) + Top\ 10\ \widehat{Customer\ Fixed\ Effects}$$
$$+ \hat{\theta}\ CAPA\ Certified\ Indicator\left.\right]$$

$$= exp\left[\widehat{\beta_1}\ ln(Crashes) + \widehat{\beta_2}\ ln(Steel\ Costs) + \widehat{\beta_3}\ ln(Exchange\ Rate)\right.$$
$$+ Top\ 10\ \widehat{Customer\ Fixed\ Effects} + \hat{\theta}\ CAPA\ Certified\ Indicator\left.\right]$$
$$\cdot exp\left[(\hat{\alpha}\ Conspiracy\ Indicator + Partslink\ \widehat{Fixed\ Effects} + \hat{\varepsilon}) - 1\right] \qquad [5]$$

6.     At his deposition, Dr. Ordover claimed that his calculated residual prices consist of only two elements: the conspiracy effect and the error term.[4] However, as shown above, the equation [5] that he uses to calculate the residual prices includes additional components, such as the effect of common market factors (i.e., Crashes, Steel Costs, Exchange Rate), the large customer effect,

[3] See Colin Cameron and Pravin Trivedi, "Microeconometrics Using Stata," Stata Press, 2009, p.103. See also, Wooldridge, "Introductory Econometrics: A Modern Approach," South-Western Cengage Learning, 2009, pp. 210-212.
[4] Ordover Deposition at 109:19-110:20.

2

the impact of CAPA Certification, and the Partslink fixed effects. Thus, Dr. Ordover is incorrect that he removed common factors from his residual prices.

7.      Dr. Ordover's correlations of residual prices are further obfuscated by his calculation of month-to-month changes in quantity-weighted residual prices. Because Dr. Ordover's residual price is a nonlinear function of the common market factors, conspiracy effect, customer and product fixed effects, and estimated error term, the changes in residual prices that Dr. Ordover calculated are a function of changes in the common market factors, conspiracy effect, customer and product fixed effects, and estimated error term that has no sensible economic meaning or interpretation.