# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Court File No. 2:09-CV-00852-LA

- - - - - - - - - - - - - - - - - - - - - - - -

Fond Du Lac Bumper Exchange, Inc., and
Roberts Wholesale Body Parts, Inc., on
Behalf of Themselves and Others Similarly
Situated,

Plaintiffs,

v.

Jui Li Enterprise, Ltd., et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -

\*\* CONFIDENTIAL/ATTORNEYS' EYES ONLY \*\*

- - - - - - - - - - - - - - - - - - - - - - - -
VIDEOTAPED DEPOSITION OF
KAREN FIERST

- - - - - - - - - - - - - - - - - - - - - - - -

Taken January 24, 2012     By Kelly A. Herrick

## Page 134

1 at 11:00 there would be an Executive Committee
2 meeting?
3 **A   It does.**
4      Q   And what's the Executive Committee?
5 **A   I don't know how they are chosen, but**
6 **TABPA has an Executive Committee so --**
7      Q   TABPA members choose the Executive
8 Committee?
9 **A   I don't know how they are chosen.**
10     Q   Do you know the positions on the
11 Executive Committee?
12 **A   (Shaking head.)**
13         MS. WOLLMAN:  Vague as to time.
14         THE WITNESS:  No.  I'm just told
15     this is the Executive Committee.
16 BY MS. SERVAIS:
17     Q   And then on Thursday, April 18th,
18 also from 2:30 to 5:30, does it indicate that the
19 TABPA would be meeting?
20 **A   Correct.**
21     Q   And they would be meeting with CAPA
22 manufacturers?
23         MR. HERBERT:  Objection:  Vague and
24     ambiguous.
25         MR. KALEC:  I object.  That

## Page 135

1 misstates what it says.
2         MS. WOLLMAN:  Best evidence.
3         THE WITNESS:  It appears to say
4     that this TABPA meeting was from 2:30 to
5     5:30, and then while there's no time
6     attributed to it, as I read it, sometime
7     after that there would be a dinner with
8     the CAPA manufacturers and the Technical
9     Committee -- CAPA's Technical Committee
10    delegates.
11 BY MS. SERVAIS:
12     Q   And so TC stands for Technical
13 Committee there?
14 **A   Correct.**
15     Q   And that would be the CAPA
16 Technical Committee?
17 **A   That's usually what it refers to.**
18     Q   And then that would be the TABPA
19 members who are delegates to the Technical
20 Committee?
21 **A   Not -- I'm sorry, ask the question again.**
22     Q   In this instance, would the TC
23 delegates be the TABPA members who were delegates
24 to the Technical Committee?
25         MR. KALEC:  Objection:  Lack of

## Page 136

1     foundation.
2         THE WITNESS:  I don't remember this
3     trip, but as I'm looking at this
4     itinerary, the way I interpret it, because
5     it says at the top where it says, "Stay in
6     Tainan (same hotel as CAPA TC)," I would
7     interpret that as there were delegates
8     from CAPA's Technical Committee that came
9     from the US, that's how I would interpret
10    the document, but I -- I do not remember
11    this particular visit.
12 BY MS. SERVAIS:
13     Q   At all, the whole 2002 trip?
14 **A   The only thing that gives me a clue is**
15 **that I know that one time I went from Taiwan to**
16 **Hawaii for a meeting, and it says Hawaii, and,**
17 **oh, that must be when I went to Hawaii.  I just**
18 **don't specifically remember this trip.**
19         (Exhibit Number 22 was marked.)
20 BY MS. SERVAIS:
21     Q   Ms. Fierst, you've just been handed
22 Fierst Exhibit Number 22.  Please take a moment
23 to review it.
24 **A   (Perusing.)  Okay.**
25     Q   Ms. Fierst, have you seen this

## Page 137

1 document before?
2 **A   I can't recall seeing it before.**
3     Q   Do you think you generated this
4 document?
5 **A   I probably did.**
6     Q   Is this referring to your April 15
7 through April 21, 2002 trip to Taiwan?
8 **A   It appears to refer to that.**
9     Q   Would that be the same trip we just
10 discussed with respect to Exhibit Number 21?
11 **A   It appears.**
12        MS. WOLLMAN:  Calls for
13    speculation; lacks foundation.
14 BY MS. SERVAIS:
15     Q   Ms. Fierst, are these -- does this
16 document constitute questions you planned to ask
17 all manufacturers at the Taiwan trip?
18         MS. WOLLMAN:  Calls for
19     speculation; lacks foundation.  The
20     witness already testified she wasn't 100
21     percent sure she had created this
22     document.
23         THE WITNESS:  I probably created
24     this document.  The -- as I'm looking at
25     this now and interpreting it, there are

138

 1    two sections of this document: One is
 2    questions -- you know, just flat-out
 3    questions, and another are discussion
 4    topics.
 5    BY MS. SERVAIS:
 6        Q    I'm asking about the questions.
 7             Were those questions you --
 8    question areas you planned to speak with the
 9    manufacturers about during the Taiwan trip in
10    2002?
11        A    Again, I don't specifically remember the
12    trip. I can assume that I created this document.
13    It is, therefore, probable that these were the
14    questions that I intended to ask, but I cannot
15    say it with 100 percent certainty.
16        Q    Do you know whether you asked any
17    of those questions?
18        A    I would guess that I asked some of these
19    questions. These are the type of questions that
20    I might ordinarily ask or discuss.
21             MS. WOLLMAN: I'm just going to
22        remind the witness, even though this is
23        not my witness, that you've been advised
24        by counsel not to guess, so I'm going to
25        assert an objection to the extent that the

139

 1        question did call for speculation and lack
 2        foundation. Thank you.
 3             MS. SERVAIS: That was coaching the
 4        witness.
 5             MR. HERBERT: Let me make a
 6        statement. Hold on. Hold on. Hold on.
 7        I didn't disclose any of the contents of
 8        my instructions to my client. I'm not --
 9             MS. WOLLMAN: I thought, at the
10        beginning, the admonitions included an
11        admonition not to guess or speculate if
12        the witness did not know. If they did not
13        include it --
14             MS. SERVAIS: This is not your
15        witness, as you said.
16             MR. HERBERT: I don't remember that
17        admonition, and if the witness wants to
18        guess, it's okay with me.
19    BY MS. SERVAIS:
20        Q    Ms. Fierst, is there any reason you
21    would not have discussed these topics?
22             MR. KALEC: I'm going to object as
23        argumentative since she testified before
24        she doesn't even remember if she made the
25        trip.

