**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Fond Du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc. on Behalf of Themselves and Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>Jui Li Enterprise Company, Ltd., et al.,<br><br>Defendants. | CASE NO. 2:09-CV-00852-LA |
| Fireman's Fund Insurance Company, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Jui Li Enterprise Company, Ltd., et al.,<br><br>Defendants. | CASE NO. 2:13-CV-00987-LA |
| National Trucking Financial Reclamation Services, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Jui Li Enterprise Company, Ltd., et al.,<br><br>Defendants. | CASE NO. 2:14-CV-01061-LA |

**DEFENDANTS JUI LI ENTERPRISE COMPANY, LTD., AUTO PARTS INDUSTRIAL, LTD. AND CORNERSTONE AUTO PARTS, LLC'S SURREPLY IN RESPONSE TO DIRECT PURCHASER PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Much of DPPs' Reply brief is merely a rehash of their opening brief, but buried within their reply and Dr. Lamb's new report are new theories and new arguments that go to the heart of class certification. First, Dr. Lamb's "straw man criticism" of Dr. Ordover's trend variable fails to save Dr. Lamb's flawed regression model, and without that model, no class can be certified. Second, Dr. Lamb's new correlation analysis fails to prove common impact, and without common impact, no class can be certified. In short, Dr. Lamb does nothing to resurrect his flawed regression model, and for these reasons and those set forth in Defendants Opposition, DPPs' Motion for Class Certification must be denied.[1]

**A. Dr. Lamb Fails to Account for the Gradual Price Decline During the Class Period**

Dr. Lamb's own model shows an unexplained price decline over almost the entire class period. (Ordover Surrebuttal ¶33 & Exh. RR6a[2]). In other words, as depicted by Dr. Lamb's model, the alleged conspiracy actually resulted in falling prices. Dr. Lamb ignores this inconvenient fact because he cannot explain it. But there is a simple explanation – Dr. Lamb left something important out of his model. In opposition to class certification, Defendants' expert (Dr. Ordover) stated, even using Lamb's faulty regression model, the simple addition of a trend variable (to account for the price decline) to Dr. Lamb's analysis, reduces the so-called conspiracy effect from Dr. Lamb's 17.54% to 3.7%.[3] (Dkt. No. 786-1 ¶79). Dr. Lamb now argues it is inappropriate to add a trend variable to his analysis, but he refuses to address or explain the gradual price decline. Indeed, actual prices behaved in a way wholly inconsistent with Dr. Lamb's conspiracy theory. Rather than addressing this issue, Dr. Lamb simply ignores it. His analysis must, therefore, be disregarded.

---

[1] This surreply focuses on the new arguments made in DPPs' reply, and the new materials submitted therewith. Defendants continue to assert the additional arguments against class certification set forth in their Opposition Brief. (Dkt. No. 785).

[2] Expert Surrebuttal Report of Janusz A. Ordover (herein "Ordover Surrebuttal") (Beck Decl. Exh. A).

[3] Dr. Ordover does not claim that this method is the proper way to determine impact, but performs this analysis to show the problems with Dr. Ordover's approach. *See, e.g.,* Dkt. No. 786-1 ¶¶61-64.

**1. The Court Must Resolve this Dispute at this Stage**

Dr. Lamb's errors cannot be ignored or left to a jury to correct because they go to the heart of class certification. If Dr. Lamb's model is wrong, no class can be certified. The Seventh Circuit has made it clear that issues of conflicting experts and ones that may overlap with the case's merits must nevertheless be decided by the District Court as part of class certification. As stated in *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010):

> In *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001), we held that a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case. And in *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002), we held that a plaintiff cannot obtain class certification just by hiring a competent expert. We emphasized, "A district judge may not duck hard questions by observing that each side has some support. . . . Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives."

