# EXHIBIT A

# [FILED UNDER SEAL]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Fond Du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc. on Behalf of Themselves and Others Similarly Situated, Plaintiffs,<br><br>v.<br><br>Jui Li Enterprise Company, Ltd., et al., Defendants.<br><br>. | CASE NO. 2:09-CV-00852-LA |

EXPERT SURREBUTTAL REPORT OF JANUSZ A. ORDOVER

01/05/15

**Table of Contents**


**I. Introduction and summary of opinions ........ 2**

**II. Dr. Lamb's rebuttal report provides no empirical evidence for the claim that the alleged conduct of Defendants had a class-wide impact. ........ 8**

***a. Dr. Lamb's regression analysis of damages is not sufficient to establish class-wide impacts*........ 9**

**b. *Market characteristics are not sufficient to establish class-wide impacts*........ 10**

***c. Dr. Lamb's claims related to a "price structure" are not sufficient to establish class-wide impacts.* ........ 11**

**III. Dr. Lamb's reply report fails to establish that his damages model is reliable........ 24**

**IV. Dr. Lamb's reply report fails to demonstrate class-wide impacts of the alleged agreements to increase prices in 2004 and 2008. ........ 29**

## I. Introduction and summary of opinions

1. My name is Janusz A. Ordover. I am an emeritus Professor of Economics at New York University, where I have taught for 42 years. I am also a Senior Consultant at Compass Lexecon, an economics consulting firm based in the United States. Previously, I have been asked by counsel for three Defendants (API, Cornerstone and Jui Li) in this litigation matter to assess claims by a class of direct purchaser plaintiffs ("DPPs") and address whether: (a) DPPs are likely to be able to demonstrate, at a single trial, through common proof on a class-wide basis, that all or virtually all of the members of the proposed class suffered economic injury from the alleged conspiracy; and (b) review the expert report filed on July 14, 2015 by Dr. Russell Lamb (hereafter "Lamb Initial Report"), the economic expert for the DPP class, and opine on the analyses and views presented therein. Pursuant to this assignment, I filed an expert report on October 13, 2015 (hereafter "Ordover Initial Report") and I was deposed on November 9, 2015. My curriculum vitae is included in my initial report, and it has not materially changed since then. A list of cases in which I have testified at deposition or trial in the last four years and earlier is included as Attachment A.

2. Since then, Dr. Lamb has filed another expert report on November 24, 2015 (hereafter "Lamb Reply Report") with opinions related to claimed class-wide impacts of the disputed conduct and with economic analyses and opinions related to my initial report. Counsel for Defendants have asked me to review and respond to the Lamb Reply Report. I do not respond to or rebut every claim in that Report. This does not imply that I agree with these claims.

3. Having reviewed the Lamb Reply Report and other materials listed in Attachment B, I stand by the opinions expressed in my initial expert report. In particular, my conclusion is that Dr. Lamb has not established as a matter of economics that the alleged conduct by Defendants had class-wide impact,[1] nor has he demonstrated that evidence common to all or nearly all members of the proposed class can be used to demonstrate impact on all or nearly all members of the proposed class. More specifically, I have reached the following conclusions:

    a. In his rebuttal report, Dr. Lamb acknowledges that the regression model of damages that he provided in his initial report does not purport to establish that all AM sheet metal parts

[1] As a matter of economics, the alleged conduct of Defendants is defined to have had a "class-wide impact" if the contested conduct elevated above competitive levels the prices paid by all or nearly all members of the proposed DPP class for all or nearly all of their purchases of AM sheet metal parts during the Class Period.

and all direct purchasers (i.e., distributors in the U.S.) were impacted by the alleged cartel. Instead, Dr. Lamb contends that the regression analysis provides evidence that the contested conduct elevated prices "generally," which does not demonstrate impact on all or nearly all of the members of the proposed class for all or nearly all of their purchases during the class period. Nothing in Dr. Lamb's regression analysis provides any insight as to what fraction of customers, products and transactions experienced price increases above competitive levels, and Dr. Lamb offers no estimate of that fraction based on his regression analysis (although my application of his model to individual customers and products show that a large fraction – often a majority -- of customers and products were unharmed). Even setting aside the problems with the way Dr. Lamb implements his regression analysis,[2] at best Dr. Lamb's regression analysis establishes that the *average* price of AM sheet metal parts paid by customers was elevated (although Dr. Lamb's damages estimates – for which this regression analysis is used -- are unreliable for the reasons stated in my initial report). However, even if the price paid by the average customer for the average product was elevated by the contested conduct, it does not necessarily follow that all or nearly all customers paid elevated prices due to that conduct. In fact, the application of Dr. Lamb's regression model used to estimate average overcharges to individual products and customers shows that a large fraction of customers and products were unharmed even if the average customer and product were impacted.

b. Given that his regression analysis does not demonstrate class-wide impacts of the contested conduct of Defendants, Dr. Lamb's opinion is essentially that if the *average* transaction was impacted by the alleged cartel, then it follows that *all or nearly all products and customers* were also impacted adversely by the contested conduct. But such an inference is fatally flawed. In order to shore up his "from average-to-all" inference, Dr. Lamb relies on two types of evidence: (a) market characteristics (such as the alleged market power of Defendants), and (b) evidence of a so-called "price structure" across customers and suppliers in that the prices they pay and charge for an individual AM sheet metal part tends to be correlated.

[2] Expert Report of Janusz Ordover, October 13, 2015 ("Ordover Initial Report"), §IV.

However, even if Dr. Lamb is correct in his claims that Defendants had substantial market power and that prices paid by customers (or charged by suppliers) for a *given product* tend to be correlated, and I do not believe that Dr. Lamb has established either proposition, they do not, as a matter of economics, support Dr. Lamb's conclusion of class-wide impacts. As such, Dr. Lamb is essentially assuming the conclusion that the alleged cartel conduct had class-wide effects. Even if the alleged cartel was effective in elevating prices for some AM sheet metal parts (or even the average price of all parts taken as a group), one cannot assume, as Dr. Lamb does, that prices of all other parts were also elevated by the contested conduct. Defendants sold more than 10,000 individual AM sheet metal parts and Dr. Lamb agrees that these parts were typically not substitutes for each other (fenders cannot be substituted for hoods, for example). Prices for individual parts and transactions were negotiated, competitive conditions varied across these parts and record evidence indicates that the alleged conduct was not uniformly effective across them. Defendants' data show conclusively that prices of AM sheet metal parts did not "move in synch" and there was little correlation in prices across parts, which indicates that AM sheet metal parts were subject to heterogeneous market forces. Not only has Dr. Lamb failed to provide any estimate of price correlations across parts, he explicitly disavows any claims of a "price structure" across AM sheet metal parts of the sort that lead to prices of AM sheet metal parts tending to move in the same direction because of demand/supply substitution across them. Hence, even if the alleged cartel was effective in elevating prices for some AM sheet metal parts (or even the average price of all parts taken as a group), one cannot assume (as Dr. Lamb does) that prices of all other parts were also elevated by the contested conduct.

Moreover, since customers purchased heterogeneous mixes of AM sheet metal parts, and since prices were individually negotiated in each transaction, the impact of the alleged conduct on an individual customer would depend on the mix of parts that customer purchased, the impacts of the alleged conduct on each of those parts, not to mention the differences in bargaining power. Customers who purchased mostly parts whose prices decreased during the Class Period[3] because of the efficiencies associated with tooling agreements would likely have paid a lower average price for the basket of AM sheet

[3] I understand that the Class Period starts in January 1, 2003 and ends on September 4, 2009.

metal parts that customer purchased. Hence assessing the impact of the alleged conduct on individual customers requires an individualized inquiry into the mix of parts purchased by that customer and the impact of the alleged cartel on those parts. This conclusion is in no way affected by Dr. Lamb's claimed price structure relating to customers and suppliers of a given part. Even if such a price structure across customers and suppliers exists, common sense and logic demonstrate that Dr. Lamb's definition of a price structure does not support his claim of class-wide impacts as shown herein.

c. In his initial report, Dr. Lamb did not investigate the extent to which prices of different AM sheet metal parts were correlated. In my initial report, I analyzed Defendants' sales data to demonstrate that prices of AM sheet metal parts did not exhibit a stable relationship with each other such that the contested conduct of Defendants would necessarily have impacted all or virtually all class members. I explained in my initial report that prices of different AM sheet metal parts frequently moved in opposite directions, which explains why prices of different parts were only weakly correlated. I further explained that price correlations across AM sheet metal parts are best estimated after purging the actual transaction prices for the influence of common factors, such as the cost of steel, for example. Faced with this evidence, Dr. Lamb now claims that my attempt to purge the influence on transaction prices of such common factors is inappropriate and it is better to use actual prices when estimating the correlations of prices. (See §II.c below for a discussion of residual prices.). However, Dr. Lamb avoids estimation of correlations of actual prices across AM sheet metal parts. Moreover, I demonstrate in this report that although residual price correlations are a better metric than actual prices, even the actual prices of AM sheet metal parts show very little correlation and they tend to move in heterogeneous ways, which is consistent with little substitution between parts and heterogeneous market conditions (such as differences in the number of suppliers and in the presence of cooperative manufacturing agreements). These findings vitiate Dr. Lamb's claim that common evidence can be used to establish class-wide impacts of the alleged cartel.

d. In my initial report, I explained that Dr. Lamb's regression model of damages is unreliable because (among other reasons) it fails to control for reductions in manufacturing costs due to innovations and investments by Defendants in their manufacturing process which led to costs being lower during the benchmark period than during the earlier years of the Class Period. As a result, Dr. Lamb's damages model

conflates cost changes with cartel conduct and hence it over-estimates damages. It has been long recognized in economics and econometrics that omitting an important price determinant likely introduces bias into estimates in models such as Dr. Lamb's.[4] In his rebuttal report, Dr. Lamb does not contest that AM sheet metal prices have been declining (after controlling for the market factors that he includes in his regression analysis), but he does not provide an explanation of why prices have declined. Instead, Dr. Lamb contends that my explanation of declining prices, i.e., declining manufacturing costs, is not a plausible explanation of why prices declined because an index of labor productivity in Taiwan does not exhibit a trend increase. However, Dr. Lamb provides no evidence that the index that he employs is correlated in a material way with Defendants' manufacturing costs. In fact, the index is unlikely to reflect such costs because it shows labor costs to be increasing when AM sheet metal prices were declining (holding constant other market factors included in Dr. Lamb's regression), which makes no economic or common sense. As such, I conclude that the index of labor productivity provided by Dr. Lamb is not relevant for explaining AM price changes and estimating damages, and the most logical explanation of the observed decline in residual prices of AM sheet metal parts is the reductions in manufacturing costs achieved by Defendants. Once this factor is accounted for, Dr. Lamb's regression model estimates of damages decline by 75% or more (as I noted in my initial report).

e. At best, Dr. Lamb's regression model is able to estimate only average overcharges (averaged across all products, customers and transactions) although even these estimates are unreliable for the reasons noted in my initial report and summarized above. In my initial report I "un-pooled" his model to the level of individual products and customers -- without modifying any of the explanatory variables – and found that the model estimates no "overcharges" for a substantial fraction of products. For example, even without accounting for declining manufacturing costs, Dr. Lamb's regression model of overcharges – when applied to individual AM sheet metal parts – estimates that AM sheet metal parts that accounted for 44% of Defendants' sales during the Class Period did not

---

[4] See, e.g., American Bar Association, "Proving Antitrust Damages: Legal and Economic Issues," 2nd Edition, American Bar Association: 2010 (hereafter "Proving Antitrust Damages"), pp. 148-149. See also, Daniel L. Rubinfeld, "Quantitative Methods in Antitrust", in Issues in Competition Law and Policy 723, ABA Section of Antitrust Law, 2008, p.726.

experience a statistically significant price elevation during the Class Period, with many of those parts actually experiencing *lower* prices relative to benchmark prices during the Class Period than after the Class Period. Customers who purchased mostly these products were likely unharmed, thereby refuting Dr. Lamb's claims of class-wide impacts of the alleged cartel. In fact, I concluded that the unpooled model (when slightly modified to include a trend variable to control for trends in manufacturing costs) estimates a substantial fraction of customers paid a lower average price for the basket of their AM sheet metal parts purchases during the Class Period. In his rebuttal report, Dr. Lamb claims that my application of his damages model to individual parts and customers is unreliable based on my deposition testimony. Dr. Lamb mischaracterizes both my testimony and my views on the relevant issues. In particular, while I consider Dr. Lamb's regression model to be unreliable, it does not mean that (as a matter of econometric practice) its predictions cannot be tested. Indeed, un-pooling the model (with or without an additional control for declining manufacturing costs) is a common way of testing the robustness of a model's predictions. Here, doing so demonstrates that Dr. Lamb's model predicts that a substantial fraction (typically a majority) of customers and parts were not, in fact, harmed by the alleged cartel.

f. In his initial report, Dr. Lamb made no attempt to use available data to test DPPs' allegations that Defendants agreed to elevate prices broadly for all or most AM sheet metal parts. In my initial report, I tested these claims for the only two specific attempts (in 2004 and 2008) noted in the DPPs' complaint as examples of the alleged efforts of Defendants to broadly elevate prices of AM sheet metal products, and I concluded that a substantial fraction of parts did not experience a price increase. In response, in his rebuttal report, Dr. Lamb claims that I assumed that DPPs allege that Defendants attempted to broadly elevate prices of AM sheet metal parts only on the two occasions (in 2004 and in 2008). This is demonstrably incorrect. As I explain later in this report and I already did in my initial report, I tested the DPPs' claims related to these two events since they are the only two specific instances noted in the DPPs' complaint as examples of the alleged efforts of Defendants to broadly elevate AM sheet metal prices. In his rebuttal report, Dr. Lamb also conducts a new analysis related to the same two events and concludes that nearly all customers experienced a price increase on at least one AM sheet metal part (although possibly a different part) purchased during the relevant time period (2004 and 2008). However, Dr. Lamb's conclusion is premised on the view that a

customer should be considered to have been harmed if it experienced a price increase for just one part that it purchased even if prices of hundreds of other parts that it also purchased experienced price *decreases*. A closer examination of the data reveals that for many customers that Dr. Lamb deems to have been harmed in 2004 and in 2008, the prices of a large fraction (sometimes a majority) of their purchases experienced no price increase.