140

 1             MS. SERVAIS: That's misstating
 2        testimony.
 3             MR. KALEC: Objection stands.
 4             MS. WOLLMAN: I didn't think it was
 5        testimony. Congratulations, Bob, I guess
 6        you're now testifying.
 7             MR. HERBERT: Would you mind
 8        telling me what the pending question is?
 9        I apologize.
10             MS. SERVAIS: Can you repeat it.
11             (Question read back.)
12             MR. HERBERT: All right. I do
13        object to that question as being ambiguous
14        and calls for speculation.
15             THE WITNESS: These questions fall
16        in line with the type of questions or
17        discussions I might have had with
18        manufacturers. I can't say whether or not
19        I did ask these questions.
20    BY MS. SERVAIS:
21        Q    Ms. Fierst, what is shared tooling?
22             MS. WOLLMAN: Objection: Calls for
23        speculation; lacks foundation.
24             MR. HERBERT: I join.
25             MS. WOLLMAN: Vague and ambiguous.

141

 1             MR. HERBERT: I join that, too.
 2             THE WITNESS: My understanding, as
 3        I've been told, is that shared tooling
 4        involves a joint investment in a new tool
 5        which is developed, and the production,
 6        profit, whatever the output of that tool
 7        is shared among the investors.
 8    BY MS. SERVAIS:
 9        Q    Do you know whether any of the
10    Tier One manufacturers have shared tooling?
11             MS. WOLLMAN: Object to the
12        continued use of the term -- undefined
13        term "Tier One" as vague and ambiguous.
14             THE WITNESS: Joint investment in
15        tools, as I have been told, is not
16        uncommon.
17    BY MS. SERVAIS:
18        Q    Does Jui Li invest in shared
19    tooling?
20             MR. KALEC: Object to foundation.
21             THE WITNESS: I don't --
22             MS. WOLLMAN: Hang on, can I ask
23        you to slow for a second. Thank you. I
24        appreciate it; vague as to time; calls for
25        speculation; lacks foundation.

**170**

1  A   Well, you said it did so that's how I
2  know. I don't -- you know, I hadn't -- this is
3  not a document that I looked at in preparing for
4  my deposition.
5      Q   Ms. Fierst, do you recall if you
6  created the final minutes of the 2004 meeting?
7  A   I'd like --
8          MR. HERBERT: Objection -- excuse
9      me, objection to the assumption in the
10     question.
11 BY MS. SERVAIS:
12     Q   Ms. Fierst?
13         MR. KALEC: Join the objection.
14         THE WITNESS: I likely created the
15     final.
16     (Exhibit Number 28 was marked.)
17 BY MS. SERVAIS:
18     Q   Ms. Fierst, please look at Fierst
19 Exhibit Number 28.
20 A   (Perusing.) Okay.
21     Q   Ms. Fierst, can you identify
22 Exhibit Number 28 for me.
23 A   This is the Executive Summary of a series
24 of meetings that took place in Southern
25 California March 2nd and 3rd, 2004.

**171**

1      Q   Did you create this document?
2  A   I believe I did.
3      Q   And then do you see the third
4  paragraph of the document? It says "Seven
5  meetings were held between March 1 and March 3:
6  two manufacturer only meetings"?
7  A   Um-hmm.
8      Q   Did those meetings occur?
9  A   I believe so.
10     Q   Do you see Footnote 1?
11 A   Yes.
12     Q   Are those companies that were
13 represented at those meetings?
14 A   I believe so.
15     Q   Ms. Fierst, can you look at page 4,
16 page 4 --
17 A   Yes.
18     Q   Do you see where it says Standard
19 Setting and Part Quality Issues?
20 A   Yes.
21     Q   Do you know what this is
22 discussing?
23         MS. WOLLMAN: Best evidence.
24         MR. HERBERT: Objection to the
25     ambiguity in the question. Do you mean

**172**

1  who was this meeting with, this part of
2  the meeting?
3  BY MS. SERVAIS:
4      Q   We could start there. Do you know
5  who this meeting was with?
6  A   Well, by way of clarification, these seven
7  meetings that were referred to were all focused
8  specifically on this event, nothing long-term.
9          There were -- you know, there are
10 cross-cultural issues in having a meeting with 6
11 or 8 Taiwanese, and another 11 or 10 Americans,
12 and these manufacturer only meetings were focused
13 on, what's going to happen in the meeting, how
14 are we going to conduct the meeting, what are our
15 goals of the meeting, that's what those were.
16         Then there were four meetings with
17 the repairers, these are the same repairers that
18 had come to Taiwan and met with the manufacturers
19 before.
20         And then the manufacturers and the
21 repairers hosted a meeting with certifiers, and
22 they hosted a meeting with distributors, and they
23 hosted a meeting with insurers. So that's what
24 went on during those few days.
25         I mean, the standard setting and