The approach taken by this Court fifteen years ago in *Paper Sys. v. Mitsubishi Corp.*, 193 F.R.D. 601, 614 (E.D. Wis. 2000), a case relied upon by DPPs, is no longer the law.[4] It is no longer the case that "resolving disputes about the merits of the plaintiff's case should be left to a later stage of litigation." *Paper Sys. v. Mitsubishi Corp.*, 193 F.R.D. 601, 614 (E.D. Wis. 2000). To the contrary, the Supreme Court now requires this court conduct a "rigorous analysis" of all the elements of Rule 23 including a review of the regression model offered by the plaintiffs in support of class certification and criticisms of it by Defendants' expert. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *see also ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 889 (7th Cir. 2011) (discussing interpretation of regression analysis).

---

[4] DPPs have cited this case in suggesting that no class certification hearing would be necessary because of the Court's demonstrated familiarity with regression analysis in class certification. However, the Court in that case did not perform the rigorous scrutiny of regression analysis now required for class certification.

**2. Regression Analysis in Class Certification**

There is no more basic economic principle than that prices are determined by supply and demand. Dr. Lamb's model tries to predict what actual prices would be by using variables that serve as supply and demand proxies. (Dkt. No. 712-1 ¶¶92-96). For example, increased raw material costs, here steel, should increase costs, and, therefore, price.

When performing a regression, it is expected that the predicted prices will vary from the actual prices. This difference is the residual price, that portion of the actual price that the model fails to correctly predict. *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 890 (7th Cir. Ind. 2011) ("the regression residual—the part of the dependent variable that is not explained or predicted by the independent variable and the intercept, or in other words is 'left over,' like the change you receive after paying for a 99-cent item with a $1 bill."). If the model is basically sound, the inevitable residual will be random. But it may be, as here, that the residual is not random, but shows a distinct trend over time. Faced with such a result, an economist should find an explanation. (Ordover Surrebuttal Report ¶¶25, 34; *see also* Jeffrey M. Wooldridge, Introductory Economics 363 (2009) (Beck Decl. Exh. D)).

This is particularly true when using regression analysis to calculate an "overcharge."

> For this approach to yield reliable estimates of the overcharge, the model must include all factors that are likely to affect price. . . . A model that failed to include the price of a key input, for example, may inappropriately attribute the impact of changing cost conditions to the conspiracy impact indicator variable and thus generate biased estimates of the true effect of the conspiracy.

American Bar Association, *Econometrics* 104 (2d. Ed. 2014) (Beck Decl. Exh. B). Dr. Lamb's own residual prices show that he has failed to explain this gradual price decline, and that failure has produced a huge error in Lamb's calculations.

**3. Dr. Lamb's Explanation Does not Fit the Data**

The problem with Dr. Lamb's analysis can best be seen in the following graphs. (Ordover Surrebuttal Exh. RR6a-b, ¶¶33-34). The first graph is an idealized version of what a lay observer might think Dr. Lamb's report shows – that after correcting for changing economic conditions, there was a dramatic drop in prices after September 2009, and that using a "dummy" conspiracy variable, an "overcharge" of 17.54% attributable to the conspiracy can be computed.

**Exhibit RR6b: Average Hypothetical Residual Prices Declined by 17.54% at the End of the Claimed Conspiracy Period**




The second graph (below) illustrates what Dr. Lamb's data actually shows – a gradual decline in residual prices beginning in 2004 and continuing through 2009 that is inconsistent with price fixing. Importantly, in both charts, the "overcharge" attributable to the alleged conspiracy is the same, even though in the first chart all of the decline in prices occurred post-conspiracy, and in the second chart most of the price decline occurred during the conspiracy. This is because, as explained in *Econometrics*, Dr. Lamb's model fails to recognize that the "post-conspiracy" price drop actually results from some economic factor that Dr. Lamb either overlooked or ignored. *Econometrics, supra*, at 104.