## II. Dr. Lamb's rebuttal report provides no empirical evidence for the claim that the alleged conduct of Defendants had a class-wide impact.

4. I understand that Dr. Lamb does not contend that only certain AM sheet metal parts and certain customers were impacted by the alleged cartel. Instead, Dr. Lamb contends that prices of all or nearly all AM sheet metal parts purchased by all or nearly all customers were elevated by the alleged cartel.[5] However, neither in his initial report nor in his reply report does he provide any direct empirical evidence to support this conclusion. Specifically, Dr. Lamb provides no empirical analysis that reflects the heterogeneity of AM sheet metal parts (that he acknowledges are typically not substitutes for one another[6]) or the fact that customers purchased a diverse mix of parts (a heterogeneity that Dr. Lamb does not deny[7]). Dr. Lamb fails to establish through empirical evidence that all or nearly all customers and products were impacted by the alleged cartel. Instead, he puts forth a select list of market features that he contends were common to all products and customers (such as the alleged unavailability of reasonable substitutes for AM sheet metal parts) but such evidence cannot show actual class-wide impact. His analyses of so called *price structure* are also unavailing and off the mark because they do not bear on the scope of the AM sheet metal parts that should (or shouldn't) be properly included in the putative class and do

[5] See, e.g., Expert Reply Report of Russell L. Lamb, Ph.D., November 24, 2015 ("Lamb Reply Report"), ¶ 6a and Expert Report of Russell Lamb, July 14, 2015 ("Lamb Initial Report"), ¶ 23. Dr. Lamb's estimates of damages include all purchases of all AM sheet metal parts by all customers. For example, Dr. Lamb's regression model estimating overcharges includes data on sales of all AM sheet metal parts identified as being sold in the U.S. during the Class Period and the relevant volume of commerce includes the sale of all such parts to all U.S. direct purchasers.

[6] Deposition of Dr. Russell Lamb, October 1, 2015, pp. 51-52.

[7] In my initial report, I explained that customers purchased a diverse range of AM sheet metal parts and I implemented a statistical test to demonstrate that these differences are statistically significant (Ordover Initial Report, fn. 88). In his reply report, Dr. Lamb does not contest this point.

not show that, for example, a collusive elevation of prices of doors would lead to higher prices for hoods, which are both in the putative class.

5. The inability of Dr. Lamb's analyses to establish class-wide impact and their irrelevance can be illustrated by considering each of the three categories of evidence provided by Dr. Lamb:

   a. *Dr. Lamb's regression analysis of damages is not sufficient to establish class-wide impacts*

6. As I explained in my initial report, Dr. Lamb's regression model of damages estimates an *average* overcharge and makes no effort to examine if all or even most parts and customers were overcharged.[8] In his rebuttal report, Dr. Lamb does not deny this. In fact, Dr. Lamb contends that unlike him, "[O]nly Dr. Ordover is attempting to use regression analysis as a way to prove whether the conspiracy affected each part and each customer."[9] Although Dr. Lamb claims that his damages model demonstrates that the alleged conduct elevated prices "generally," all it does – at best – is to establish that prices were elevated on *average*, which is not sufficient to demonstrate class-wide impact.[10] Nothing in Dr. Lamb's initial report related to his damages regression analysis provide any insight into what fraction of customers and products did experience higher prices during the Class Period relative to the benchmark period.

7. Although I explained in my initial report that Dr. Lamb's regression model of damages at best provides evidence only about the average price impact on class members (and that too is unreliable for the reasons explained in my initial report), in his reply report Dr. Lamb does not test whether his regression analysis demonstrates or is capable of demonstrating that all/almost all or even most products and customers were impacted. Instead he makes the unsupported claim that the analysis shows a "general" impact of the alleged cartel on prices.[11] Dr. Lamb does not define what "general" impact means and how it bears on demonstrating his claim that the alleged cartel had a class-wide impact. Dr. Lamb's regression analysis certainly does not illuminate the central

[8] Ordover Initial Report, ¶¶ 64-67.

[9] Lamb Reply Report, ¶ 46.

[10] When properly specified, a regression model of the sort used by Dr. Lamb estimates *average* damages (averaged across all customers, parts and transactions), as is recognized in an American Bar Association (ABA) monograph on estimating antitrust damages: "The estimated coefficient of conspiracy period dummy variable(s) provides an estimate of the average overcharge due to the price-fixing activity." (Emphasis added.) ("Proving Antitrust Damages," p. 204.)

[11] Lamb Reply Report, ¶ 46 ("[T]he regression analysis provides evidence that the alleged misconduct had the effect of artificially raising prices generally.")

question whether all/almost all customers/products were impacted by the alleged cartel. In contrast, I demonstrated in my initial report that when even a slightly modified version of Dr. Lamb's regression model is applied to individual products and customers, it shows that for most products and customers, prices were not statistically higher during the Class Period.[12] Although Dr. Lamb critiques my extensions of his model (and I show below that he is mistaken in these critiques), the undisputed fact remains that nothing in Dr. Lamb's rebuttal report provides any support for the proposition that his regression model of damages shows class-wide impacts of the alleged cartel. In fact, Dr. Lamb acknowledges that his regression analysis does not demonstrate an impact on each part and each customer.[13]

b. *Market characteristics are not sufficient to establish class-wide impacts.*

8. Having purportedly demonstrated that the alleged cartel impacted the *average* transaction price, Dr. Lamb then contends that there exists common evidence to show that the alleged conduct impacted all or nearly all class members. Dr. Lamb lists the following types of evidence that purportedly allow him to infer class-wide impact: "existence of a pricing structure, the Defendants dominant share of AM sheet metal part sales, the barriers to entry; and lack of economic substitutes."[14] He is mistaken. Essentially, Dr. Lamb relies heavily on certain market features and the alleged presence of a "price structure" to make the leap from the premise that the alleged cartel impacted the average transaction price to the conclusion that all or nearly all customers and products were adversely impacted by the alleged cartel. For the sake of convenience, I will refer to this as the "from-average-to-all inference," or FATAL inference, for short. In the rest of this section, I explain that neither the market features cited by Dr. Lamb nor his "price structure" findings support this inference. Consequently, as a matter of economics, Dr. Lamb is essentially assuming that the alleged cartel conduct had class-wide impacts.

9. Consider the market features cited by Dr. Lamb: even if one accepts Dr. Lamb's contention that Defendants had market power because of their high shares, the lack of alternatives and entry

[12] Ordover Initial Report, §III.D.

[13] Lamb Reply Report, ¶ 46. ("[O]nly Dr. Ordover is attempting to use regression analysis as a way to prove whether the conspiracy affected each part and each customer.")

[14] *Id.*

barriers,[15] that does not support the from-average-to-all (FATAL) inference made by Dr. Lamb because, as explained in my initial report, competitive conditions were not uniform across the multitude of parts sold by Defendants and hence one cannot assume that the alleged cartel was successful in elevating prices for all AM sheet metal parts.[16]

10. Hence, even if the alleged cartel agreed to elevate prices across the board in all categories of AM sheet metal parts and the agreements impacted the prices of some parts, and even if the Defendants had market power in the relevant market, there is no reason to assume that such agreements would have necessarily elevated the prices of all or nearly all products above competitive levels. As a matter of economics, one would need to examine data on actual pricing conduct related to the many thousands of AM sheet metal parts and several hundred customers for evidence of class-wide impacts of the alleged conduct. The only general evidence provided by Dr. Lamb which uses price data is in the context of the claims related to a "price structure" in the AM sheet metal marketplace. I turn to this next and explain why his claims related to "price structure" are insufficient to show class-wide impacts, and a more general analysis of price movements leads to the opposite conclusion.

*c. Dr. Lamb's claims related to a "price structure" are not sufficient to establish class-wide impacts.*

11. Dr. Lamb included in his initial report a review of price charts of 20 AM sheet metal products and concluded (based on a visual inspection) that they showed a "price structure" wherein prices tended to be correlated, i.e., move in the same direction. He then claimed that this observation supported his view of class-wide impact.[17] In my initial report, I explained that Dr. Lamb's price charts do not demonstrate that AM sheet metal parts' prices exhibited a stable relationship with each other such that the contested conduct of Defendants would necessarily have impacted all or

---

[15] In my initial report, I explain that Dr. Lamb has failed to establish that OEM parts did not constrain prices of AM sheet metal parts, nor that Defendants had dominant market shares in the relevant antitrust market since he has not established the relevant antitrust market. (Ordover Initial Report, fn. 9.) Absent a proper delineation of the relevant antitrust market, Dr. Lamb's claims related to entry barriers do not establish that Defendants had sufficient market power to materially elevate prices for all or nearly all parts sold to all or nearly all customers. In any case, my ultimate conclusions relating to class-wide impact do not depend on these elements of Dr. Lamb's analysis. The same applies to Dr. Lamb's claim that demand for AM sheet metal parts was declining. Even if this were correct, it does not follow that the alleged cartel had class-wide impacts.

[16] Ordover Initial Report, ¶ 13b, ¶ 22.

[17] *Id.*, fn.5.

virtually all class members. In fact, frequently prices of AM sheet metal parts moved in opposite directions.[18] Given the heterogeneity of AM sheet metal parts and the lack of substitutability among them, the absence of stable price relationships between parts is not surprising and it vitiates any claim of class-wide impacts.

12. In his reply report, Dr. Lamb contends that I have misunderstood his definition of a "price structure" and that his claimed price structure simply means that the prices paid by different customers (or charged by different suppliers) for a *given* part tend to be correlated across customers (suppliers).[19] For example, "price structure" as now clarified by Dr. Lamb, merely means that prices paid by different customers for a left fender, say, for a 2006 Toyota Camry were correlated across customers, as were the prices charged by different suppliers for the same part. Thus, Dr. Lamb now makes it clear that his interpretation of "price structure" does not encompass prices of different AM sheet metal parts, i.e., his empirical analysis of price structure does not aim to investigate whether prices of AM sheet metal parts are inexorably linked to each other (for example, whether the price of a left fender used in a 2006 Toyota Camry is correlated with the price of bumper used in a Ford pick-up truck, or with prices of any other parts). In fact, Dr. Lamb now contends that the allegations of class-wide impact on *all* parts do not require that he actually demonstrate that prices of *all* AM sheet metal parts are correlated. Thus, despite the fact that the putative class and the relevant market encompasses all parts, it is not incumbent on him to show that the prices of distinct parts are linked through competitive market forces of supply and demand, i.e., by means of economic linkages among them.[20] As a matter of economics, this is a rather surprising claim given that, as already noted, according to the plaintiffs (and seconded by Dr. Lamb), all AM sheet metal parts belong to the same "market."[21] Dr. Lamb's approach is inconsistent with standard economic practice which constructs an antitrust market from products that are substitutes in consumption, and possibly in production.[22]

---

[18] *Id*., ¶¶ 43-50.

[19] Lamb Reply Report, ¶ 23.

[20] Lamb Reply Report, ¶ 6(c)i. ("Dr. Ordover is wrong in asserting that the allegations require me to establish that there is a correlation among prices across AM Sheet Metal Parts (there is a correlation among prices across AM Sheet Metal Parts (that is, that the price of a fender, for example, is correlated with the price of a tailgate).")

[21] *See*, e.g., Second Amended Complaint, ¶¶ 27-29; Lamb Reply Report, ¶ 2(f).

[22] See, e.g., U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," 2010, p.7.

13. In my view, given the heterogeneity of AM sheet metal parts and the lack of substitution between distinct parts, given the evidence of differential impacts of contested conduct on various parts, and given the differences in the mix of parts purchased by customers, it is essential – as a matter of economics – to establish that *all* AM sheet metal parts are tightly linked by demand/supply substitution and hence there exists stable relationships between their prices in order to establish that the alleged conduct had class-wide impacts. In fact, even if Dr. Lamb were correct in his claim that there is a price structure across customers and suppliers, it does not follow that the alleged cartel has had class-wide impacts, nor is it sufficient to support the FATAL inference that underlies Dr. Lamb's claim of class-wide impact.

14. My point can be illustrated with a simple example: suppose that two auto parts A and B are each sold by multiple sellers to multiple customers and there are no substitutes for A and B. Suppose also that A is sold for the same price by all sellers to all customers in all periods.[23] Suppose the same is true of B. In this example, the price of A is perfectly correlated across customers and also across suppliers and the same is true for B. Thus, product A exhibits the "price structure" defined by Dr. Lamb and so does product B. Finally, suppose that prices of A and B can diverge because these parts are not substitutes from the standpoint of customers and the molds used to manufacture A cannot be used to manufacture B and hence there is little supply substitution as well. Consequently, the prices of A and B are not highly correlated.

15. Now suppose that the price of A increases above the benchmark level by 10% during a class period as a result of cartel conduct but the price of B is either unaffected by the cartel or decreases by 10% per period due to reductions in manufacturing costs for part B that can be attributed to the contested conduct.[24]

16. In this setting, whether a given customer is better or worse off as a consequence of cartel conduct depends on the mix of A and B parts purchased. Customers that purchased only B would be unharmed by cartel conduct. In the scenario where the contested conduct engendered efficiencies and lowered prices of B, even a customer that purchased some A but purchased mostly B would pay a lower average price for the basket of its purchases. Thus, determining the impact of the

---

[23] Although the price of A changes over time in response to market conditions, all sellers at any given point in time sell A at the same price to all customers who buy A.