**173**

1  part quality issues, these were interesting, but
2  this would probably relate back to that previous
3  document that was very difficult to read as to
4  where -- this looks like a -- ah, okay, M2, that
5  means that -- M means manufacturers had this
6  conversation.
7      Q   All right. So this --
8  A   Oh, no, I'm sorry, that's not what it
9  meant. It means that the manufacturers saw this
10 as a significant issue, that -- the standardized
11 certification and enforcement process for
12 certification.
13         These notes, I think, were -- I
14 think were cumulative --
15         MR. HERBERT: There's a key to
16     these numbers.
17         THE WITNESS: Yeah.
18         MR. HERBERT: It doesn't say
19     about --
20         MS. SERVAIS: Anyway, I'm asking
21     the witness what her understanding --
22         MR. HERBERT: There's a key to the
23     numbers.
24 BY MS. SERVAIS:
25     Q   Ms. Fierst, the manufacturers were

174
1   at all these meeting --
2   A    Yes.
3        Q    -- segments, correct?
4   A    Yes.
5        Q    Can you tell me what the second to
6   last paragraph on this page --
7             MR. KALEC:  Which page?
8             MS. SERVAIS:  I'm sorry, the page
9        we've been discussing, the Standard
10       Setting and Part Quality Issues.
11  BY MS. SERVAIS:
12       Q    Actually, Ms. Fierst, can you read
13  for the record the second to last paragraph that
14  begins with "Consensus."
15  A    "Consensus was that once the standard is
16  established" -- "Consensus was that once the
17  standard is established, it will be the major
18  factor in setting the price.  Repairers and
19  insurers agreed that manufacturers should
20  establish quality and then set price.  Concern
21  about over competition in Taiwan affecting price
22  was expressed."
23       Q    Does that accurately reflect what
24  happened at that meeting?
25            MR. HERBERT:  Objection.  That is

                                                                        175
1        grossly overbroad.  There's no indication
2        that this has a complete summary of what
3        happened at that meeting, and there's no
4        indication of who was speaking.  I object.
5             MS. WOLLMAN:  Join.
6             THE WITNESS:  This is an Executive
7        Summary.  I certainly don't remember the
8        specifics of the discussions of the
9        meetings.  I see that it's here on the
10       paper.  I can't respond differently.  I
11       don't know how to respond differently to
12       your question.
13  BY MS. SERVAIS:
14       Q    I mean, you don't need to respond
15  differently.  I just wanted an answer.
16            I mean, does this document
17  accurately reflect what happened at the meeting?
18            MR. HERBERT:  Same objections.
19            MS. WOLLMAN:  Join.  Best evidence.
20            MR. HERBERT:  I join.
21            MS. WOLLMAN:  Lacks foundation;
22       calls for speculation.
23            MS. SERVAIS:  You're interrupting
24       the witness.
25            MS. WOLLMAN:  I was trying to get

                                                                        176
1        my objection in.
2             MR. KALEC:  I was trying to get an
3        objection in, too.  She said this is a
4        summary, I imagine it would be her
5        summary.
6             I don't see how she can answer
7        whether or not this accurately reflects
8        what was said.  This may be an accurate
9        reflection of her understanding, and a
10       summary of it, so I'll object for lack of
11       foundation.
12            MR. HERBERT:  I join that
13       objection.  You may answer.
14            THE WITNESS:  Again, I do not
15       recall the specifics of the meeting.  From
16       a professional perspective, I would hope
17       that this was an accurate representation
18       of the meeting.
19            (Exhibit Number 29 was marked.)
20  BY MS. SERVAIS:
21       Q    Ms. Fierst, please take a moment to
22  look at Exhibit Number 29.
23  A    (Perusing.)
24       Q    Ms. Fierst, have you had an
25  opportunity to review the document?

                                                                        177
1   A    Um-hmm.
2        Q    Ms. Fierst, are these the attendees
3   at the 2004 meeting in Santa Monica?
4   A    These are only the repairers and the
5   manufacturers.  These are not the certifiers,
6   insurers or distributors.
7        Q    Can you identify some of the people
8   in here.
9             MS. WOLLMAN:  How are we going to
10       do that on the record?  Do you want her to
11       identify them by pointing to them?
12            MS. SERVAIS:  Yeah, I mean, she can
13       point to them and tell us who they are.
14            MS. WOLLMAN:  Well, okay.
15            MS. SERVAIS:  I mean, then we'll
16       know their names, right?
17            MS. WOLLMAN:  I have no problem to
18       her -- I have no problem with her
19       identifying who was present in the meeting
20       but to the extent you're going to have her
21       point at somebody and identify them
22       visually, it will be impossible for the
23       record to reflect what she's doing, so I
24       think that's an improper use of a
25       deposition, but I have absolutely no

|     | 218 |
| --- | --- |
| 1   | A    No.  It was obviously before his company |
| 2   | went bankrupt. |
| 3   |    Q    Do you recall when his company went |
| 4   | bankrupt, the year? |
| 5   | A    I can't. |
| 6   |       (Exhibit Number 36 was marked.) |
| 7   | BY MS. SERVAIS: |
| 8   |    Q    Ms. Fierst, please take a moment to |
| 9   | review Document Number 36. |
| 10  | A    (Perusing.)  Okay. |
| 11  |    Q    Ms. Fierst, do you recognize this |
| 12  | document? |
| 13  | A    I don't recognize it. |
| 14  |    Q    Is it a document you created? |
| 15  | A    It appears that it is a document I |
| 16  | created. |
| 17  |    Q    Around 2003? |
| 18  | A    It says it's an annual report for 2003. |
| 19  |    Q    And do you know who this report was |
| 20  | intended for? |
| 21  | A    It was meant to -- an annual report would |
| 22  | have been meant to the members of TABPA. |
| 23  |    Q    Did you provide this report to |
| 24  | them? |
| 25  | A    I presume I sent it to them. |