Rather than trying to determine why this long term decline in prices exists, Dr. Lamb baldly states he is not convinced that this decline in prices reflects lower production costs. (Dkt. No. 813-1 ¶¶62-63). But such a response does nothing to explain the gradual decline in prices that occurred, nor does it rebut the fact that Dr. Ordover's use of a trend variable[5] was proper to account for that decline. The fact that Dr. Lamb's model does not account for the price decline that actually occurred renders his model fatally flawed.

Both parties' experts agree that Dr. Lamb's labor cost data does not explain those price changes. (Dkt. No. 813-1 ¶63; Ordover Surrebuttal ¶34). But that does not give Dr. Lamb a license to ignore the underlying trend. And a trend variable such as that used by Dr. Ordover is a proper and generally accepted proxy for hard to measure inputs, such as gradual improvements in manufacturing technology. (Ordover Surrebuttal ¶34). Certainly Dr. Lamb knows manufacturing costs were declining, because the DPPs' complaint alleges that in Paragraph 91,

[5] "This trend variable can serve as a proxy for a variable that affects the dependent variable and is not directly observable -- but is highly correlated with time. For example, in the estimation of production functions a trend variable may be included as a proxy for technological change." Diana Whistler, *An Introductory Guide to Shazam, available at http://www.econometrics.com/intro/trend.htm* (last visited Jan. 3, 2016) (Beck Decl. Exh. H); *see also* Ordover Surrebuttal ¶¶25, 34.

which Dr. Lamb assumes to be true. (Dkt. No. 712-1 ¶22). Dr. Lamb is unpersuaded by the direct evidence provided by the Defendants. But the IPPs' expert, Dr. Connor, agrees with Defendants' expert that the AM Sheet Metal industry is marked by continual improvements in technology. After reviewing the industry's investment in new technology, Dr. Connor concluded that "Defendants had considerable advantages from their first-hand knowledge and access to technological innovations generated by the R&D ventures." (Dkt No. 818-1 ¶83).

It is precisely those types of "technological innovations" that were driving manufacturing costs down and which Dr. Lamb ignores. And it is precisely those "technological innovations" that IPPs' expert recognizes that support Dr. Ordover's approach.

It is Plaintiffs' burden to show that they can prove impact by reliable means. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (U.S. 2013) ("a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23" (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011))). They cannot do so based on Dr. Lamb's unreliable regression analysis.

**B. Dr. Lamb's New Correlation Analysis Fails to Prove Classwide Impact**

Beyond showing an impact in the aggregate, Dr. Lamb was also tasked with showing that there is classwide impact – that is, that higher prices would have been paid by all, or nearly all class members. As Dr. Lamb now admits, his regression analysis cannot show classwide impact, as it provides only an average price difference. (Dkt. No. 813-1 ¶46). Computing only an aggregate "overcharge" may be relevant for some purposes, but "it is completely unrelated to class certification." Paul A. Johnson, *The Economics of Classwide Impact in Antitrust Class Certification*, 77 Antitrust Law Journal 533, 544 (2011) (Beck Decl. Exh. C).

In Dr. Lamb's opening report, he failed to analyze any sales data to provide evidence of classwide impact.[6] Instead, he focused almost exclusively on qualitative descriptions of the market as "evidence" that a drop in *average prices* must mean a drop in prices for *all products* and *all customers*. (Dkt. No. 712-1 ¶¶44-79). In his initial report, the closest Dr. Lamb came to any analysis of data was to "eyeball" charts he had generated of transaction prices paid by the largest direct purchasers for the 20 highest volume products. (*Id.* ¶54).

In opposition, Defendants pointed out that the market factors Lamb identified are insufficient to show classwide impact, (Dkt. No. 785 at 20; *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 319-20 (N.D. Cal. 2014)), and that his "stare and compare" approach to data analysis is unreliable and improper. (Dkt. No. 785 at 17-18; Johnson, *supra,* 77 Antitrust Law Journal at 557).