[24] Because of lack of demand and supply substitution between the two parts, their relative prices do not converge to pre-cartel levels.

cartel on individual customers requires an individualized inquiry into the mix of parts they purchased and the impact of the cartel on the individual products in the basket of parts purchased by each customer. This conclusion applies even though there exists a price structure of the sort claimed by Dr. Lamb. This logic applies to AM sheet metal parts because (a) customers of AM sheet metal parts purchased different mixes of parts, i.e., they did not purchase an uniform mix of parts,[25] and (b) there is no reason to assume that the cartel had uniform impacts on AM sheet metal parts' prices and there is evidence that prices of some parts either decreased or did not increase during the Class Period following contested conduct while the prices of other parts may have increased.[26] In sum, even if Dr. Lamb is correct is in his view that there exists a narrow price structure of the sort he claims (i.e., a price structure across customers and suppliers but not across parts), it does not follow that common evidence can be used to show that the alleged cartel harmed all or nearly all products and customers, nor does it follow that his "from-average-to-all" inference is valid.

17. So far, I have assumed that there exists a price structure of the sort claimed by Dr. Lamb. However, the data record indicates that prices paid by customers for the same part often diverged substantially. For example, even Dr. Lamb himself estimates that for nearly 2/3rd of parts, the correlation between the price paid by LKQ/Keystone for a given part and the average price paid by other distributors for the same part is low, i.e., the correlation coefficients are less than 0.8.[27] Dr. Lamb further estimates that for nearly a quarter of products, the correlation coefficient of the price paid by LKQ/Keystone for a given part and the average price paid by other distributors for

---

[25] In my initial report, I provided an analysis of parts purchases by customers and showed that customers purchased heterogeneous mixes of parts and that the variation across customers in the parts they purchased was statistically significant. (Ordover Initial Report, fn.88.) In his reply report, Dr. Lamb does not contest this conclusion.

[26] For example, the document record indicates that prices of some parts subject to tooling agreements decreased following these agreements even if prices of other parts increased. (See Ordover Initial Report, ¶ 22a.) Documents and deposition testimony indicate that tooling agreements often failed. (See Ordover Initial Report, ¶ 22b.) They also indicate that tooling agreements were expected to produce and did produce manufacturing efficiencies and economic logic indicates that such cost savings likely would have impacted prices. (See Ordover Initial Report, ¶ 22c.) In his reply report, Dr. Lamb does not dispute the validity of the evidence that I cited in this regard in my initial report. Moreover, Defendants' sales data indicate that even after specific attempts by Defendants to increase prices across the board as DPPs allege occurred in early 2004 and 2008, prices of many parts did not increase and many decreased. (Ordover Initial Report, ¶¶ 57-60.) Although Dr. Lamb disputes the relevance of the metric of prices that I used in this analysis, he provides no analysis to show that the prices of all or nearly all products increased following the express agreements to elevate prices in 2004 and 2008 as alleged by DPPs. I discuss this further later in this report.

[27] I explained in my initial report that correlation coefficients below 0.8 are small from an economics standpoint. (Ordover Initial Report, ¶ 48.)

the same part is even smaller, i.e., below 0.5.[28] These levels of correlations indicate that prices paid by LKQ/Keystone for an AM sheet metal part could and did diverge substantially from the prices paid by other distributors. I illustrate this in Exhibit RR1, which depicts the prices paid by LKQ/Keystone for three AM sheet metal parts and the average prices paid for the same part by all other customers. For example, Exhibit RR1a shows the price paid by LKQ/Keystone and the average price paid by other distributors for a Ford hood. As can be seen in that chart, although the prices paid by these two sets of firms were about the same in August 2007, the prices diverged sharply for over a year thereafter with the price paid by LKQ/Keystone being as much as 34% lower than the average price of other distributors in that time window. Even greater divergences in prices for extended periods can be observed for the two other examples depicted in Exhibit RR1. Such divergences across customers in prices they pay for the same part are not surprising in an industry where there are no list prices applicable to all customers and prices are negotiated.[29] Such divergences are masked by Figure 2 of Dr. Lamb's Reply Report which shows high correlation coefficients across prices paid by different customers for the same part.[30] Such price divergences across customers show that the impacts of market conditions (including the impacts—if any – of the alleged cartel) need not have been uniform across customers.[31, 32]

---

[28] Lamb Reply Report, ¶ 38.

[29] Ordover Initial Report, ¶ 54, fn. 64.

[30] Figure 2 in Dr. Lamb's reply report only examines the extent of correlation in prices paid by customers for the Top 20 products identified by Dr. Lamb. Even if the prices paid for these products are correlated across customers, it does not follow that prices for other products are also correlated across customers. Certainly, Dr. Lamb has provided no evidence that they are correlated.

[31] As shown in Exhibit 7 of my initial report, there is little evidence of strong correlations in changes in residual prices paid by different customers for a given part. (A revised version of this exhibit – which adjusts for the calculation issues raised in Dr. Lamb's reply report – is in Appendix 1 of this report, and it is not materially different from the analysis in Exhibit 7 of my initial report.) Unlike Figure 2 in Dr. Lamb's reply report, which relates to estimates of correlations in the *levels* of (actual) prices paid by customers for a given part, my analyses of correlations in (residual) price *changes* better reflect the lack of co-movement in prices paid by customers.

[32] Dr. Lamb's claim of a price structure across suppliers (i.e., prices charged by suppliers for a given part tend to be highly correlated) suffers from the same issues as his claim related to a price structure across customers. Chief among them is that, as explained above using a simple example, even if such a price structure across suppliers exists, it does not imply that class-wide cartel impacts can be established using common evidence. Moreover, prices charged by different suppliers for the same part did diverge substantially. For example, the correlation coefficients of monthly changes in residual prices charged by Defendants for the Top 20 parts identified by Dr. Lamb are less than 0.8 in all instances and less than 0.5 in 94% of instances. (The analysis is conducted by estimating correlation coefficients between monthly changes in residual prices charged by Defendants to all customers for each of the Top 20 products identified by Dr. Lamb. These pairwise correlation coefficients are estimated only if the number of

(footnote continued …)

18. Having mistakenly denied the importance of showing that price of AM sheet metal parts are correlated due to demand/supply substitution between them, Dr. Lamb then simply avoids any attempt to demonstrate a stable relationship among prices of AM sheet metal parts, and he provides no estimate of the extent to which prices of AM sheet metal parts are correlated. Instead, Dr. Lamb critiques my estimates of cross-part price correlations by claiming that I erred when I used *residual* prices (i.e., prices that are purged of the impacts of market conditions that are common to all parts/customers such as the cost of steel that are included in Dr. Lamb's damages regression) instead of *actual* prices (i.e., prices that are not purged of the impacts of such market conditions) of AM sheet metal parts when I demonstrated that prices of AM sheet metal parts frequently moved in opposite directions and had low price correlations.[33]

19. It is important to note that residual prices (and changes in such prices) are generally better suited to deal with the problem of spurious correlations, i.e., avoid the false conclusion that products have economic linkages stemming from demand/supply substitution across them when none exist. Hence, residual prices are a more reliable metric for assessing the potential for class-wide impacts of alleged cartel conduct. As I explained in my initial report, one cannot infer anything about economic linkages between products based merely on correlations in actual prices.[34] I elaborate on this point later in this section. However, as an initial matter, even if one were to use actual price levels (as proposed by Dr. Lamb) instead of changes in residual prices, the prices of AM sheet metal parts demonstrate little correlation with each other. In fact, estimates of price correlations are similar regardless of the metric of "price" used – residual prices, which I consider a better metric, or actual prices which Dr. Lamb prefers. Exhibit RR2 depicts the correlation in actual price levels of the Top 20 AM sheet metal parts presented by Dr. Lamb in his initial report. Exhibit RR2 shows that 87% of the correlation coefficients between actual prices of these Top 20

(… footnote continued)

overlapping months across a pair of suppliers' sales of a product equaled 30 or more.) (Figure 3 in Dr. Lamb's reply report only examines the extent of correlation in prices paid by suppliers for the Top 20 products identified by Dr. Lamb. Even if the prices paid for these products are correlated across suppliers, it does not follow that prices for other products are also correlated across suppliers. Certainly, Dr. Lamb has provided no evidence that they are correlated.)

[33] See, e.g., Lamb Reply Report,¶ 34 ("Dr. Ordover claims that there is little correlation between changes in prices paid by customers for the top 20 AM Sheet Metal Parts. However, Dr. Ordover did not examine actual prices of AM Sheet Metal Parts in his analysis. Instead, Dr. Ordover bases his conclusion on his unreliable examination of changes in residual prices.")

[34] Initial Ordover Report, ¶¶ 41-42.

products with each other were less than 0.8, which is the "high-correlation" level. In fact, 79% of correlations between actual prices were less than 0.7 and 47% were less than 0.5. Similarly, correlation coefficients between actual prices of Top 20 parts subject to tooling agreements and not-subject to them are very low as can be seen in Exhibit RR2.[35]

20. Correlations that are so low imply that prices of AM sheet metal parts frequently changed in opposite directions. As depicted in Exhibit RR3, the actual prices of AM sheet metal parts did indeed frequently change in opposite directions. Exhibit RR3 shows that in a typical month when the actual prices of a majority of hoods increased (decreased), 22% of fenders' actual prices decreased (increased) while another 31% of fenders' actual prices remained unchanged. Thus, prices of about 53% of fenders either did not change or moved in the direction opposite to the direction of change of the majority of hoods during the relevant months. A similar pattern is observed for tailgates (see Exhibit RR3) and across parts that were and were not subject to tooling agreements (see Exhibit RR4). These patterns of divergent movements of actual prices of parts are similar to the movement of residual prices.

21. Thus, even if actual prices (instead of residual prices) are used to estimate price correlations across AM sheet metal parts, the conclusion is no different from the conclusion that I reached using residual prices, i.e., prices of AM sheet metal parts changed in heterogeneous ways and frequently moved in opposite directions, which is evidence that there is no demand and supply substitution between parts that compels the prices of those parts to move in the same direction.[36]

---

[35] All correlations of actual prices in this report are estimates of correlations in actual price levels – not changes in actual prices. (This is the same metric used by Dr. Lamb in Figures 1-3 in his Reply Report.) In his reply report, Dr. Lamb claims that my analyses demonstrating the absence of stable price relationships between parts subject to tooling agreements and not subject to them are irrelevant. (Lamb Reply Report, ¶ 6c(ii) However, he does not provide any analysis in his reply report to refute my finding that the Defendants' pricing data show no stable relationships between prices of parts subject to tooling agreements and parts not subject to them. (This conclusion applies even if actual prices are used to estimate price relationships instead of residual prices. See Exhibits RR2 and 4.) The absence of stable relationships and the heterogeneity of price movements indicate that even if the alleged cartel was successful in elevating prices of parts subject to tooling agreements, one cannot assume that prices of other parts would have been necessarily elevated as well. Moreover, such evidence is relevant for assessing class-wide impacts of the contested conduct that includes conduct related to tooling agreements– unless one assumes (as Dr. Lamb does) that prices of all parts paid by all customers were elevated by the alleged cartel.

[36] As I explained in my initial report, the distinct auto parts included in the class were generally not substitutes from customers' standpoint. Moreover, supply substitution was limited by the fact that a mold used to manufacture a specific part cannot be used to manufacture a different part. Although I understand that the presses, coating machines and other equipment used by manufacturers can be switched from producing one AM sheet metal part to producing another part, such supply-side substitution would imply that if Defendants were able to reduce supply of a certain part, this would release manufacturing capacity that can then be used to produce other parts. Such supply-

(footnote continued …)

It also shows that different market forces affected various categories of parts and affected them differently. Put differently, there is no evidence of economic links between the prices of AM sheet metal products that create a stable relationship between them.

22. Despite the similarity in results from using actual prices instead of residual prices when estimating price correlations across AM sheet metal parts, it is important to note that residual prices (and changes in such prices) are generally more likely to avoid problems of spurious correlations, i.e., to avoid the false conclusion that products have economic linkages stemming from demand/supply substitution across them and broad cartel impact when none exist. Hence, residual prices are a more reliable metric for assessing the potential for class-wide impacts of alleged cartel conduct. As I explained in my initial report, one cannot infer anything about economic linkages between products based simply on their actual price correlations.[37] Although Dr. Lamb claims otherwise in his reply report, he does not provide any references to economics literature to support his view that economic links across products are better detected by the use of actual price correlations. In fact, economists have long recognized that products can have high correlations in their actual prices and yet have no economic linkages between them based on demand/supply substitution. This problem of "spurious correlation" is described in an economics textbook that deals with the application of statistical and econometric methods to antitrust:

> If two products use the same input and its price varies, we will generate a positive correlation in the costs of producing the two products. For instance, both airline travel and rubber are intensive in fuel-based inputs. As the price of oil varies, the costs of producing both airline travel and rubber will covary … A (in this case very) naïve application of price correlation analysis might therefore find that the prices of rubber and airline travel are correlated and thus argue they are in the same product market. Naturally, such a conclusion would be a mistake—the positive correlation is a 'false positive' for market definition since we are not in truth learning from the positive correlation in prices that the products are demand substitutes. Putting it another way one could not plausibly claim that airline travel is a demand

(… footnote continued)

side substitution would, if anything, make it more likely that prices of parts would be differentially impacted by the alleged cartel, thus undermining Dr. Lamb's FATAL inference. (Ordover Initial Report, ¶¶ 26-27.)

[37] Initial Ordover Report, ¶¶ 41-42.