219

1    Q    Do you see the last paragraph on
2    the first page of the document, last paragraph?
3    A    Um-hmm, yes.
4    Q    What is this discussing?
5    A    The compensation for KerenOr Consultants
6    is somehow collected from member companies of
7    TABPA.  Not all member companies contribute to
8    the fee.
9         So I was asked to speak to some
10   current TABPA members who did not contribute to
11   the KerenOr fee, and also to some manufacturers
12   who may not have been in TABPA, and the request
13   was that I meet with these companies, try to
14   explain to them what I do on behalf of TABPA, and
15   persuade them to contribute to the fund that
16   would underwrite the cost and expenses for the
17   work that KerenOr Consultants does for TABPA.
18   Q    And that's because everyone -- all
19   the TABPA members are benefiting from your
20   services, correct?
21   A    At that time, all of them were benefiting
22   from the services.
23   Q    Okay.  And the last line of that
24   paragraph it says, "Two or three new companies
25   began to contribute as a direct result of

220

1    KerenOr's efforts," correct?
2    A    That's what it says.
3    Q    Do you recall which new companies
4    those were?
5    A    No, I do not.
6    Q    Ms. Fierst, on the last page of the
7    document?
8    A    Um-hmm.
9    Q    Can you read that final paragraph
10   for me.
11   A    "In my opinion, 2004 is a critical year
12   for Taiwanese manufacturers.  I look forward to
13   working closely with you to improve your image
14   and achieve increased sales and profits."
15   Q    Ms. Fierst, how did you intend to
16   help the Taiwanese manufacturers improve their
17   image?
18   A    All of the industry relations work I did
19   for them was with the intent of building trust,
20   enhancing communication, and opening doors so
21   that the products -- so that the -- the body
22   shops would be more willing to use products.
23        Some of these body shops used the
24   products in early years, they were not happy with
25   the quality, they didn't see the improvements in

221

1    quality, they just, you know, kind of defaulted
2    back to previous perceptions.
3         So my work for TABPA was
4    significantly to help them improve their image
5    through the industry relations role.
6    Q    How did you intend to help them
7    achieve increased sales and profits in 2004?
8    A    Well, improving image is part of a
9    marketing strategy.  Marketing, ultimately, is
10   worth it only if it improves increased -- if it
11   improves sales and profits, so whenever you
12   market, there's always a risk, you can't always
13   prove that there's a direct causal relationship,
14   but that is what the intent of that sentence was.
15        (Exhibit Number 37 was marked.)
16   BY MS. SERVAIS:
17   Q    Ms. Fierst, please take a moment to
18   review Document Number 37.
19   A    (Perusing.)  Okay.
20   Q    Ms. Fierst, do you recognize this
21   document?
22   A    I reviewed this document in preparation
23   for this deposition.
24   Q    What is this document?
25   A    This appears to be a letter written

1  shortly after the meetings that we had in
2  Santa Monica that we discussed earlier, a letter
3  to the TABPA members that were involved in that
4  Santa Monica meeting.
5     Q    Ms. Fierst, this letter was drafted
6  April 2, 2004?
7     A    It's dated April 2, 2004.
8     Q    Is it your understanding it was
9  sent shortly around that -- or around that time?
10    A    I would assume.
11    Q    And, Ms. Fierst, in the first
12 sentence of the letter you say "I would like to
13 reflect, for a moment on the Santa Monica
14 meetings and our next steps"; is that correct?
15    A    Yes.
16    Q    In this letter, do you give the
17 TABPA members directions on next steps?
18         MS. WOLLMAN: Objection: The
19    document speaks for itself; best evidence.
20         THE WITNESS: I believe I
21    encouraged them to commit to working
22    together with the certification program to
23    improve the program and the process, and I
24    think that the letter encourages them
25    to -- each individual company to commit to

1     manufacturing quality product.
2  BY MS. SERVAIS:
3     Q    Ms. Fierst, can you read the fourth
4  paragraph of this letter for the record.
5     A    "As was mentioned by someone in one of our
6  meetings with CSD in Taiwan last February, the
7  issue of manufacturers undercutting each other is
8  quite serious.  In order to improve the health of
9  our industry, Tier One manufacturers have to
10 understand the implications of many of their own
11 actions and the impact those actions have on the
12 over all [sic] health of our industry.  The
13 industry is maturing and if we want long term
14 success, we have to do business differently than
15 we have been doing it for the past two decades."
16    Q    Ms. Fierst, in the next paragraphs,
17 are you advising the TABPA members that changing
18 prices every few months without 90 days advance
19 notice is detrimental --
20         MS. WOLLMAN: Objection.
21 BY MS. SERVAIS:
22    Q    -- to TABPA's ability to improve
23 the situation?
24         MS. WOLLMAN: I'm sorry that I
25    interrupted.  Objection: Best evidence;

1     the document speaks for itself; lacks
2     foundation; assumes facts not in evidence.
3          THE WITNESS: In reading these
4     sentences, that appears to be what I -- it
5     says, we have to take into account that
6     there is a -- in the supply channel, there
7     is a time lag between the time a
8     manufacturer changes a price and the time
9     the insurance company and the body shop
10    would actually receive notification of
11    that.
12         Again, I do not track prices, but I
13    assume -- I can only assume that this --
14    either -- this issue either came up at the
15    Santa Monica meeting, or some distributor
16    may have mentioned it to me.
17         I don't remember the genesis of why
18    I would have said this because I, myself,
19    do not track prices.
20 BY MS. SERVAIS:
21    Q    Ms. Fierst, did you ever follow up
22 with the Tier One manufacturers to see if they
23 had stopped changing prices every few months?
24    A    No.
25         MS. WOLLMAN: Object -- let me