Faced with Defendants' criticism of his analysis, Dr. Lamb now attempts to use correlation analysis to show a "pricing structure," arguing that because actual product prices for some products paid by some customers are correlated, all customers therefore must have been impacted by the alleged conspiracy. (Dkt. No. 813-1 ¶¶37-40). But DPPs and Dr. Lamb miss the point. To show classwide impact, an analysis must show all, or nearly all, prices are correlated, not just those for a small sample of parts sold to some customers. (Ordover Surrebuttal ¶10, 13). Moreover, before deciding if a price correlation is relevant to class certification, the reasons for the correlation must be analyzed. If the prices are correlated only because of common economic factors, such as increasing or decreasing steel prices and increasing or decreasing customer demand, correlation does not show common impact. Michelle M. Burtis & Darwin V. Neher, *Correlation and Regression Analysis in Antitrust Class Certification,* 77 Antitrust Law Journal 495, 498 (2011) (Beck Decl. Exh. E).

[6] In his second report he goes further, and argues that his economic model cannot be used to calculate individual "overcharges" or classwide impact. (Dkt. No. 813-1 ¶¶ 46-49).

**1. Dr. Ordover's Use of Residual Prices is Proper**

Use of correlation to prove common impact, as Dr. Lamb attempts, has been the subject of considerable economic debate, and economists have concluded that Dr. Lamb's approach is wrong. As was explained in a 2011 article,

> Claims of common impact based on correlation, when the correlation exists due to the common factor effect, can lead to nonsensical results. Returning to the example of washing machines and bicycles, price correlation induced by the common factor of steel (an input to both) should not lead to a conclusion that a price-fixing conspiracy among bicycle suppliers to raise the price of bicycles should commonly affect both bicycle and washing machine prices. In any scenario where the cost of an input plays an important role in determining the price of the products at issue, the correlation coefficient between the two products' prices could be found to be relatively high.

Burtis & Neher, *supra,* 77 Antitrust Law Journal at 512.

Here you would expect a high correlation between prices charged to different customers for the same product, because the products have the same costs. To prove common impact, the effect of those common economic factors must be eliminated or the correlation itself is unreliable. (*Id.*) This is exactly what Dr. Ordover did. He used Dr. Lamb's residual prices, not actual prices, because residual prices eliminated those common economic factors, such as the effect of changing steel prices. (Ordover Surrebuttal ¶22).

DPPs criticize the use of residuals, arguing in substance that residual prices are never correlated because they are simply the "left overs" of Dr. Lamb's regression analysis. That is a nonsensical argument. Residuals are what Dr. Lamb actually used to compute his so-called "overcharge." (Dkt. No. 712-1 at 47-48, Ordover Surrebuttal ¶27). He compares residual prices before September 4, 2009 with residual prices after that date, and his "overcharge" is computed from the difference in those residual prices. (Ordover Surrebuttal ¶27). As such, DPPs' criticism of Dr. Ordover's use of residual prices is absurd.

Moreover, even using actual prices, as Dr. Lamb (incorrectly) suggests, correlation of prices across products is still very low. As Dr. Ordover shows, 87% of comparisons between the

Top 20 parts do not show a high correlation. In short, even using actual prices, there is no evidence of a price structure across parts. (Ordover Surrebuttal ¶¶19-21).

Dr. Lamb bases much of his criticism of residual prices on a hypothetical dataset he created. This dataset included a conspiracy factor in all prices. (Dkt. No. 813-1 ¶¶35-36). In this dataset, actual prices were correlated, but residual prices were not. But Dr. Lamb draws the wrong conclusion from that result. He has proved that a high correlation of actual prices depends on supply and demand. Dr. Lamb's hypothetical dataset shows only that a correlation will always be found when common economic supply and demand factors are present in the analyzed data, regardless of whether there is common impact from an antitrust violation. That is, Dr. Lamb's correlation of actual prices here is useless. (Ordover Surrebuttal ¶¶28-31).