> substitute for rubber, that if the price of rubber were to go up, people would increase air travel![38]

23. A positive correlation between the actual prices of airline travel and rubber is not a basis for concluding that a rubber cartel that successfully elevated the prices of rubber products would also elevate the price of airline travel. There is no demand or supply substitution between them that would imply such an impact across products. Similarly, even if the alleged AM cartel elevated the prices of the average AM product, it does not follow that prices of all/almost all parts were elevated – unless there is compelling evidence of demand/supply substitution between these parts. Correlation in actual prices is not evidence of such substitution since common market factors such as the cost of steel impact the prices of most AM sheet metal parts and can lead to high correlations in the prices of AM sheet metal parts even if there was no substitution across products. Dr. Lamb has not only provided no evidence of such substitution across AM sheet metal parts but readily acknowledges that customers cannot typically substitute one type of AM sheet metal part for another (e.g., a fender for a hood), and he does not dispute that supply-side substitution is limited and can lead to divergent price impacts of the contested conduct.[39]

24. In his reply report, Dr. Lamb acknowledges that "a correlation could be considered spurious if two prices moved together despite not having a true economic relationship. But Dr. Ordover's conclusion that the prices of AM Sheet Metal Parts would be correlated because of common market factors means by definition that the relationship is not spurious."[40] What Dr. Lamb seems to be saying is that the mere fact that prices of AM sheet metal parts are commonly impacted by the changes in the cost of steel (for example) is reason enough to conclude that they have a true "economic" relationship and the correlation in their actual prices is not spurious even absent demand or supply substitution between them. However, Dr. Lamb's argument would imply that the correlation in prices of rubber and airline travel due to their dependence on fuel costs is indicative of an economic relationship between rubber and airline travel such that a cartel that was effective in elevating the prices of rubber would likely increase the prices of airline travel. The implausibility of this prediction illustrates the flaw in Dr. Lamb's argument in this context.

---

[38] Peter Davis and Eliana Garcés (2010), *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, p. 175.

[39] Deposition of Dr. Russell Lamb, October 1, 2015, pp. 51-52

[40] Lamb Reply Report, ¶ 31.

What matters for the purpose of demonstrating class-wide impact is a presence of economic links between products stemming from demand/supply substitution patterns that imply that if the alleged cartel was effective in elevating prices of some products, it likely was also effective in elevating prices of other products. Absent such links across products, one cannot reasonably make the FATAL inference that Dr. Lamb makes. Since AM sheet metal parts are not substitutes in ways that create stable relationships across their price,[41] and since Dr. Lamb has not even attempted to demonstrate such relationships, he has failed to support his claim of class-wide impact.

25. One way to reduce the risk of spurious correlation and the resulting error of falsely concluding that products have economic links due to substitution when none exists is to remove the impacts of the common cost and demand factors that drive the prices of products in the same direction. In the context of the example above related to airline travel and rubber, this is equivalent to examining the correlation in the prices of airline travel and rubber after removing the impacts of fuel costs. When prices are purged of such common factors, the results are "residual prices" which I have used in my initial report when estimating price correlations across products. I obtain this residual price by using the pricing regression model employed by Dr. Lamb. The model includes several competitive market determinants of AM sheet metal prices including the cost of steel and the number of vehicle crashes in the U.S.. When AM sheet metal prices are purged of the influence of these market factors, what remains are the residual prices, i.e., the components of AM sheet metal prices that are determined by competitive market factors not included in Dr. Lamb's pricing regression (unavoidably, every regression excludes some relevant explanatory variables) and by any alleged cartel conduct. I then correlate the residual prices of various AM sheet metal parts in order to assess their relationships without the confounding effects of market factors that drive prices of AM sheet metal products within the confines of Dr. Lamb's regression model, even absent any direct economic links between them due to substitution across parts. This approach of using regression residuals to test for direct links between economic variables free of

---

[41] Dr. Lamb acknowledges that there is little or no demand substitution across AM sheet metal parts (e.g., across hoods and fenders). As for supply substitution, as I explained in my initial report, although some of the manufacturing capacity employed to manufacture an AM part can be switched to produce other parts, if anything, such supply-side substitution would imply that any agreement by Defendants to reduce supply of a certain part (for example, because a tooling agreement designated only one manufacturer to produce that part) would release manufacturing capacity that can then be used to produce other parts. (Ordover Initial Report, ¶ 27.)

the effects of confounding variables is a standard methodology in econometrics and it is noted in basic textbooks. [42]

26. Although Dr. Lamb contends in his reply report that I have made various errors in calculating residual prices, he also acknowledges that the result of these minor errors is that my estimated residual prices are not entirely purged of market demand and cost factors.[43] Of course, Dr. Lamb does not provide any estimates of corrected residual price correlations. More importantly, inasmuch as my residual price estimates do not remove all common market factors, they are conservative in that they are likely to indicate correlations in prices across AM sheet metal parts despite the absence of any economic linkages between them.[44]

27. In his reply report, Dr. Lamb claims that my estimates of residual prices do not include any overcharges due to cartel conduct and hence changes in residual prices convey no information about the impact of the alleged cartel on prices. He further claims that there is no reason to expect correlations in residual prices.[45] He is mistaken on both counts. The "residual price" that I have defined and analyzed includes not just the influence of market factors excluded by Dr. Lamb's regression model but also the impact of the alleged cartel – as I explained in my initial report.[46] Consequently, residual prices convey information about alleged overcharges and the impact of

---

[42] The use of "residualized" variables to detect relationships between them that are free of the effects of other confounding variables is referred to as estimating "partial correlations", which is analytically identical to my use of residual prices. See, for example, the discussion in William Greene, *Econometric Analysis*, 7th ed., Prentice Hall, 2012, p. 36. See also, Kennedy, Peter, *A Guide to Econometrics*, 5th Edition, The MIT Press, Cambridge, Massachusetts, 2003, p. 508.

[43] Lamb Reply Report, Mathematical Appendix, ¶ 7.

[44] I have re-calculated residual price correlations after making the adjustments noted by Dr. Lamb and found that the resulting changes correlation estimates (compared with those in Exhibits 3-7 in my initial report) are *de minimis*. For example, each of the statistics related to correlation coefficients across Top 20 AM sheet metal parts noted in Exhibit 5 of my initial report differ from the new estimates by no more than 2 percentage points. Thus, the technical issues raised by Dr. Lamb related to calculating residual prices do not impact the conclusion that residual prices of AM sheet metal parts show very little correlation. Appendix 1 lists all the exhibits in my initial report altered by the adjustments noted by Dr. Lamb.

[45] Lamb Reply Report, ¶¶ 30-31.

[46] Ordover Initial Report, ¶ 42. This can be seen in the mathematical expression for the residual price associated with a transaction: $Residual_t = \widehat{P_{BF,M_t}}(e^{\hat{\alpha}+\hat{\varepsilon}} - 1)$ where $\widehat{P_{BF,M_t}}$ is the but-for price estimated using market factors included in Dr. Lamb's damages regression and the multiplicative factor $\left(e^{\hat{\alpha}+\hat{\varepsilon}} - 1\right)$, which includes the price impact of the alleged cartel, $e^{\hat{\alpha}}$, and the price impact of market factors not included in Dr. Lamb's model, $e^{\hat{\varepsilon}}$. (The residual price also includes a non-linear correction term that I omit here in order to simplify the exposition but I include it in the calculation of residual prices, which does not alter the conclusion that residual prices depend on the impact of the alleged cartel as well as market variables excluded from Dr. Lamb's pricing model.)

the alleged cartel. Residual prices are likely to be correlated across customers/products if DPPs are correct in their claim that Defendants' conduct elevated prices across all customers/products. Indeed, Dr. Lamb's entire regression analysis of overcharges consists of comparing the average residual prices during the Class Period with the average residual price during the benchmark period and attributing (mistakenly) the entire higher average residual price during the Class Period to the impact of the alleged cartel. This is because the regression model that Dr. Lamb employs to estimate damages is designed to compare the average residual prices during the Class Period and the benchmark period. This comparison is reflected in the estimated "overcharges" generated by his damages regression model.

28. Dr. Lamb provides a simulation analysis in his reply report to support his claim that actual prices are better than residual prices in detecting widespread impacts of a cartel and the presence of a "price structure" across products.[47] His hypothetical simulation assumes that there are two products, A and B, whose prices are both elevated by an identical amount by a cartel for an equal amount of time relative to the benchmark. Dr. Lamb estimates actual and residual price correlations and finds in the context of the example that the correlation in actual prices is high, whereas the correlation in residual prices is low. This he takes as evidence that actual price correlations provide more reliable information about the existence of broad cartel effects.

29. However, as an initial matter, as I have shown in Exhibit RR2, even when actual AM sheet metal part prices are used to estimate correlations, the conclusion remains the same as with residual prices: there is no evidence of strong correlations across actual prices of AM sheet metal parts. Moreover, Dr. Lamb's simulation analysis relies entirely on hypothetical data and not data from the AM sheet metal parts marketplace. Furthermore, in this simulation analysis, Dr. Lamb makes assumptions that are not consistent with market conditions in the AM sheet metal parts marketplace, which renders his simulation analysis based on hypothetical data irrelevant. For example, his simulation model assumes that there is no systematic relationship between market factors excluded from his simulated pricing model that impact the prices of the two products such that during periods when the price of one product is high due to market factors not considered by

[47] Lamb Reply Report, ¶¶ 34-36.

Dr. Lamb there is no reason for prices of other products would also be high.[48] When applied to the AM sheet metal parts, this is tantamount to assuming that increases in labor and energy costs, for example, which are excluded from Dr. Lamb's pricing regression, would only affect the prices of some AM sheet metal parts and not others. This makes no economic sense given that all or nearly all relevant parts were manufactured in plants in Taiwan that were subject to similar macroeconomic shocks. Fluctuations in labor and energy costs in Taiwan would have impacted prices of all/almost all parts manufactured in Taiwan. Thus, Dr. Lamb's simulation ignores conditions in the AM sheet metal marketplace.

30. Extending Dr. Lamb's simulation by allowing the market forces excluded from the pricing simulations to impact prices of parts A and B, thereby by rendering the simulation analysis more consistent with AM sheet metal marketplace realities, leads to the conclusion that residual price correlations correctly identify the fact that – as posited in Dr. Lamb's simulation model – the hypothetical cartel affected the prices of both products. As such, Dr. Lamb's criticism of my reliance on residual prices is incorrect. This is depicted in Exhibit RR5, panel (i) which shows correlations in levels of actual prices of products A and B and correlations in their residual price changes – once Dr. Lamb's unrealistic assumption is removed.[49] Both types of correlations are above 0.8, and hence they both detect the existence of identical cartel impacts on the prices of A

---

[48] In his simulation (Lamb Reply Report, fn. 100), Dr. Lamb generates a hypothetical dataset consisting of 480 observations ("months") for two products, A and B. The prices of each product are determined according to the following formula:

$$\ln P_i = 0.21 \ln D + 0.14 \ln C + 0.15\, Conspiracy + \varepsilon_i\,, \qquad i = \text{A, B}$$

where *D* is a demand variable that is uniformly distributed between 80 and 200; *C* is a cost variable that is uniformly distributed between 50 and 160; *Conspiracy* equals1 for the first half of the period considered and zero for the second half; and $\varepsilon_i$ (i=A,B) are the error terms that capture the price impact of variables excluded from the pricing model and which are normally distributed with mean 0 and variance $\sigma^2$. Crucially, $\varepsilon_i$, the regression error for each product, is assumed to be independently generated and hence i.i.d. This assumption is tantamount to assuming that competitive market factors other than *D* and *C* that influence the price of A in each period are uncorrelated with factors that influence the price of B. (Subject to this assumption, Dr. Lamb estimates the correlation coefficient of the actual price levels of A and B. He also estimates the correlation coefficient of monthly changes in residual prices during the first 240 months, where the residual price in each period is estimated by taking the difference between the actual price and the predicted price, after setting the *Conspiracy* variable equal to zero, in that period.)

[49] In Exhibit RR5, panel (i), *D*, *C*, and *Conspiracy* variables are unchanged from Dr. Lamb's simulation, but the error term is composed of a common component $\varepsilon_c$ and an idiosyncratic component $\varepsilon_i$ (i = A, B), all of which are normally distributed with mean 0 and variance $\sigma^2$. This structure of the regression error term implies that regression error in the pricing equation for A and for B are correlated, i.e., it permits competitive market factors other than *D* and *C* that influence the price of product A to also influence the price of product B in each period.

and B (as Dr. Lamb assumes in his simulation). Thus, when Dr. Lamb's simulation is amended to better reflect the relevant market conditions, it demonstrates that residual price correlations from my analysis would not fail to detect the presence of a "price structure" across products as reflected in price correlations.

31. Moreover, Dr. Lamb's simulation model shows why price correlations in actual prices are more likely than residual price correlations to incorrectly conclude that a cartel had class-wide impacts when none exists. Exhibit RR5, panel (ii) depicts results from altering Dr. Lamb's assumption that the hypothetical cartel elevated the prices of both products A and B. The modified simulation assumes that the price of product A was increased (by 15%) whereas the price of product B was reduced (by 15%). In this scenario where there is no substitution across products A and B and differential cartel impacts are possible across the two products, actual prices of the two products are highly correlated (i.e., they are above 0.8) but correlations of their residual prices remain below 0.8.[50] Thus, this example shows that residual price correlations are less likely to falsely indicate a price structure than actual price correlations because the former are purged of the impact of confounding variables.

## III. Dr. Lamb's reply report fails to establish that his damages model is reliable.

32. In his reply report, Dr. Lamb makes several claims regarding the regression model that he developed to estimate average overcharges and my critiques of that model. For example, in my initial report, I explained that Dr. Lamb's damages regression model is unreliable because it does not account for the impact of cost-reducing innovations made by Defendants during the relevant period and hence his model over-estimates "overcharges" by conflating changes in manufacturing costs with cartel impacts.[51]

---

[50] The analysis in panel (ii) of Exhibit RR5 posits the same regression error structure described in footnote 49.

[51] Ordover Initial Report, ¶ 77-79. The only control for manufacturing costs included in Dr. Lamb's regression model is an index of the cost of steel in the U.S., and that variable demonstrates no consistent trend during the data period and instead increased in some years and declined in others. In his reply report, Dr. Lamb contends that data on Taiwanese steel import prices validate his use of U.S. steel costs instead of steel costs incurred by Defendants in Taiwan in his damages model. (Lamb Reply Report, ¶ 68.) However, changes in Taiwanese steel import prices are poorly correlated with changes in the U.S. steel cost index with a correlation coefficient of just 0.5, which indicates that the two steel cost indices frequently diverged.