1     please add an objection to the use of the
2     term "Tier One manufacturers" as
3     undefined; vague and ambiguous; overbroad;
4     potentially encompassing information that
5     is not reasonably calculated to lead to
6     the discovery of admissible evidence.
7  BY MS. SERVAIS:
8     Q    Ms. Fierst, did you ever check with
9  TABPA members in general to see if they stopped
10 changing prices every few months?
11    A    I don't believe I did.
12         MS. WOLLMAN: Objection.  If you
13    could just pause just for a second.  I
14    know we're all getting impatient in the
15    afternoon.  Could I have the question read
16    back.
17         (Question read back.)
18         MS. WOLLMAN: Object to the use of
19    the term "Tier One manufacturers" on the
20    same ground as previously stated.
21         The question assumes facts not in
22    evidence; it is compound; lacks
23    foundation; calls for speculation.
24         MR. HERBERT: And I object that it
25    mischaracterizes the witness's prior

230

1 THE WITNESS: I see the date is
2 different.
3 MR. HERBERT: They are different.
4 THE WITNESS: Oh, okay. All right.
5 (Question and answer read back.)
6 THE WITNESS: Okay.
7 BY MS. SERVAIS:
8 Q Ms. Fierst, do you recognize this
9 document, Exhibit Number 38?
10 A This is an E-mail that appears to have
11 been sent by me to some of the -- it looks like
12 to the manufacturers that participated in the
13 Santa Monica meeting.
14 It's dated April 12th and it is
15 among the documents that I reviewed prior to
16 this -- it's among the E-mails that I reviewed
17 prior to this deposition.
18 Q Ms. Fierst, does the bottom of the
19 document indicate that you sent this E-mail from
20 your AOL account on April 12, 2004, the bottom of
21 the first page?
22 A Yes, I guess it does, yeah.
23 Q Ms. Fierst, the subject line of his
24 E-mail is "A VERY important message - please read
25 in its entirety," correct?

231

1 A That is correct.
2 Q Ms. Fierst, can you identify the
3 individuals you sent this E-mail to?
4 A I'm not sure who the first person is,
5 sales31.
6 Q Is it someone from Jui Li?
7 A It would be someone from Jui Li, yes.
8 Q Do you know, in the 2004 time
9 period, who that might have been?
10 MR. HERBERT: Objection: Calls for
11 speculation.
12 THE WITNESS: I don't know. In
13 the -- in the picture from the meeting,
14 there were at least two people from
15 Jui Li. That would have been Flyer Su and
16 John Lu, and I don't know if this was one
17 of them.
18 BY MS. SERVAIS:
19 Q Okay.
20 A I think, but I'm not positive, that the
21 next one is Janey Wu of Tong Yang, or of TN, or
22 whatever they called it at that time, TKY.
23 Only because I saw the picture, the
24 next one may be Norman Yang of Tong Yang, OTN,
25 that group of companies.

232

1 This looks like it may be John Lu
2 of Jui Li. It looks like a personal address. If
3 it is John Lu, then maybe the first one is Flyer,
4 I don't know.
5 CEO ProFortune would have been John
6 Jou of ProFortune; Vincent Chou, at this time he
7 was with Eagle Eyes; Kenny Ho of TYC; I'm not
8 positive, but I think QAQ116, I think is someone
9 that was not at the meeting, Jack -- I don't
10 remember his last name -- from DEPO, I believe
11 that's him; service@mail.autoparts, that would
12 have been Parkson Jong.
13 Q What company again?
14 A API. And Sonny0605@Yahoo.com, that would
15 have been Sonny Pan of Gordon.
16 Q Thank you.
17 Ms. Fierst, can you turn to the
18 second page of the document.
19 A (Complying.)
20 Q Ms. Fierst, do you see the second
21 paragraph where it says, I see the following
22 steps as critical to the long term success of
23 Tier One manufacturers securing their place in
24 the high end, high volume shops and creating real
25 market demand for repairs, rather than continuing

233

1 to depend on insurance company policies to push
2 the parts on repairers.
3 MR. HERBERT: Actually, you said
4 "for repairers" and it says "by
5 repairers."
6 THE WITNESS: Right.
7 BY MS. SERVAIS:
8 Q By repairers.
9 A Yes, I see that paragraph.
10 Q Ms. Fierst, are the following steps
11 that you refer to in that paragraph?
12 A It appears to be.
13 Q And there appear to be five steps,
14 correct?
15 A Yes.
16 Q Ms. Fierst, can you read for the
17 jury Step Number 3.
18 MS. WOLLMAN: The jury?
19 MR. KALEC: What jury? I object to
20 the phraseology of the question.
21 MS. WOLLMAN: I think that's an
22 entirely inappropriate question. She's
23 not reading anything for the jury.
24 BY MS. SERVAIS:
25 Q Ms. Fierst, can you read paragraph

234

1   number 3 for the jury.
2           MR. KALEC:  Same objection.
3           MS. WOLLMAN:  Same objection.
4           MR. KALEC:  There's no jury to be
5   read to.
6           MS. WOLLMAN:  The question is
7   improper.
8           MR. HERBERT:  It sounds like you're
9   attempting to bully the witness.  What are
10  you doing?  I've never heard a question
11  phrased like that before and I object to
12  it.  I think it's improper.
13          We've had now five and a half hours
14  of deposition.  There's been no reference
15  to a jury.
16          MS. SERVAIS:  Who do you think this
17  is intended for?
18          MR. HERBERT:  I think it's intended
19  for impeachment at trial.
20          MS. SERVAIS:  At trial.  Who's at
21  the trial?
22          MR. HERBERT:  I don't know if this
23  is going to go into evidence at the trial.
24  I don't agree with this phrasing at all.
25  BY MS. SERVAIS:

                                                                                        235

1       Q   Ms. Fierst, can you read paragraph
2   number 3, please.
3       A   "Tier One Manufacturers must abandon the
4   practices of under bidding and under cutting each
5   other's prices.  Each company must adopt a long
6   term, reasonable pricing practice.  Perhaps CSD
7   can assist with this endeavor."
8       Q   Ms. Fierst, did you ever follow up
9   with the recipients of this E-mail to see if they
10  had taken your advice?
11          MS. WOLLMAN:  Are you asking only
12  with reference to that one paragraph?  The
13  question is vague and ambiguous.
14          MS. SERVAIS:  I am asking with
15  respect to Number 3.
16          THE WITNESS:  My comment here would
17  be similar to the previous document.  It
18  appears, as I read this, that my choice of
19  words in this document, which was written
20  in 2004, might be misconstrued.
21          When I write, "Each company must
22  adopt a reasonable long term, reasonable
23  pricing practice," what I intended was --
24  and I think this is clear throughout the
25  documents that I have reviewed here -- the

                                                                                        236

1   emphasis is on quality, quality
2   production, distinguishing between a
3   quality product and a -- a certified
4   product versus a noncertified product.
5           There was a failure on the part of
6   the manufacturers, on the part of the
7   distributors, of establishing in the
8   marketplace that there are two different
9   price points here, and as a result of
10  this, there was a lot of pressure on the
11  manufacturers, both to increase the
12  manufacture of lower-quality products, or
13  perhaps charge a lower price for a product
14  that really should have been at a higher
15  price point.
16          I did not -- I do not recall
17  following up on this with the
18  manufacturers.
19  BY MS. SERVAIS:
20      Q   Ms. Fierst, can you return to the
21  recipient line, or the To line of this E-mail.
22      A   (Complying.)
23      Q   Ms. Fierst, do you know whether any
24  of the executives from any of the companies
25  represented in the To line have been indicted by

                                                                                        237

1   the U.S. Government for price fixing?
2           MS. WOLLMAN:  Object to the
3   question as irrelevant; beyond the scope
4   of this lawsuit; not reasonably calculated
5   to lead to the discovery of admissible
6   evidence in this case; and a violation of
7   Judge Wu's Order staying another lawsuit
8   pending in the Central District of
9   California, and caution counsel that this
10  line of questioning -- if it is a line of
11  questioning -- may be a violation of that
12  Order which is in effect, and suggest that
13  you may want to consult with your
14  co-counsel, who I believe is on the phone,
15  who can advise you that you may be
16  treading into an area which would be a
17  direct violation of that Order, as well as
18  a Motion for Protective Order, which was
19  the subject of a motion filed by the
20  Department of Justice.
21          MR. HERBERT:  And I would also
22  object that you're calling for hearsay.
23  Anything Ms. Fierst might or might not
24  know about that either comes from
25  something that someone else told her or

238

1  from what she read in the newspaper. It
2  has no evidentiary value.
3  BY MS. SERVAIS:
4  Q    Ms. Fierst, you can answer the
5  question.
6       MS. WOLLMAN:  I'm advising counsel
7  that you may be in contempt of court at
8  this time.  Up to you to proceed.  You
9  have now been advised.
10      I suggest we take a break and you
11 can consult with counsel.  You're going to
12 be in contempt of court.  I will provide
13 you with the Order.
14      I am representing to you, as a
15 fellow officer of the court, that you're
16 about to be in contempt of court.
17      Mr. Hartley, I just heard you clear
18 your voice, you can advise her, we can
19 take a break, whatever you want to do.
20      MR. HARTLEY:  I think Jessica is
21 doing a fine job.
22      MS. WOLLMAN:  Great.
23      MR. HARTLEY:  Why don't you repeat
24 the question for me.
25      MS. SERVAIS:  Can you read the

239

1  question to the witness.
2       (Question read back.)
3       MS. WOLLMAN:  Same --
4       MR. KALEC:  I'm going to object to
5  the question that it's ambiguous;
6  misleading.
7       As a former Assistant United States
8  Attorney for the United States Department
9  of Justice, and a practicing criminal
10 defense lawyer, I can assure you the
11 United States Government does not indict
12 anyone.
13      MR. HERBERT:  I join that
14 objection.
15      MS. WOLLMAN:  Same objections as
16 previously stated, as well as my previous
17 admonitions to counsel.
18      MR. HARTLEY:  Jessica, the question
19 is fine.  Don't worry about the
20 objections.  I would ask the witness to
21 answer the question, and then, depending
22 on the answer, we can confer further if
23 necessary.
24      MS. WOLLMAN:  I would state, Jason,
25 the admonition is being extended to you as

240

1  a matter of professional courtesy as well.
2       I understand you are free to
3  disregard my advice, I know you were not
4  at the hearing that was held recently
5  before Judge Wu, and I suggest you
6  reconsider, but I will let you make your
7  own decision.
8       MR. HARTLEY:  My decision is the
9  objection is ridiculous because in the To
10 line there are Defendants in this case,
11 and depending on the witness' answer, then
12 we can determine whether to proceed
13 further.
14      MS. WOLLMAN:  My objections --
15      MR. KALEC:  There is no Defendants
16 in the To line.  Those are individuals in
17 the To line.  There's no individual
18 Defendants in this case.
19      So I -- I object to your
20 characterization.  If that's the basis of
21 the question, the question has no basis.
22 BY MS. SERVAIS:
23 Q    I think it's time for the answer to
24 the question.
25 A    I don't know.