**2. Dr. Lamb's Correlation Analysis Fails to Show Classwide Impact**

In addition, even if Dr. Lamb were correctly looking at the residual prices, his analysis does not show classwide impact. First, even using his cherry-picked data and cherry-picked parts, Dr. Lamb's analysis merely shows a strong correlation for only 37% of prices across customers on a monthly basis, and only 55% on a quarterly basis. (Dkt. No. 813-1 at Fig. 2; Ordover Surrebuttal ¶17). Thus, even when Dr. Lamb cherry-picks the data, and analyzes the wrong prices, he cannot show a strong correlation across customers.

In addition, his analysis of only 20 products out of over 10,000 is not enough to show that all, or nearly all customers' prices were affected. When attempting to determine whether prices move together across all parts, it is important to actually look at prices for all parts. (Ordover Surrebuttal ¶¶13-16). Dr. Lamb recently made a similar error in *In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 2015 U.S. Dist. LEXIS 142717 (D. Del. Oct. 21, 2015). There the Court correctly pointed out a flaw in two separate regression analyses performed by Dr. Lamb. First for the direct purchaser class:

> It appears, then, that Dr. Lamb's analysis is based on less than 60 percent of half of the data. … When asked about the most persuasive component of his analysis, Dr. Lamb testified that his analysis "is more credible because it's grounded in the facts of the case." In reality, Dr. Lamb's

> analysis utilizes assumptions based on a modicum of data not fully representative of Eaton transmission sales during the Class Period… **Dr. Lamb's "compartmentalized view" of damages does not comprise common proof that Eaton overcharged the direct purchasers.** Plaintiffs have not met their burden in this regard.

*In re Class 8 Transmission Indirect Purchaser Antitrust Litig.*, 2015 U.S. Dist. LEXIS 142717, 31-33 (D. Del. Oct. 21, 2015) (citations omitted, emphasis added). Dr. Lamb's indirect purchaser analysis also fell short:

> This amounts to an analysis utilizing less than **one percent** of the relevant truck sale data and fails to account for transmission price in the sale of a truck as a whole. In no way does an analysis of one percent compel the conclusion that plaintiffs can proffer sufficient common evidence to prove the alleged overcharges were passed through to indirect purchasers.

*Id.* at 41 (emphasis in original). The Court found Dr. Lamb's conclusions based on a small sample were insufficient, and denied class certification. Here, Dr. Lamb has addressed only 0.2% of the available parts in his correlation analysis, but he concludes just the same that it is enough to show classwide impact. But a review of such a small sample cannot support a conclusion that all prices move together. Accordingly, his analysis simply cannot show classwide impact, because he did not look at classwide data. (Ordover Surrebuttal ¶¶13-16).

Moreover, even Dr. Lamb admits his analysis does not show a relationship between prices across parts. Indeed, he states that "a pricing structure in a market means that the prices paid by different purchasers for the same product from a single seller, or for the same product from different sellers, tend to move together over time." (Dkt. No. 813-1 ¶23). Accordingly, under Dr. Lamb's definition, prices across parts are not necessarily related, and do not necessarily move together. In other words, the movement of the average price in one direction does not mean that all prices are moving in that direction. (Ordover Surrebuttal ¶¶12-16). The presence of a "pricing structure," as Dr. Lamb defines it, does not show classwide impact.

In the end, Dr. Lamb's classwide impact analysis cannot show what he says it does. Dr. Lamb asserts that he can show that all, or nearly all, class members were impacted without looking at the actual prices:

> in a market with common demand and supply factors, such as the market for AM Sheet Metal parts, there is likely to be a structure to prices such that any force that artificially raises the price for a given product generally, above what that price would have been in the absence of such force, would result in all, or nearly all, purchasers of that product paying a higher price than they otherwise would have paid.

(Dkt. No. 813-1 ¶24). So , according to Dr. Lamb, regardless of the price paid, or how prices of different parts relate to one another, all prices would have been lower absent the cartel he has assumed. He reaches that conclusion based only on subjective market factors and an irrelevant correlation analysis. That is, Dr. Lamb has assumed classwide impact rather than proven it. (Ordover Surrebuttal ¶¶3.b, 8, 12-16).