33. In his reply report, Dr. Lamb disputes the need to control for changes in manufacturing costs by adding a trend variable to his regression model (as I did).[52] However, Dr. Lamb does not dispute the fact that prices of AM sheet metal parts – after controlling for the market factors included in his regression (i.e., residual prices) -- have, in fact, been declining over time. Exhibit RR6a depicts the decline in AM residual prices over time.[53] As illustrated in this chart, AM sheet metal parts' residual prices declined by more than 30% during much of the Class Period. Dr. Lamb provides no explanation of this pronounced decrease in prices. In my initial report I cited to several sources of information indicating that manufacturers of AM sheet metal parts increased the efficiency of their manufacturing processes during the Class Period and thereafter.[54] Such improvements are consistent with and likely explain the decline in prices of AM sheet metal products. The fact that the price decline observed in Exhibit RR6a occurred during the Class Period as well as thereafter indicates that cost reducing innovations occurred even before the end of the Class Period. The gradual decline in residual prices contrasts with the assumption made by Dr. Lamb in his damages model that "overcharges" were uniform during the Class Period but such overcharges wholly or mostly disappeared after 09/2009. If this depicted reality, then the average residual price each quarter would have looked more like the pattern depicted in Exhibit RR6b which shows a sudden reduction in average residual prices at the end of Class Period. The fact that average residual prices did not follow this pattern highlights that Dr. Lamb's model fails to control for changes in manufacturing costs (other than steel costs), which significantly impairs the reliability of his model's estimate of average overcharges. The omission of an important variable from a regression model leads to biased and unreliable results and this has long been recognized in econometrics as a critical concern in regression analyses.[55]

---

[52] Lamb Reply Report, §V. Dr. Lamb further claims that my use of different trend functions is an example of "data mining." (Lamb Reply Report, ¶ 64.) It's nothing of the sort given that there are ample reasons (as cited in my initial report) to expect as a matter of economics that Dr. Lamb's regression model fails to control for manufacturing cost declines. My use of different functional forms for a trend variable is consistent with standard robustness checks performed by economists.

[53] Exhibit RR6a depicts the trend in residual prices where residual prices include the impact on prices of any alleged cartel conduct as well as the impacts of competitive market factors excluded from Dr. Lamb's regression model. Even when one excludes the impact of alleged cartel activity from residual prices, such prices exhibit a trend decline.

[54] Ordover Initial Report, ¶¶ 77-78.

[55] See, e.g., "Proving Antitrust Damages," pp. 148-149. ("Mistakenly excluding important explanatory variables in an attempt at simplicity, on the other hand, can result in an *omitted variable bias*. Omitted variable bias arises when important explanatory variables … have been omitted from the regression model … This misspecification will bias

(footnote continued …)

34. Although Dr. Lamb does not contest in his reply report the existence of the decline in prices, he claims that the decline could not be due to a decline in labor costs because an index of Taiwanese labor productivity does not display a trend increase in productivity.[56] However, this index does not even purport to capture manufacturing costs other than labor costs incurred by Defendants. Moreover, this index is based on the entire automobile and auto parts industry in Taiwan and Dr. Lamb provides no evidence that it reliably captures trends in labor costs incurred by Defendants. In fact, if the index identified by Dr. Lamb reflects labor productivity of manufacturing AM sheet metal parts at Defendants' plants, then the index should be negatively correlated with prices of AM sheet metal products, i.e., when labor productivity increases, the cost of labor decreases – because each hour of labor produces more output – and hence the prices of AM sheet metal parts would likely decline as well. However, as seen in Exhibit RR6c, the opposite is observed in the data, i.e., when the labor index increases, prices generally increase. The correlation coefficient between them is positive and statistically significant.[57] This leads to the absurd conclusion that the labor index relied upon by Dr. Lamb implies that increased labor costs are associated with decreases in AM sheet metal parts' prices, where the opposite should be the case. Thus, it's highly likely that the labor index used by Dr. Lamb does not reflect AM manufacturing costs at Defendants' plants and hence it is irrelevant for the analysis here. Hence, a better approach to controlling for the trend decline in manufacturing costs is to use a trend variable. Adding a time trend to a regression model is a standard approach to control for unobserved, trending factors that could affect the analysis.[58]

(… footnote continued)

the resulting coefficient estimates, and make these estimates unreliable for damage estimation.") See also, Daniel L. Rubinfeld, "Quantitative Methods in Antitrust", in 1 Issues in Competition Law and Policy 723, ABA Section of Antitrust Law, 2008, p.726. ("[T]he omission of relevant variables can bias the results. If, for example, costs were high during those periods of alleged wrongful behavior because of the influence of variables not included in the regression model, or if demand grew more inelastic during that period in ways not captured by the included demand-side variables, then a dummy variable reflecting the likely effect of wrongful behavior might have a large positive coefficient for reasons unrelated to the existence of the alleged conspiracy.")

[56] Lamb Reply Report, ¶ 63.

[57] Similarly, when the labor index is added to Dr. Lamb's regression model, the model estimates a positive and statistically significant coefficient on the labor productivity index, i.e., higher labor productivity and associated lower labor costs lead to higher prices of AM sheet metal products, a result that is contrary to economic logic.

[58] *See*, e.g., Wooldridge, Jeffery M., *Introductory Econometrics,* 4th Edition, South-Western Cengage Learning: 2009, p. 363.

35. In addition to disputing the need to extend his regression model to account for declining costs, Dr. Lamb also disputes the analysis in my initial report wherein I applied his damages model (with a trend variable) to individual customers and products to conclude that his model estimates no "overcharges" to a majority of customers and parts.[59] In his reply, Dr. Lamb contends that this unpooling (or disaggregation) of his damages model is unreliable because Dr. Lamb alleges I testified at my deposition that the regressions applied to individual parts and customers produce unreliable estimates of overcharges.[60] Dr. Lamb mischaracterizes my testimony. I testified that Dr. Lamb's damages model is unreliable as I noted in my initial report.[61] However, the unpooling of damages as done in my report *does not* impart enough unreliability to the estimates as to render an otherwise reliable model, unreliable. Put another way, if the Court or another fact finder were to deem Dr. Lamb's regression analysis of *aggregate* damages as reliable, then my estimates derived from his model (with the minor modification of an added trend variable to control for changes in costs) when applied to individual parts and customers are also reliable. My estimates show that a majority of customers and parts did not pay elevated prices during the Class Period. Incidentally, even without the addition of a trend variable to control for cost trends, Dr. Lamb's damage regression model when applied to individual parts estimates that parts that accounted for over 40% of dollar sales did not experience a statistically significant elevation of prices during the Class Period.[62] Customers who purchased mostly these products likely were unharmed, thereby refuting Dr. Lamb's claims of class-wide impacts of the alleged cartel.

---

[59] Ordover Initial Report, §III.D.

[60] Lamb Reply Report, ¶ 47.

[61] Ordover Initial Report, §IV.

[62] *Id*., ¶ 69. In his reply report, Dr. Lamb contends that the unpooled damages regression model is unreliable because it estimates an overcharge of about -120% for a customer (Unicity Import and Export Corp. or "Unicity") and attributes this estimate, which he deems implausible, to insufficient data. (Lamb Rebutal Report, ¶ 48 and fn. 115.) Defendants' data contain more than 300 observations for this customer during the relevant period (with more than 100 observations during the Class Period and more than 100 during the benchmark period). The adequacy of a sample of this size to precisely estimate "overcharges" for Unicity is evidenced by the fact that the (negative) "overcharge" estimated by the unpooled regression for Unicity is statistically significant at the 1% level. More generally, if as Dr.Lamb claims the estimated overcharge for Unicity is unreliable (and perhaps the same is true for other customers), then that fact only serves to demonstrate the unreliability of Dr.Lamb's damages regression model, which averages "overcharges" estimated for individual customers. If the individual "overcharges" estimated by his model are unreliable, then there is no reason to believe that the average of unreliable "overcharges" is somehow reliable. Certainly, Dr. Lamb has provided no reasons to conclude otherwise.

36. Furthermore, in his reply report, Dr. Lamb claims that my use of his damages model to estimate "overcharges" for individual products is inappropriate because any attempt to estimate "overcharges" for individual products requires controlling for demand for individual parts whereas Dr. Lamb's model used a measure of aggregate demand for AM sheet metal parts.[63] As an initial matter, it is important to note that I employ the same measure of demand (count of total crashes in the U.S.) for AM sheet metal parts as Dr. Lamb does. Second, although this metric is a proxy for aggregate demand for AM sheet metal parts, it captures demand for individual AM sheet metal parts as well. This is not surprising since the aggregate demand for AM sheet metal parts is the sum of individual demands. In fact, nowhere in his report does Dr. Lamb claim that the aggregate crash count that we both use conveys biased information about the demand for individual parts. Thus, Dr. Lamb's argument is that it would have been better to use data related to demand for specific parts rather than his metric of aggregate demand when unpooling his damages regression. However, Dr. Lamb does not cite to the existence of any such data. More important, Dr. Lamb has not even attempted to provide any analysis to demonstrate that had I used such hypothetical disaggregated demand data when unpooling his regression, this would have led to the conclusion that all or nearly all parts and all or nearly all customers experienced positive and statistically significant "overcharges." Consequently, Dr. Lamb's argument is mere speculation. [64, 65]

---

[63] Lamb Reply Report, ¶ 48.

[64] In his reply report, Dr. Lamb claims that I have not established that the methodology that I employed to apply Dr. Lamb's regression model to estimate overcharges associated with individual products and customers is a recognized approach in the economics and econometrics literature because I cited to only one paper in this context (Lamb Reply Report, fn. 108). Dr. Lamb does not indicate how many papers need to be cited in this regard in order to make my analysis reliable in his view. In any event, my approach is indeed a standard one in econometrics. For example, a basic econometrics textbook (Ramu Ramanathan, *Introductory Economics with Applications,* 3rd ed., The Dryden Press, Fort Worth, Texas, 1995, at pp. 263, 343-345) contains a discussion of the same fundamental issue of heterogeneity in the population being analyzed as the issue at hand here. Specifically, as noted in that textbook, a regression coefficient measures the marginal effects of an independent variable on the dependent variable and that marginal effect may vary across subsets of the population being analyzed. In order to estimate separate marginal effects for different sub-populations, the analyst can create indicator variables for each sub-group and interact these indicator variables with the independent variable. Dr. Lamb's regression model of damages assumes that all AM sheet metal parts and customers were uniformly overcharged, but for the reasons explained in this report and in my initial report there are sound reasons to believe that the impacts of the contested conduct differed across parts and customers. To estimate differences in the impacts of the alleged cartel across products and customer, I interact fixed effects for each AM part and each customer with the cartel indicator variable. This is entirely consistent with the interactions model approach described in the cited textbook.

[65] In my initial report, I explained that a standard test (the F-test) refutes the implicit assumption made by Dr. Lamb that all products and customers were uniformly overcharged during the Class Period. (Ordover Initial Report, ¶ 66)

(footnote continued …)

37. In sum, nothing in Dr. Lamb's reply report leads me to alter my conclusions that (a) his damages model's estimates of average "overcharges" are unreliable and exaggerated because the analysis fails to control for changes in manufacturing costs, and (b) after controlling for such cost trends, applying Dr. Lamb's model to individual customers and parts demonstrates that a majority of customers and parts did not experience elevated prices during the Class Period.

## IV. Dr. Lamb's reply report fails to demonstrate class-wide impacts of the alleged agreements to increase prices in 2004 and 2008.

38. Although Plaintiffs allege that Defendants periodically agreed to broad price increases of AM sheet metal parts, in his initial report, Dr. Lamb did not provide any empirical analysis to test whether these alleged agreements impacted all or virtually all purchases by all or virtually all class members. For example, Plaintiffs allege that Defendants agreed to elevate prices broadly in March 2004 and again in March 2008.[66] In his initial report, Dr. Lamb did not provide any empirical analysis of the impacts of these alleged agreements. In my initial report, I examined changes in prices of AM sheet metal products after Q1 2004 and Q1 2008 and concluded that

(… footnote continued)

In his reply report, Dr. Lamb claims that I have misused the F-test and that the test result may be due to the fact that Dr. Lamb's model estimates that only one product (or customer) had an overcharge that was statistically significantly different from overcharges on remaining products (or customers), whereas all other products and customers had overcharges that were not statistically different from each other. (Lamb Reply Report, ¶¶ 50-52.) However, Dr. Lamb does not provide any evidence to substantiate his claim. As such, all he provides is speculation. It is, in fact, possible to extend the F-test to compare the overcharges estimated by Dr. Lamb's regression model of damages for an individual product (or customer) with estimated overcharges for each of all other products (customers). If Dr. Lamb's critique of my use of the F-test is correct, then these pair-wise comparisons and associated tests would reveal that for nearly all products (customers), the overcharges estimated for each pair of products and (customers) by the unpooled version of Dr. Lamb's model are comparable. In fact, these comparisons reveal the opposite to be true, i.e., in the overwhelming majority of instances, the pairwise comparisons reveal that differences in overcharges are statistically significant, thereby validating my use of the F-test in my initial report and validating my finding that "overcharges" varied materially across products and customers (with negative "overcharges" for many), thereby refuting Dr. Lamb's assumption of uniform overcharges. For example, in my initial report, I unpooled Dr. Lamb's damages regression model to estimate overcharges for 126 individual customers (and all other customers pooled together since they did not satisfy sample size requirements individually). (See Ordover Initial Report, ¶¶ 71-73.) I have compared estimated overcharges for individual customers and tested for the statistical significance of the difference in estimated overcharges for each pair of customers. Of the 8,001 pairs of comparisons across customers, I find that the overcharges are statistically significantly different for 80% of customer pairs. Moreover, for the top 500 products with at least 100 transactions in the Class Period and the benchmark period, I have compared the estimated overcharges for individual products and tested for the statistical significance of the difference in estimated overcharges for each pair of products. Of the 124,750 pairs of comparisons across products, I find that the overcharges are statistically significantly different for 89% of product pairs. Thus, the data reveal that the overcharges estimated by Dr. Lamb's model for individual customers and products are significantly different from one another, thereby refuting Dr. Lamb's assumption of uniform "overcharges."