241

1  Q    Is there anything that would
2  refresh your recollection?
3       MS. WOLLMAN:  Same objections.
4       MR. KALEC:  Objection: Lack of
5  foundation.  There's no indication she had
6  a recollection to be refreshed.
7       MR. HERBERT:  I join the last
8  objection.
9  BY MS. SERVAIS:
10 Q    Ms. Fierst, do you know whether any
11 of the TABPA members have been indicted in
12 price-fixing cases in the United States?
13      MR. KALEC:  Objection: Irrelevant
14 in this case.  Given how long we've been
15 going at it, this is going to badger the
16 witness.  I object.
17      MS. WOLLMAN:  Same objection. This
18 is a violation of Judge Wu's Order staying
19 another lawsuit pending in the
20 United States District Court for the
21 Central District of California.
22      Co-counsel on the phone, Jason
23 Hartley, is fully aware of the parameters
24 of that Order rendered by Judge Wu very
25 recently.

242

1    I can have a copy available to
2    counsel to review. I suggest, again, as a
3    fellow member of the court -- officer of
4    the court, that she may want to make her
5    own decision on behalf of her own law firm
6    and review that Order.
7        I have it available on the phone
8    and you can read it if you like.
9        MR. HARTLEY: You can state your
10   objection and then let the witness answer
11   the question, please.
12       MR. BROWN: For the record, the
13   only person that's talking about any other
14   case other than the one that's ours is you
15   guys on the defense side. Nobody else
16   here has mentioned any other case.
17       MS. SERVAIS: Exactly. I'm dealing
18   with an E-mail that has been produced in
19   this case.
20       MR. KALEC: But you first state the
21   question is as -- has anybody on here been
22   indicted by the United States Government?
23   The United States Government doesn't
24   indict anyone.
25       Secondly, the basis of the question

243

1    was as to whether these people in this To
2    line are Defendants in this case, they are
3    not.
4        MS. WOLLMAN: The question is a
5    direct intent to violate an Order staying
6    another lawsuit. You know that, you've
7    been advised of that, you're trying to
8    play games, and we all know what's going
9    on.
10       You can ask your question if you
11   want to proceed to do that. I am advising
12   you, as a matter of professional courtesy,
13   that you're treading into very dangerous
14   territory. You can disregard what I'm
15   saying.
16       The question is irrelevant; it
17   seeks the discovery of information that is
18   not reasonably calculated to lead to
19   discoverable evidence in this case; lacks
20   foundation; calls for speculation; assumes
21   facts not in evidence.
22       MR. HERBERT: I haven't had a
23   chance to state my objections yet to this
24   question.
25       I join all the objections that have

244

1    just been stated except with respect to
2    Judge Wu's Order, which I know nothing
3    about, and with respect to relevance and
4    whether it's reasonably calculated to lead
5    to the discovery of admissible evidence,
6    again which I know nothing about.
7        I add to those objections that it
8    is objectionable because it calls for
9    information based on hearsay.
10       <u>MS. SERVAIS: Can you read back my</u>
11   <u>last question.</u>
12       <u>(Question read back.)</u>
13       <u>MR. KALEC: Same objections.</u>
14       <u>THE WITNESS: I'm aware of the fact</u>
15   <u>that Eagle Eyes and DEPO have been</u>
16   <u>involved in price-fixing cases.</u>
17   BY MS. SERVAIS:
18   Q    Ms. Fierst, do you know whether --
19       MS. WOLLMAN: Move to strike the
20   last answer as having been solicited in
21   violation of a stay, a complete stay of
22   the civil suit entitled In Re:
23   Aftermarket Auto Lights pending in the
24   United States District Court for the
25   Central District of California.

245

1        That stay Order was issued by
2    Judge Wu this month. Counsel on the
3    phone, Jason Hartley, is fully aware of
4    Order as counsel of record in that
5    lawsuit.
6        He was the non- movement on that
7    motion, opposed it -- he's fully aware of
8    the outcome of that motion.
9        He has been served with a copy of
10   Judge Wu's Order, and he has now violated
11   it, as has all counsel present for the
12   Plaintiffs who were advised by me in
13   advance of asking that the question they
14   were asking was going to violate that
15   Order. Now you proceed at your own peril.
16   BY MS. SERVAIS:
17   Q    Ms. Fierst, do you whether any --
18       MR. HARTLEY: Jessica, now I need
19   to respond because I've been accused of
20   violating an Order, so I've just got to
21   state quickly on the record that
22   everything Shari Wollman just said is
23   ridiculous, and I don't agree with it, and
24   if we're going to continue to have
25   speaking objections, I'm going to start

| | |
|---|---|
| Subj: | **A VERY important message - please read in its entirety** |
| Date: | 4/12/2004 9:05:50 AM Eastern Standard Time |
| From: | Kfierst |
| To: | sales31@juili.com.tw, tyg0622@tyg.com.tw, tyg6074@tyg.com.tw, johnjflu@yahoo.com, ceo@profortune.co.tw, vincent_chou@eagleeyes.com.tw, Kenny_Ho@tyc.com.tw, qaq116@yahoo.com.tw, service@mail.autoparts.com.tw, sonny0605@yahoo.com.tw |

Dear Colleagues,

I realize that the process we have begun to change the industry and its image are difficult for all involved. Not only do the manufacturers have to learn to work together, but we are also facing the challenge of bringing like-minded representatives from other segments to the table to work toward a common goal. Every group has its own agenda and vision. Finding a consensus will be difficult.

I am doing my best to develop a long term strategy which will benefit the manufacturers and the future of high end aftermarket parts. However, some companies or industry segments focus on the short term and\or are resistant to change. Change is always difficult. I expect the next few months to be difficult for all and, perhaps controversial, as we attempt to find the "friends" President Su mentioned and organize everyone to work together.