A simple example shows why Dr. Lamb's approach is insufficient. Assume eight purchasers buying a part at $100 each. A cartel is formed that conspires to raise prices. Prices are raised two dollars for each customer. Dr. Lamb's model would find an average of two percent price increase across the class. But assume that instead, the cartel succeeded only in raising the price $16 for one customer, and the others continued paying $100. Obviously there would be no classwide impact. But Dr. Lamb's regression analysis would still show an average two percent price increase. Moreover, Dr. Lamb's improper classwide impact analysis would not find the problem, particularly if that part were outside the Top 20 parts at which Dr. Lamb has actually looked. Dr. Lamb's model is a fictional work based on averages over the entire market, and on vague generalities about price structure, and the story he tells ignores the actual facts. (Ordover Surrebuttal ¶¶3.b, 8, 10, 12-16).

**3. Dr. Ordover's Analysis Shows There is No Classwide Impact**

A proper analysis would have determined whether each class member actually paid higher prices. *See, e.g., In re Plastics Additives,* 2010 WL 3431837, *5-6, 15-16 (E.D. Pa. 2010) (Dkt. No. 787). In opposition, Dr. Ordover performed such an analysis, using individual customer regressions based on Dr. Lamb's model to determine that 60% of class members did not actually pay higher prices. (Dkt. No. 786-1 ¶73). In other words, there is no classwide impact.

Dr. Lamb criticizes Dr. Ordover's use of individual regressions, stating that his model was not designed to analyze prices on an individual basis, but rather was designed only for use on the overall data. (Dkt. No. 813-1 ¶¶46-49).[7] But DPPs argue the opposite in their reply brief, falsely stating that Dr. Lamb supports the use of his model to compute individual "overcharges":

> Plaintiffs' expert, Dr. Lamb, determined that a formulaic method existed based on standard econometric techniques to measure overcharges suffered by the proposed Class as a result of Defendants' anticompetitive conduct. Based on common evidence, Dr. Lamb was able to preliminarily assess a class-wide overcharge of 17.54 percent.

(Dkt. No. 812-1 at 24 (citations omitted)). Dr. Ordover's use of Dr. Lamb's own regression model to perform individual regressions is at least as reliable as Dr. Lamb's original, and should not be disregarded simply because Dr. Lamb, in direct opposition to the DPPs' statements, claims his model was not designed for such an analysis. (Ordover Surrebuttal ¶35).

Dr. Lamb fails to perform an alternative analysis, leaving Dr. Ordover's as the only reliable analysis of all parts and all customers presented to this Court.[8] As stated therein, even according to Dr. Lamb's faulty regression model, only 40% of customers paid higher prices during the class period. (Dkt. No. 786-1 ¶73). There simply is no classwide impact.

**C. Dr. Lamb's Benchmark Period Analysis is "Junk Science"**

Choosing a benchmark period (as Dr. Lamb has done), without knowing whether the factor being tested for (in this case "cartel behavior") is present or not, is "junk science." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, *5-7 (S.D.N.Y. Feb. 10,

---

[7] DPPs argue that another part of Dr. Ordover's analysis, regarding tooling agreements, would not find "impact" in a situation where the cartel behavior merely slows, rather than reverses, a price decline. (Dkt. No. 812-1 at 22). That criticism is wrong, as stated in Dr. Ordover's Surrebuttal at n.70. In addition, that criticism does not apply to Dr. Ordover's conclusion that 60% of class members did not pay higher prices. Dr. Ordover's conclusion was based on a comparison of class period prices with benchmark prices, and therefore did not require a drop in actual prices to find impact. (Dkt. No. 786-1 ¶¶61-73).