[66] Ordover Initial Report, pp. 38-39.

prices of a large fraction of AM sheet metal parts did not increase after Q1 2004 and after Q1 2008.[67] The fact that prices of AM sheet metal parts did not uniformly increase following these alleged agreements is inconsistent with class-wide impacts since such heterogeneity in price movements implies that differential market forces were impacting AM sheet metal parts. Hence, one cannot assume that all AM sheet metal parts were impacted even if some parts were impacted by the alleged cartel. Thus, class-wide impact is unlikely to be established using common evidence across parts.

39. In his reply report, Dr. Lamb does not dispute my analysis showing that a large fraction of parts did not experience price increases after Q1 2004 and Q1 2008. However, Dr. Lamb claims that I assumed that DPPs allege that Defendants attempted to increase prices broadly only on these two occasions.[68] This is demonstrably incorrect since I noted in my initial report that these two were *examples* of DPPs' allegations of broad price manipulations.[69] While I assume that DPPs allege that Defendants attempted to elevate prices throughout the Class Period, these two events to my knowledge are the only ones where DPPs allege specific attempts on specific dates to elevate prices broadly and hence permit an analysis of their impacts[70]

40. Moreover, although Dr. Lamb provided no empirical analyses to assess the impact of the alleged agreements in Q1 2004 and Q1 2008 in his initial report, he now provides an analysis of their impacts in his reply report. Specifically, Dr. Lamb compares the (actual) price of each part in March 2004 (2008) and its average price during the six months after March 2004 (2008). If the

---

[67] *Id*., pp. 39-40.

[68] Lamb Reply Report, ¶ 41.

[69] Ordover Initial Report, ¶ 58.

[70] In his reply report, Dr. Lamb also claims that I assume that the DPPs allege that the Defendants' attempted to increase the prices of only parts subject to tooling agreements and not all products (with the exception of the two events in 2004 and 2008 noted in this section). ("Dr. Ordover erroneously assumes that the parts subject to the tooling agreements are the only parts directly targeted by the alleged conspiracy." Lamb Reply Report, ¶ 9.) I have not made such an assumption. I assumed that Defendants attempted to elevate the prices of all AM sheet metal parts and I analyzed evidence related to such conduct. In addition, I also examined the impacts of tooling agreements that the DPP's complaint specifically alleges were a *mechanism* employed by the alleged cartel. Contrary to Dr. Lamb's claims, my analysis of tooling agreements in my initial report is entirely relevant for assessing the likelihood that DPPs would be able to establish class-wide impacts using common evidence since such tooling agreements are alleged to have been an element of the alleged cartel. Tooling agreements – as with the alleged agreements in Q1 2004 and Q1 2008 – are specific allegations made by DPPs and I focused on such specific conduct alleged by the DPPs because available data could be employed to test for class-wide effects of such conduct. Where the DPPs were not specific and instead made broad and vague allegations that could not be tied to specific events, actions or time periods, it is not feasible to construct reliable empirical tests of the impacts of such allegations.

price of a part was higher during the after-period, Dr. Lamb claims that any customer who purchased that part was "harmed" by the cartel. He concludes that nearly all customers were harmed because they purchased at least one "harmed" product.[71]

41. According to Dr. Lamb's logic, if a customer purchased a single part that experienced a price increase but other parts that accounted for 99 percent of spending experienced no price increases or even price declines, the customer was harmed – and all purchases of that customer are included in the class regardless of the impact of the agreements on their prices and damages are estimated over all parts. In fact, the same data used by Dr. Lamb reveal that among these supposedly harmed customers, there are many who purchased a great many parts that did not experience a price increase during the relevant time period. Specifically, as depicted in Exhibit RR7, among the third of customers that experienced the least price increases after March 2004, the typical customer experienced no price increase (i.e., prices stayed unchanged or decreased) for parts that accounted for 59% of their purchases during the 6 months after March 2004. For March 2008, the corresponding figure is 58%. Measured in residual prices instead of actual prices, these fractions are even greater. Thus for the average customer in this group that accounted for a third of all customers, the majority of its purchases experienced no price increase. Yet, Dr. Lamb includes all purchases by these customers in the proposed class. As a matter of economics and common sense, Dr. Lamb's analysis of these two events fails to establish that these alleged agreements elevated the prices paid by all or nearly all customers on all or nearly all of their purchases.[72]

42. In sum, nothing in Dr. Lamb's reply report alters my conclusions that Dr. Lamb has not established as a matter of economics that the alleged conduct by Defendants likely has had a class-wide impact as he claims,[73] nor has he demonstrated that evidence common to all or nearly

[71] Lamb Reply Report, ¶ 44.

[72] In his reply report, Dr. Lamb contends that even customers who experienced price declines following alleged cartel actions could have been harmed because the alleged conduct could have limited the magnitude of price declines. He further (incorrectly) claims that I consider price declines as evidence that the cartel had no impact on prices. (Lamb Reply Report, ¶ 42.) While it is true that even AM sheet metal parts whose prices declined may have had their prices elevated relative to a competitive benchmark, the fact that prices of AM sheet metal parts change in heterogeneous ways following alleged cartel actions is evidence that AM sheet metal products are subject to heterogeneous market forces, and hence one cannot assume that all AM sheet metal parts were impacted even if some parts were impacted by the alleged cartel. Certainly, Dr. Lamb has not produced any evidence that parts whose prices declined following alleged cartel events would have declined even more in the but-for world.

[73] As a matter of economics, the alleged conduct of Defendants is defined to have had a "class-wide impact" if the contested conduct elevated above competitive levels the prices paid by all or nearly all members of the proposed DPP class for all or nearly all of their purchases of AM sheet metal parts during the Class Period.

all members of the proposed class can be used to demonstrate impact on all or nearly all members of the proposed class.

Respectfully Submitted,

Janusz A. Ordover

January 5, 2016

**Exhibit RR1a: Prices Paid by LKQ for a Certified Ford Hood Did Not Move in Lockstep with the Average Prices Paid by All Other Customers**




*Source: Defendants' sales data compiled by Dr. Lamb.*




*Source: Defendants' sales data compiled by Dr. Lamb.*

## Exhibit RR1c: Prices Paid by LKQ for a Nissan Hood Did Not Move in Lockstep with the Average Prices Paid by All Other Customers




*Source: Defendants' sales data compiled by Dr. Lamb.*

# Exhibit RR2: There Is Little Correlation between the Actual Price Levels of Top 20 AM Sheet Metal Products or between Actual Price Levels of Top 20 AM Sheet Metal Products Potentially Subject to Tooling Agreements and Top 20 Products Not Subject to Them

| Fraction of Correlations below Thresholds | Correlations between All Pairs of Top 20 Parts | | Correlations between Sixteen Top 20 Parts Not Subject to Tooling Agreements and Four Parts Potentially Subject to Them | |
|---|---|---|---|---|
| | Monthly Prices | Quarterly Prices | Monthly Prices | Quarterly Prices |
| **Fraction of Correlation Coefficients less than 0.8** | 87% | 86% | 95% | 96% |
| **Fraction of Correlation Coefficients less than 0.7** | 79% | 84% | 91% | 92% |
| **Fraction of Correlation Coefficients less than 0.5** | 47% | 67% | 69% | 77% |

Source: Dr. Lamb's compilation of Defendants' sales data

Notes: See notes to Exhibits 5 and 6 in Ordover Initial Report. Instead of correlations of changes in residual prices of Top 20 AMSM parts, the analysis estimates correlations of actual price levels of Top 20 AMSM parts.

## Exhibit RR3: The Heterogeneity of Monthly Changes in Products' Actual Prices Indicates the Absence of a "Price Structure" between AM Sheet Metal Parts

| | Category 1 | Category 2 | Weighted Fraction of Prices of Parts in Category 2 that Changed in the Opposite Direction to the Month-to-Month Change in the Average Price for Category 1 | Weighted Fraction of Prices of Parts in Category 2 that Did Not Change Despite a Month-to-Month Change in the Average Price for Category 1 | Sum of the Previous Two Columns |
|---|---|---|---|---|---|
| **Differences across Categories** | Hoods | Fenders | 22% | 31% | 53% |
| | | Trunks | 24% | 31% | 55% |
| | Fenders | Hoods | 18% | 14% | 32% |
| | | Trunks | 17% | 29% | 46% |
| | Trunks | Hoods | 28% | 20% | 48% |
| | | Fenders | 26% | 31% | 57% |
| **Differences within Categories** | Hoods | Hoods | 24% | 17% | 42% |
| | Fenders | Fenders | 16% | 23% | 40% |
| | Trunks | Trunks | 21% | 20% | 41% |

Source: Analysis of Defendants' sales data compiled by Dr. Lamb.

Notes: See notes to Exhibit 3b in Ordover Initial Report

## Exhibit RR4: The Heterogeneity of Monthly Changes in Products' Actual Prices Indicates the Absence of a "Price Structure" between AM Sheet Metal Parts Potentially Subject to Tooling Agreements and Parts Not Subject to Them

| | Category 1 | Category 2 | Weighted Fraction of Prices of Parts in Category 2 that Changed in the Opposite Direction to the Month-to-Month Change in the Average Price for Category 1 | Weighted Fraction of Prices of Parts in Category 2 that Did Not Change Despite a Month-to-Month Change in the Average Price for Category 1 | Sum of the Previous Two Columns |
|---|---|---|---|---|---|
| **Differences across Categories** | Part of Tooling Agreement | Not Part of Tooling Agreement | 24% | 25% | 49% |
| | Not Part of Tooling Agreement | Part of Tooling Agreement | 22% | 20% | 42% |
| **Differences within Categories** | Part of Tooling Agreement | Part of Tooling Agreement | 22% | 20% | 42% |
| | Not Part of Tooling Agreement | Not Part of Tooling Agreement | 21% | 21% | 42% |

Sources: Analysis of Defendants' sales data compiled by Dr. Lamb; list of AM sheet metal parts potentially subject to tooling agreements.

Notes: See notes to Exhibit 4 in Ordover Initial Report

# Exhibit RR5: When Dr. Lamb's Simulation Model is More Realistic, It Confirms the Value of Using Residual Prices.

**(i) Scenario 1: Prices of both products A and B are identically impacted by the hypothetical cartel - residual price correlations detect class-wide impact**

**Product A overcharge: 15%; Product B overcharge: 15%**

| Variance of the error term | Correlation Coefficient of Actual Prices | Correlation Coefficient of Residual Prices |
|---|---|---|
| **0.0005** | 0.989 | 0.850 |
| **0.001** | 0.979 | 0.825 |
| **0.0025** | 0.954 | 0.813 |
| **0.005** | 0.925 | 0.804 |

**(ii) Scenario 2: Price of product A is increased and the price of product B decreased by the hypothetical cartel - residual price correlations are less likely to erroneously show class-wide impact.**

**Product A overcharge: 15%; Product B overcharge: - 15%**

| Variance of the error term | Correlation Coefficient of Actual Prices | Correlation Coefficient of Residual Prices |
|---|---|---|
| **0.0005** | 0.989 | 0.310 |
| **0.001** | 0.979 | 0.513 |
| **0.0025** | 0.955 | 0.679 |
| **0.005** | 0.926 | 0.739 |

Notes: (i) Data used are sourced from the same simulation analysis as Dr. Lamb's. However, instead of assuming as Dr. Lamb does that regression residuals are uncorrelated across products A and B, they are allowed to be correlated in all three tables;
(ii) In Scenario 1, prices of both A and B are assumed to have been elevated by 15% by the hypothetical cartel. In Scenario 2, prices of A are elevated by 15% and prices of B decreased by 15%;

**Exhibit RR6a: Average Residual Prices Decline Over Time**




Exhibit RR6b: Average Hypothetical Residual Prices Declined by 17.54% at the End of the Claimed Conspiracy Period
Index (Q1 2003 = 100)
80
85
90
95
100
105
110
115
120
125
130
2003
2004
2005
2006
2007
2008
2009
2010
2011
1 2 3 4

## Exhibit RR6c: Average Residual Prices Decline and Labor Productivity Does Not Increase Over Time




*Source: Defendants' sales data compiled by Dr. Lamb.*
*Notes: (1) Dr. Lamb's overcharge regression model was estimated with the addition of quarterly fixed effects and with the exclusion of his conspiracy indicator variable; (2) The labor productivity index shown here is simply the quarterly mean value of the monthly Index of Labor Productivity for the Manufacture of Motor Vehicles and Parts in Taiwan that Dr. Lamb produced; (3) The quarterly fixed effects are a set of 36 dummies, each of which takes a value of 1 for one quarter in the data and 0 for all other periods; (4) Data for the class period extend from 01/02/2003 through 09/04/2009, and the data for the benchmark period are from 09/05/2009 through 12/31/2011; (5) Each observation in the data represents a transaction by an individual customer for a particular AM sheet metal product; (6) Data excluded by Dr. Lamb are excluded in this analysis. E.g., Dr. Lamb excludes observations where the PartsLink number is missing. These parts are excluded in the analyses in this report (as well as when the PartsLink number equals "X" or "N/A"); (7) To confirm that the productivity index was not being affected by changes in the USD/TWD exchange rate, the index was re-calculated in terms of USD. This modified index was very similar to the one shown here, and in fact, the correlation between the quarterly fixed effect and modified productivity series was lower than that between the fixed effect and the original productivity series.*

# Exhibit RR7: A Significant Fraction of Customers Experienced No Increases in Prices of A Majority of the Parts They Purchased after March 2004 and after March 2008

| Mean of the share of quantity purchased of products whose prices did not increase, by the customers whose value of the share was among the top third of all customers | March 2004 vs April - September 2004 | | March 2008 vs April - September 2008 | |
|---|---|---|---|---|
| | Residual Prices | Actual Prices | Residual Prices | Actual Prices |
| | 65% | 59% | 59% | 58% |

Source: Dr. Lamb's compilation of Defendants' sales data

Notes

(1) The figures in the table above were calculated as follows: (i) For each customer, a weighted average residual price was calculated for all parts with non-blank PartsLink numbers in both the month of March 2004 (2008) and in the period April-September 2004 (2008); (ii) For all parts with non-blank PartsLink numbers that had positive sales to a given customer in both periods, the change in the average price between March and the April-September period was calculated; (iii) For each customer, the share of parts that showed no increase in price was calculated by dividing the total quantity of all parts purchased in both periods that showed a decline or no change in average price from March to April-September, by the total quantity of all parts purchased in both periods; (iv) Finally, looking only at customers who had a rank in the top third of all customers in terms of the share calculated in the previous step, the simple mean of the shares was calculated; (v) This exercise was repeated using actual prices.