Some of you have expressed concerns about whether ASA, SCRS and AASP are the groups of repairers with whom we should be working. I would like to clarify why I feel strongly that this is the right approach.

Because of their relationships with insurers, most consolidators are already trying to use AM parts, even if they don't want to. But very few are using the maximum potential number of parts because they do not trust AM parts to get the job done in a quality or timely fashion. These concerns are based on their past experiences, whether they be 2 months, 2 years or 10 years ago.

Also, some insurance companies have written provisions in their direct repair agreements which require the repairer to pay for additional rental car expenses if the repair has been delayed. This can add significant costs to a repairer who cannot meet guaranteed cycle time requirements. Therefore, the risk, and cost, of using an AM part which may not succeed is too high.

Additionally, a very important concept for us to remember is that consolidators are viewed by the independents as being too close to the insurers. So, working with them now will not help us change our image or gain wider acceptance by the repairer community. It will simply be looked upon as if the insurance industry is still pushing the product. Yes, it is true that we MIGHT be able to get consolidators to buy more parts in the short term. However, I question that approach, since, apparently, we still have certified part availability and quality issues. I know that there are still distribution service issues. These all have to be fixed before going the next step, otherwise the out reach to consolidators will back fire, and result in a worse image, not a better one.

On the other hand, since the three national associations have not embraced aftermarket parts in the past, getting them involved and vested in the processes is extremely important to our end goal of increasing the number of parts we can sell over time. If we want to change our image, we need to work with the three associations. Once we have gotten their buy in to the

process, if we have successfully achieved the necessary changes, we can go to the consolidators and show them what we have done. At that time, persuading the consolidators to use more of our parts will be easy.

While my approach is subject to change, at present, I see the following steps as critical to the long term success of Tier One manufacturers securing their place in the high end, high volume shops and creating real market demand by repairers, rather than continuing to depend on insurance company policies to push the parts on repairers.

I. Continue to work with ASA, SCRS and AASP to identify and fix the problems in the certification process. We also have to have some distributors involved in this process, which we have done and are doing. If the certifiers are reluctant to change, we can bring our issues to insurers and have them 'strongly encourage' the certifiers to change. In any event, friendly insurers will be informed of the process.

II. Certified part quality must be consistent, reliable and constantly available. If this does not happen, we cannot succeed in filling the role of high end providers. Quality, availability, service and reasonable pricing are the formula for success. We need all four to reach our goal. It is in the Tier One manufacturers responsibility to insure that all four of these criteria are met in the supply channel. This is a great deal of work and will cost money, but is necessary to achieve change and solidify your future. This is one of those investments which will reap benefits in the future, not over night.

III. Tier One Manufacturers must abandon the practices of under bidding and under cutting each other's prices. Each company must adopt a long term, reasonable pricing practice. Perhaps CSD can assist with this endeavor.

Please keep in mind that price changes can take up to 90 days to be incorporated into the electronic databases. Distributors should be given advance notice of price changes and, perhaps, we should discuss the pros and cons of sending notice to the corporate people of key insurers in advance of price changes.

IV. We must take the initiative to sponsor a long term dialogue and on going communication with all industry segments to protect the high end market position we hope to achieve. This includes on going discussions with insurers. In my opinion, the meetings Sonny and I had with insurers last September were productive in opening the line of communication. We should keep that going. I envision the next phase of the modification of the certification program (after Montreal) to include insurers. That will be helpful to us.

V. We must stay focussed. You have to remember that you are doing business in the US with Americans, other than the distributors with whom you have been working for 20 years. Remember that the source of some of the problems we have today is at the distributor level. In order to meet repairer needs, gain acceptance, and achieve long term success, it is necessary to learn to better understand their motivators.

I know that some of you were not comfortable with the process we went through in Santa Monica. It is possible that you will also not be comfortable with the next phase in Montreal. Please keep in mind that we need ASA, SCRS and AASP much more than they need us. They have a great deal of leverage in this issue. I can assure you that they are not trying to hurt us. I believe this and trust these people on this issue with all my heart. If I did not feel so strongly, I would not advise you to work with them.

Monday, April 12, 2004 America Online: Kfierst

CONFIDENTIAL INFORMATION, SUBJECT TO PROTECTIVE ORDER          KERE-00006838

Having said that, I know their methods are not necessarily your methods. If you want to succeed here in the high end, I sincerely request that you trust me and those I have tapped to help us through the process. Again, we are attempting to change the way we have done business over the past 20 years. In the long run, the manufacturers will be among the biggest beneficiaries. Please try to work together and with me. In order to succeed I need your trust and support. I am one person working on your behalf. It may be difficult for you sometimes to understand some of the strategies I am recommending. Please ask when you have questions. I will be happy to explain.

Lastly, I feel strongly that you have about 18 months to resolve the issues at hand and implement the Formula of Four [Quality, availability, service and reasonable pricing]. Not only are the insurers and repairers tired of the games begin played in the aftermarket, but the threat of completely losing the market because of global manufacturing threats is very real. Remember, the low end products will ALWAYS be available. However, their market penetration in the US and EU countries will decline. China is positioned to take over the high end, should they decide to go that route, within about 5 years – unless you can establish your Tier One companies as the best alternative to OE within the next 18 months and build the necessary trust and support to sustain the reputation of Taiwan as the source for all high end AM parts.

We are attempting to change an entire supply chain and reach very high goals. I am convinced that this will have a profitable and stabilizing effect on the industry, though the process will be difficult.

Thanks you for your time. Please forward this e-mail to anyone in your company you think should see it. I am also going to ask Sonny to have it translated, to make sure it is fully understood.

Sincerely,
Karen

CONFIDENTIAL INFORMATION, SUBJECT TO PROTECTIVE ORDER    KERE-00006839