[8] This contrasts sharply with *In re Polyurethane Foam Antitrust Litigation*, 2014 WL 6461355 (N.D. Ohio 2014), cited by DPPs (Dkt. No. 814-5). There Plaintiffs' expert performed 73 separate regression analyses designed to show whether each alleged price-fixing letter had impact, on each customer and on each product. If any of the separate analyses showed no impact, it could be thrown out. *Id.* at *21-23. Here by contrast Dr. Lamb admits his regression does not show classwide impact – it is just an average. (Dkt. No. 813-1 ¶46). Indeed Dr. Lamb performs no product-by-product or customer-by-customer regressions, because they would not show classwide impact. (Dkt. No. 786 ¶73).

2015) (Dkt. No. 787).[9] DPPs suggest that this means the "overcharge" amount is "conservative," (Dkt. No. 812-1 at 24 n. 16) apparently because (according to DPPs), if there was continued cartel behavior in the benchmark period that would have raised prices relative to the class period.

This is yet another example of DPPs and their expert **assuming** the result without performing the test. Dr. Lamb's analysis is supposed to determine whether the alleged cartel had any impact on prices, and if so, which direction that impact went. Instead, he not only assumes (based on zero evidence) which time periods had cartel behavior, he justifies that assumption, again, by baldly assuming that the cartel must have increased prices! In other words, he assumes the exact result for which he is supposed to be testing. As explained above, Dr. Lamb utterly fails to consider or explain the reason behind the general decrease in prices evident using his own model as a possible reason for his results. Dr. Lamb's inability to consider any explanation other than a cartel renders his testimony unreliable.

**D. A Class Including LKQ Must Not be Certified**

DPPs' Reply attempts to justify the presence of LKQ[10] in the class by arguing, based on a new correlation analysis from Dr. Lamb, that LKQ is in the same position as the other class members. (Dkt. No. 812-1 at 10-11; Dkt. No. 813-1 ¶38). But Dr. Lamb's correlation is, again, weak, finding only 37% of prices were correlated at a high level, despite, again, using actual prices (thereby including the effects of common inputs, such as changing steel prices). (Ordover Surrebuttal ¶17). Moreover, even if Dr. Lamb's analysis were correct, part prices moving together based on steel prices or other such inputs does not show that LKQ was in the same boat as all the other proposed class members.[11]

DPPs also argue that Defendants have conceded that a class action is a "superior mechanism" for adjudicating this matter. (Dkt. No. 812-1 at 5). Defendants concede no such

---

[9] Defendants reserve the right to challenge Dr. Lamb's testimony with a motion to exclude it.

[10] Defendants' explanation of why LKQ does not belong in the class is at Dkt. No. 785, pages 28-30.

[11] DPPs further argue that Defendants cannot plead an "unclean hands" defense in this matter. (Dkt. No. 812-1 at 11). To begin with, Defendants are not required to plead their defenses against unnamed class members at this stage. Moreover, Defendants can raise the defense of acquiescence and *in pari delicto.*

thing. Indeed, for the reasons set forth in Defendants' opening brief (Dkt. No. 785 at 28-30), LKQ should be separated under the superiority requirement. Fed. R. Civ. Proc. 23(b)(3).

**E. Dr. Lamb Admits That Much of the Matter in DPPs' Reply is Irrelevant to Class Certification**

In his reply report, Dr. Lamb criticizes Dr. Ordover for including in his analysis a review of the tooling agreements and meetings DPPs' allege make up the supposed "conspiracy." (Dkt. No. 813-1 ¶8). According to Dr. Lamb, analysis of those events is "baseless and irrelevant to the issue at hand." (*Id.*). DPPs' reply brief, on the other hand, relies on those very events to supposedly "establish" that the predominance requirement is met. (Dkt. No. 812-1 at 1-2, 13-15). This disagreement exposes another fundamental flaw in DPPs' case. While they allege an overarching conspiracy covering all parts and all customers over 6 years, the evidence they cite to prove said conspiracy is limited to a few agreements and a few meetings which their own expert states are "**baseless and irrelevant**" to the matter at hand.