# Appendix 1

**Revised Exhibit 3a from Ordover Initial Report: In April 2004, Residual Prices of 56% of Hood Parts Increased, but Residual Prices of a Significant Fraction of Fender and Tailgate Parts Did Not Increase**




*Notes: All fractions are sales weighted. E.g., prices of parts that accounted for 56% of hood sales in April 2004 increased relative to March 2004. See also notes to Ex. 3b in Ordover Initial Report.*
*Source: Defendants' sales data compiled by Dr. Lamb.*

## Revised Exhibit 3b from Ordover Initial Report: The Heterogeneity of Monthly Changes in Product Residual Prices Indicates the Absence of a "Price Structure" between AM Sheet Metal Parts

| | Category 1 | Category 2 | Weighted Fraction of Residual Prices of Parts in Category 2 that Changed in the Opposite Direction to the Month-to-Month Change in the Average Residual Price for Category 1 | Weighted Fraction of Residual Prices of Parts in Category 2 that Did Not Change Despite a Month-to-Month Change in the Average Residual Price for Category 1 | Sum of the Previous Two Columns |
|---|---|---|---|---|---|
| **Differences across Categories** | Hoods | Fenders | 21% | 28% | 49% |
| | | Trunks | 26% | 18% | 44% |
| | Fenders | Hoods | 19% | 11% | 29% |
| | | Trunks | 20% | 16% | 36% |
| | Trunks | Hoods | 25% | 15% | 41% |
| | | Fenders | 23% | 29% | 52% |
| **Differences within Categories** | Hoods | Hoods | 22% | 14% | 36% |
| | Fenders | Fenders | 16% | 23% | 40% |
| | Trunks | Trunks | 23% | 14% | 37% |

Source: Analysis of Defendants' sales data compiled by Dr. Lamb.
Notes: See notes to Exhibit 3b in Ordover Initial Report.

## Revised Exhibit 4 from Ordover Initial Report: The Heterogeneity of Monthly Changes in Product Residual Prices Indicates the Absence of a "Price Structure" between AM Sheet Metal Parts Potentially Subject to Tooling Agreements and Parts Not Subject to Them

| | Category 1 | Category 2 | Weighted Fraction of Residual Prices of Parts in Category 2 that Changed in the Opposite Direction to the Month-to-Month Change in the Average Residual Price for Category 1 | Weighted Fraction of Residual Prices of Parts in Category 2 that Did Not Change Despite a Month-to-Month Change in the Average Residual Price for Category 1 | Sum of the Previous Two Columns |
|---|---|---|---|---|---|
| **Differences across Categories** | Part of Tooling Agreement | Not Part of Tooling Agreement | 22% | 20% | 42% |
| | Not Part of Tooling Agreement | Part of Tooling Agreement | 21% | 18% | 39% |
| **Differences within Categories** | Part of Tooling Agreement | Part of Tooling Agreement | 20% | 18% | 38% |
| | Not Part of Tooling Agreement | Not Part of Tooling Agreement | 21% | 19% | 40% |

Sources: Analysis of Defendants' sales data compiled by Dr. Lamb; list of AM sheet metal parts potentially subject to tooling agreements.

Notes: See notes to Exhibit 4 in Ordover Initial Report.

# Revised Exhibit 5 from Ordover Initial Report: There Is Little Correlation between Changes in Residual Prices of Top 20 AM Sheet Metal Products

| Correlations between All Top 20 Parts | Monthly Residual Price Changes | Quarterly Residual Price Changes |
|---|---|---|
| Fraction of Correlation Coefficients less than 0.8 | 99% | 96% |
| Fraction of Correlation Coefficients less than 0.7 | 96% | 89% |
| Fraction of Correlation Coefficients less than 0.5 | 77% | 76% |

Source: Dr. Lamb's compilation of Defendants' sales data
Notes: See notes to Exhibit 5 in Ordover Initial Report

# Revised Exhibit 6 from Ordover Initial Report: There Is Little Correlation between Changes in Residual Prices of Top 20 AM Sheet Metal Products Potentially Subject to Tooling Agreements and Top 20 Products Not Subject to Them

| Correlations between Sixteen Top 20 Parts Not Subject to Tooling Agreements and Four Parts Potentially Subject to Them | Monthly Residual Price Changes | Quarterly Residual Price Changes |
|---|---|---|
| Fraction of Correlation Coefficients less than 0.8 | 100% | 100% |
| Fraction of Correlation Coefficients less than 0.7 | 97% | 100% |
| Fraction of Correlation Coefficients less than 0.5 | 89% | 88% |

Source: Dr. Lamb's compilation of Defendants' sales data

Notes: See notes to Exhibit 6 in Ordover Initial Report

# Revised Exhibit 7 from Ordover Initial Report: There Is Little Correlation between Changes in Residual Prices Paid by Customers for Top 20 AM Sheet Metal Products

| Correlations between All Customers of Top 20 Parts | Monthly Residual Price Changes | Quarterly Residual Price Changes |
|---|---|---|
| **Fraction of Correlation Coefficients less than 0.8** | 100% | 93% |
| **Fraction of Correlation Coefficients less than 0.7** | 99% | 81% |
| **Fraction of Correlation Coefficients less than 0.5** | 89% | 33% |

Source: Dr. Lamb's compilation of Defendants' sales data
Notes: See notes to Exhibit 7 in Ordover Initial Report

## Attachment A - Expert Testimony of Dr. Janusz A. Ordover 2006-2016

| CLIENT | MATTER NAME |
|---|---|
| NCAA | *In Re: NCAA I-A Walk-On Football Players Litigation*, U.S. Dist. Court, Western District of Washington at Seattle, Master File No. C-04-1254-C (deposition testimony in 2005 and 2006) [D][C] |
| Canadian Lumber Trade Alliance; Norsk Hydro Canada, Inc.; and Canadian Wheat Board | *Canadian Lumber Trade Alliance, et al. v. United States, et al. and Coalition for Fair Lumber Imports Executive Committee, et al.* Consolidated Court No. 05-00324 (U.S. Court of International Trade) (deposition and trial testimony) [P] |
| Medpointe Inc. | *Jame Fine Chemicals, Inc. v. Hi-Tech Pharma Co., Inc., Medpointe Inc.,* U.S. Dist. Court, Dist. of New Jersey, Civ. Action No. 00-3545 (AEI) (deposition testimony) [D] |
| NCAA | *Jason White, et al. v. NCAA*, U.S. Dist. Court, Central District of California, No. CV06-0999 RKG (MANx) (deposition testimony) [D][C] |
| Kemira Chemicals, Inc., and Kemira OYJ | *In Re: Hydrogen Peroxide Antitrust Litigation*, U.S. Dist. Court, Eastern District of Pennsylvania, Civ. Action No. 05-DV-666 (MDL No.:1682) (deposition testimony) [D][C] |
| Tyco International | *Rochester Medical Corp. v. C.R. Bard International et al.*, U.S. Dist. Court, E.D. of Texas (Texarkana Div.), No. 504-CV-060 (deposition testimony) [D] |
| Covidien (f/k/a Tyco Healthcare) | *Natchitoches Parish Hospital et al. v. Tyco International, Ltd. et al.,* U.S. Dist. Court, District of Massachusetts, Civ. Action No. 05-12024 PBS (deposition testimony twice, court hearing, jury trial testimony) [D][C] |
| Sound Exchange, Inc. | *In the Matter of Adjustment of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services,* Docket No. 20006-1 CRB DSTRA, Copyright Royalty Board, Library of Congress, Washington, D.C. (deposition testimony, hearing testimony) |
| Tyco Health Care Group L.P. | *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group L.P. et al.,* U.S. Dist. Court, Central District of California (Western Div.), CV-05-6419 MRP (AJWx) (deposition testimony twice) [D][C] |
| Wakefern Food Corp. | *Delco LLC and Edward Decker v. Giant of Maryland LLC, Wakefern Food Corp., and Stop & Shop Supermarket Company LLC,* U.S. Dist. Court, District of New Jersey (Camden Vicinage), No. 07-CV-03522 (JBS-AMD) (deposition and PI hearing testimony) [D] |
| Woolworths Ltd | *Woolworths Ltd. and The Warehouse Group v. The Commerce Commission*, High Court of New Zealand, Wellington Registry, CIV 2007-485-1255 (hearing on the appeal from the determination of the NZ Commerce Commission) [P] |
| IGT | *IGT v. Alliance Gaming et al.,* U.S. Dist. Court, Dist. of Nevada, No. CV-S-04 (1676-RCJ-(RJJ)) (deposition testimony) [D] |

| CLIENT | MATTER NAME |
|---|---|
| American Honda Motor Co., Inc. | *In Re: New Motor Vehicle Canadian Export Antitrust Litigation,* MDL Docket No. 03-md-1532-P-H (All Cases) (deposition testimony) [D] |
| Dole Food Company, Inc. | *The European Commission Case Comp. 39.188 Bananas*, European Commission, Brussels, Belgium (Oral Hearing testimony) |
| Advanced Micro Devices, Inc. | *The European Commission Case Comp. 37.990 Intel,* European Commission, Brussels, Belgium (Oral Hearing testimony) |
| PVVW | *Appeal No. 25: PCCW versus Telecommunications Authority,* In the Telecommunications (Competition Provisions) Appeal Board, Hong Kong (Testimony) [P] |
| Exxon Mobil Corporation | *Michael Siegel et al., v. Shell Oil Co., et al.,* U.S. District Court, Northern District of Illinois, Eastern Div., No. 06 C 0035 (deposition testimony) [D][C] |
| The Commerce Commission | *The Commerce Commission v. Telecom Corp. of New Zealand Ltd.,* High Court of New Zealand, Auckland Registry, Civ. 2004-404-1333 ("hot tub" testimony) [P] |
| Tyco International, (US) Inc., and Tyco Healthcare Group, L.P. | *Daniels Sharpsmart Inc., Plaintiff, v. Tyco International, (US) Inc., and Tyco Healthcare Group, L.P., Defendants*, U.S. District Court, Eastern District of Texas, Texarkana Division, No. 5:05-CV-169 (deposition testimony) [D] |
| CCC Holdings, Inc. | *FTC v. CCC Holdings, Inc., et al.*, U.S. District Court for the District of Columbia, CA 08-2043 (deposition and trial testimony) [D] |
| Hynix Semiconductor American Inc. | *Rambus Inc. v. Micron Technology, Inc. et al.,* Superior Court of the State of California, County of San Francisco, Case No. 04-431105 (deposition testimony, jury trial testimony) [D] |
| Bright House Networks, LLC, Cox Communications, Inc., and NewHouse Partnership | *In The Matter of Herring Broadcasting, Inc. d/b/a Wealth TV vs. Bright House Networks, LLC and Cox Communications, Inc.,* Federal Communications Commission, Washington, DC, File Nos. CSR-7709-P, 7822-P, 7829-P, 7907-P. (deposition testimony, FCC hearing testimony) [D] |
| Chemtura Corp. | *In the matter of Rubber Chemicals Antitrust Litigation: Bridgestone Americas Holdings, Inc., et al. v. Chemtura Corp., et al.,* U.S. District Court, Northern District of California, Individual Case No. C 06-5700-MJJ (testimony in an arbitration hearing) [D] |
| International Business Machines | *International Business Machines* v. *T3 Technologies, Inc.,* U.S. District Court, Southern District of New York, Civ. Action No. 06-cv-13565-LAK (deposition testimony) [P] |
| BP America Production Company | *In the matter of BP America Production Company v. Repsol YPF, S.A.,* Arbitration under the UNCITRAL Arbitration Rules (testimony in an arbitration hearing) [P] |

| CLIENT | MATTER NAME |
|---|---|
| Hynix Semiconductor, Inc. | *Tessera Technologies, Inc. v. Hynix Semiconductor, Inc.,* Case No. 106CV-07668, Sup. Ct. of the State of California, County of Santa Clara (deposition testimony) [D] |
| LG Philips LCD Co., Ltd., LG Philips LCD America, Inc., Samsung Electronics Co., Ltd., Sharp Corporation, Sharp Electronics Corporation, Toshiba Corporation, Matsushita Display Technology Co., Ltd., Hitachi Ltd., Hitachi Displays, Ltd., Hitachi America Ltd., Hitachi Electronic Devices (USA), Inc., Sanyo Epson Imaging Devices Corporation, NEC Corporation, NEC LCD Technologies, Ltd., NEC Electronics America, Inc., IDT International Ltd., AU Optronics, International Display Technology Co., Ltd., International Display Technology USA Inc., AU Optronics Corporation America, Chi Mei Optoelectronics, Chi Mei Optoelectronics USA, Inc., Chunghwa Picture Tubes Ltd., and Hannstar Display Corporation (Joint Defense Group) | *In Re: TFT-LCD (Flat Panel) Antitrust Litigation,* U.S. Dist. Court, N.D. of California, No. M 07-1827 SI, MDL No. 1827 (deposition testimony) [D] [C] |
| Enron Coal Services Ltd. | *Enron Coal Services Ltd. And English Welsh and Scottish Railway Ltd.*, In the Competition Appeal Tribunal (London, U.K.), Case No. 1106/5/7/08 (testimony in the Hearing) [P] |
| Electronic Arts | *Geoffrey Pecover, et al.* v. *Electronic Arts,* Case No. C08-02820VRW, US Dist. Court, N.D. of CA, San Francisco Div. (deposition testimony) [D][C] |
| Volkswagen of America, Inc. | *Darren Berry, et al.* v. *Volkswagen of America, Inc.*¸ Case No. 0516-CV01171-01, Cir. Court of Jackson County, Missouri at Independence (deposition testimony) [D][C] |