**F. DPPs Knowingly Misquote Jui Li's Chairman**

In their reply brief, DPPs cite a snippet of the deposition transcript of Jui Li chairman Jui-Huang Lu as supposed "evidence" that Defendants "agreed to fix prices." (Dkt. No. 812-1 at 14). To begin with, even in the erroneous transcript, Mr. Lu never said there was an agreement to fix prices. The erroneous transcript statements were made in the context of tooling agreements, not any agreement to fix prices. (Beck Decl. Exh. F at 266:20-25). Second, as DPPs are well aware, the quote DPPs use is in error. Jui Li submitted an errata sheet identifying the accurate testimony: "Firstly, we didn't know whether violated the U.S. laws. We really didn't know this." (Beck Decl. Exh. G at 6). Further, in the remainder of the transcript Mr. Lu testified that (1) he is not familiar with U.S. law (Beck Decl. Exh. F at 110:12-21; 264:2-9); and (2) he never said there was a violation of U.S. law:

> When you testified earlier about possibly violating U.S. antitrust laws,
> were you speaking for anybody other than Jui Li?
> THE WITNESS: I did not say that. I did not say that.
> Q What did you not say?

A I did not say that Jui Li was in violation of antitrust law.

(Beck Decl. Exh. F at 293:1-14) (objections omitted).

DPPs have willfully ignored the context, the errata sheet, and Mr. Lu's remaining testimony to falsely conjure some "evidence" of price fixing, when there is none.

**G. Conclusion**

At the class certification stage, DPPs have the burden to show (1) that there was impact on the proposed class; and (2) that the impact was classwide – that is that all, or nearly all, class members were impacted. But DPPs, and most importantly, Dr. Lamb's model, fail to do this.

Dr. Lamb's analysis of impact grossly overinflates any alleged impact. His data shows a gradual decline in prices over a six year period. Rather than investigate the reason for that decline, he ignores it, instead comparing average prices in the class period with average prices in his later benchmark period, in order to find that prices during the benchmark period are lower by 17.54%. Dr. Lamb then baselessly opines that the class period ended, causing a dramatic decrease in prices. This ignores the general decline in prices evident in Dr. Lamb's own model, and results in a gross exaggeration in his estimate of impact.

Dr. Lamb's attempt to show classwide impact is unbelievably worse. Dr. Lamb concludes that all prices for all products were impacted, not based on any measurable data, but based only on market conditions and a useless correlation analysis. He *assumes* a conspiracy existed, and concludes that because of market conditions, he need not look at the prices each customer paid, to conclude that each customer's price would have been lower absent the assumed conspiracy. That is not scientific, nor even based in fact, and it is certainly not evidence of classwide impact.

For the reasons set forth herein and in the Defendants' Opposition Brief, DPPs' Motion for Class Certification must be denied.

January 5, 2016

Respectfully submitted,

**ATTORNEYS FOR DEFENDANTS**

s/ *Justin T. Beck*
Justin T. Beck
Ronald C. Finley
BECK, BISMONTE & FINLEY, LLP
150 Almaden Blvd., 10th Floor
San Jose, CA 95113
Telephone: (408) 938-7900
Facsimile: (408) 938-0790
Email: jbeck@beckllp.com
rfinley@beckllp.com

*Attorneys for Defendant Jui Li Enterprise Co., Ltd.*

s/ *Gretchen L. Jankowski*
Gretchen L. Jankowski
Cindy Hinkle
Wendelynne J. Newton
BUCHANAN INGERSOLL & ROONEY PC
301 Grant Street, 20th Floor
Pittsburgh, PA 15219
Telephone: (412) 562-8800
Facsimile: (412) 562-1041
Email: gretchen.jankowski@bipc.com
cindy.hinkle@bipc.com
wendelynne.newton@bipc.com

*Attorneys for Defendants Auto Parts Industrial, Ltd. and Cornerstone Auto Parts, LLC*



Case 2:09-cv-00852-LA Filed 01/05/16 Page 17 of 17 Document 840-1