| **CLIENT** | **MATTER NAME** |
|---|---|
| Whole Foods Market | *Ekaterini Kottaras, et al.* v. *Whole Foods Market,* U.S. Dist. Court, Dist. of Columbia, 1:08-cv-01832 - PLF (deposition testimony, Court hearing testimony) [D][C] |
| NetFlix, Wal-Mart Stores, and WalMart.com | *In re Online DVD Rental Antitrust Litigation,* U.S. Dist. Court, M:09-cv-2029 PJH (deposition testimony) [D][C] |
| Volkswagen of America, Inc. | *John M. Dewey et al.,* v. *Volkswagen Aktiengesellschaft,* U.S. Dist. Court, Dist. of New Jersey, Civ. Action No. 07-2249 (FSH) (deposition testimony) [D] |
| SoundExchange, Inc. | *In re Digital Performance Right in Sound Recordings and Ephemeral Recordings,* Docket No. 2009-1, Copyright Royalty Board (Webcasting III) (deposition testimony, CRB testimony on behalf of the Sound Exchange) |
| Volkswagen of America, Inc. | *In re Volkswagen and Audi Warranty Extension Litigation,* U.S. District Court, District of Massachusetts, MDL Docket No. 1:07-md-01790 (deposition testimony) [D][C] |
| Cephalon, Inc., Barr Pharmaceuticals, Inc., Mylan Laboratories, Inc., Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc., and Ranbaxy Laboratories, Ltd. and Ranbaxy Pharmaceuticals, Inc. | *King Drug Company of Florence, Inc., et al. v. Cephalon, Inc. et al.,* U.S. District Court, E.D. of Pennsylvania, No. 06-CV-1791-MSG (deposition testimony) [D][C] |
| T-Mobile USA, Inc. | *T-Mobile USA, Inc.* v. *IDT Domestic Telecom, Inc.*, Superior Court of the State of Washington, No. 09-2-19475-1 (SEA) (deposition testimony) [P/D] |
| Clear Channel Communications, Inc. | *In re Live Concert Antitrust Litigation,* U.S. District Court, Central District of California, Western Div., Case No.: 2:06-MDL-01745 SVW (VBKx) (deposition testimony) [D][C] |
| CEMEX, Inc., Lafarge North America Inc., Holcim, Vulcan Materials Company, Lehigh Hanson, Inc., Votorantim Cimentos North America, Titan American LLC (Joint Defense Group) | *In Re Florida Cement and Concrete Litigation,* U.S. District Court, S.D. of Fla., Miami Division, Master Docket No. 09-23493-Civ. (direct and indirect cases) (deposition testimony) [D][C] |
| Sandisk Corp. | *Sandisk Corp.* v. *Kingston Technology Co., Inc., et al.,* U.S. District Court, Western Dist. of Wisconsin, Civ. Action No. 10-cv-243 (deposition and trial testimony) [P/D] |

| **CLIENT** | **MATTER NAME** |
|---|---|
| SoundExchange | *In Re Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Services,* Docket No. 2011-1 CRB PSS/Satellite II, Copyright Royalty Board (deposition testimony on behalf of the Sound Exchange) |
| Guardian, Pilkington, AGC America Inc., and PPG Industries, Inc. (Joint Defense Group) | *Jeld-Wen, Inc. v. AGC America, Inc. et al.*, U.S. District Court, Western Dist. of Pennsylvania, Civ. Action No. 11-658 (deposition testimony) [D][C] |
| Apple Inc. | *Apple, Inc. v. Samsung Electronics Co. Ltd. and Samsung Electronics Co., Ltd. v. Apple, Inc.*, U.S. District Court, N.D. of CA., San Jose Div., Civ. Action No., 11-CV-01846 (deposition and jury trial testimony) [P/D] |
| Avery Dennison Corp. | *Avery Dennison Corp. v. 3M Innovative Properties Co. and 3M Company,* U.S. Dist. Court for the District of Minnesota, Civ. Action 11-cv-0824 MJD/FLN (deposition testimony) [P] |
| Warner Chilcott | *Mylan Pharmaceuticals, Inc., et al. v. Warner Chilcott Public Limited Company, et al.,* U.S. Dist. Court, Eastern District of Pennsylvania, Case No. 12-3824 (deposition testimony) [D][C] |
| BNSF Railway Corp. | *In re: Rail Freight Fuel Surcharge Antitrust Litigation,* U.S. Dist. Court, Dist. of Columbia, 1:07-mc-00489-PLF –JMF (deposition testimony) [D] |
| American Express Co., Inc. | *United States of America et al. v. American Express Co. Inc.,* U.S. Dist. Court, E.D.N.Y., 10-cv-04496 and *In re: American Express Anti-Steering Rules Antitrust Litigation*, E.D.N.Y., Master File No. 11-MD-2221 (deposition testimony) [D] |
| Apple, Inc. | Apple, Inc. v. Samsung Electronics Co., et al, U.S. District Court, N.D. Cal (San Jose Div.), Case No. 12-cv-00630 (LHK) (deposition testimony) [P] |
| Carpenter Company, Foamex Innovations, Inc., Hickory Springs Manufacturing Company, Flexible Foam Products, Inc., Future Foam, Inc., Leggett & Platt, Incorporated, Mohawk Industries, Inc., Woodbridge Foam Corporation, Woodbridge Foam Fabricating, Inc., and Woodbridge Sales & Engineering, Inc. | *In Re: Polyurethane Foam Antitrust Litigation*, US District Court, Northern District of Ohio, Western Division, MDL 2196 (Direct) (deposition testimony, testimony at the class certification hearing) [D][C] |

| CLIENT | MATTER NAME |
| --- | --- |
| Carpenter Company, Foamex Innovations, Inc., Hickory Springs Manufacturing Company, Flexible Foam Products, Inc., Future Foam, Inc., Leggett & Platt, Incorporated, Mohawk Industries, Inc., Woodbridge Foam Corporation, Woodbridge Foam Fabricating, Inc., and Woodbridge Sales & Engineering, Inc. | *In Re: Polyurethane Foam Antitrust Litigation*, US District Court, Northern District of Ohio, Western Division, MDL 2196 (Indirect) (deposition testimony, testimony at the class certification hearing) [D][C] |

| **CLIENT** | **MATTER NAME** |
|---|---|
| Sony Corp., Sony Optiarc Inc., Sony Optiarc America Inc., Sony NEC Optiarc Inc., Sony Electronics Inc., Sony Computer Entertainment America Inc., Hitachi Ltd., LG Electronics Inc., LG Electronics USA Inc., Hitachi-LG Data Storage Inc., Hitachi-LG Data Storage Korea Inc., Koninklijke Philips Electronics N.V., Lite-On It Corp. of Taiwan, Philips & Lite-On Digital Solutions Corp., Philips & Lite-On Digital Solutions USA Inc., Samsung Electronics Co. Ltd., Samsung Electronics America Inc., Toshiba Samsung Storage Technology Corp., Toshiba Corp., Toshiba America Information Systems Inc., Toshiba Samsung Storage Technology Corp. Korea, Benq Corp., Benq America Corp., TEAC America Inc., Quanta Storage Inc., Quanta Storage America Inc., Panasonic Corp. of America Inc. (JOINT DEFENSE GROUP) | *In Re Optical Disk Drive Products Antitrust Litigation,* U.S.D.C. Northern District of California, San Francisco Division, MDL No. 3:10-MD-2143 VRW (deposition testimony) [D][C] |
| Enersys Delaware Inc. | *EnerSys Delaware Inc. v. Altergy Systems,* American Arbitration Association (San Francisco, CA), No. 7 4-198-Y -0 1772-12-JMLE (testimony at the Arbitration Tribunal) |
| Apple, Inc. | *Apple v. Samsung*, Federal Court of Australia, N.S.W. Registry, March 2014 (trial testimony)[P] |
| UBS | *CDS Information Market*, Case COMP/AT.39.745 (white paper, testimony at a Hearing) D |

| CLIENT | MATTER NAME |
|---|---|
| American Media, Inc. | *Anderson News, L.L.C. and Lloyd Whitaker, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C. vs. American Media, INC ., Bauer Publishing Co., L.P., Curtis Circulation Company, Distribution Services, Inc., Hachette Filipacchi Media U.S., Inc., Hearst Communications, Inc., Hudson News Distributors, LLC, Canadian Services, Inc., Rodale, Inc., Time, Inc., and Time/Warner Retail Sales & Marketing, Inc.,* United States District Court, Southern District of New York, October 10, 2014 (Deposition Testimony) [D] |
| Guardian, Pilkington, AGC America inc., and PPG Industries, Inc. (Joint Defense Group) | *Jeld-Wen, Inc. v. AGC America, Inc. et al.*, U.S. District Court, Western Dist. of Pennsylvania, Civ. Action No. 11-658 (deposition testimony-damages phase) [D][C] |
| Office of the Commissioner of Baseball, National Hockey League, Comcast Corporation, DIRECTV, LLC, The Madison Square Garden Company, Yankees Entertainment & Sports Network, and related entities | *Thomas Laumann, et al. v. National Hockey League, et al.,* U.S. District Court, Southern District of New York, 12-cv-1817 (SAS); *Fernanda Garber, et al. v. Office of the Commissioner of Baseball, et al.,* U.S. District Court, Southern District of New York, 12-cv-3704 (SAS) (deposition testimony, testimony at the class certification hearing) [D, C] |
| Packaging Corporation of America, et al. | *Kleen Products LLC, et al. v. Packaging Corporation of America, et al.*, U.S. District Court for the Northern Dist. Of Illinois, Eastern Division, Case No. 1:10-cv-05711 [D][C] |
| Hitachi,LTD., et al. | *Dell Inc. and Dell Products L.P., v. Hitachi, LTD., et al.*, U.S. District Court for the Northern Dist. Of California, San Francisco Division, Case No. 3:13-cv-02171-SC and various other indirect purchaser plaintiffs and optouts [D] |
| Apple | *Certain Communications or Computing Devices and Components Thereof,* United States International Trade Commission, Inv. No. 337-TA-925 (deposition testimony) [D] |
| NASDAQ | *In the Matter of the Application of: Securities Industry and Financial Market Association (SIFMA) for Review of Actions Taken by Self-Regulatory Organizations*, Securities and Exchange Commission, Admin. |

| **CLIENT** | **MATTER NAME** |
| --- | --- |
| | Proc. File No. 3-15350, (Hearing Testimony for NAQDAQ) |
| Big Ten Conference, Inc., The<br>Atlantic Coast Conference<br>Atlantic Sun Conference Inc.<br>Conference USA<br>Mid-American Conference<br>Mountain West Conference<br>National Collegiate Athletic Association<br>Pacific 12 Conference<br>Southeastern Conference<br>Sun Belt Conference<br>Big Twelve Conference, Inc., The<br>Western Athletic Conference | *In Re National Collegiate Athletic Association Grant-in-Aid Cap Antitrust Litigation*: Martin Jenkins, et al., v. NCAA, et al., MDL Docket No. 14-md-02541-CW, deposition testimony, [C, D] |
| API and Jui Li Enterprise Company, Ltd. | *In Re Fond Du Lac Bumper Exchange, Inc. and Roberts Wholesale Body Parts, Inc. on Behalf of Themselves and Others Similarly Situated v. Jui Li Enterprise Company, Ltd., et al.,* U.S. District Court, Eastern Division of Wisconsin, Case No. 2:09-CV-00852-LA, deposition testimony, [C, D] |

P=Plaintiff D=Defendant C=Class Action

## Attachment B: Materials Relied Upon by Janusz Ordover

### Legal Filings

Second Amended Class Action Complaint for Damages and Injunctive Relief for Violation of the Sherman Act, *Fond Du Lac Bumper Exhange, Inc., et al., v. Jui Li Enterprise Company, Ltd., et al.,* Case No. 2:09-CV-00852-LA, August 3, 2011

### Expert Depositions and Exhibits

Russell Lamb, Ph.D., October 1, 2015

### Expert Reports and Backup

Expert Report of Janusz Ordover, October 13, 2015

Expert Report of Russell Lamb, July 14, 2015

Expert Reply Report of Russell L. Lamb, Ph.D., November 24, 2015

### Academic Texts and Articles and Agency Documents

ABA *Proving Antitrust Damages* 2d Ed. (2010)

Daniel L. Rubinfeld, "Quantitative Methods in Antitrust", 1 Issues in Competition Law and Policy 723 (ABA Section of Antitrust Law 2008), p.726

Jeffrey M. Wooldridge, *Introductory Econometrics,* 4th Ed., South-Western Cengage Learning (2009)

Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis,* Princeton University Press (2010)

Peter Kennedy, *A Guide to Econometrics,* 5th Ed., The MIT Press, Cambridge, Massachusetts (2003)

Ramu Ramanathan, *Introductory Econometrics with Applications,* 3rd Ed., The Dryden Press (1995)

U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," 2010

William Greene, *Econometric Analysis,* 7th Ed., Prentice Hall (2012)