# EXHIBIT F

# [FILED UNDER SEAL]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Fond Du Lac Bumper Exchange, )
Inc., and Roberts Wholesale Body )
Parts, Inc., on Behalf of )
Themselves and Others Similarly )
Situated, ) Case No.
Plaintiffs, ) 2:09-CV-00852-LA
vs. )
Jui Li Enterprise Company, Ltd., )
et al., )
Defendants. )
__________________________________________)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF JUI-HUANG LU
Taipei, Taiwan
Tuesday, July 21, 2015
VOLUME I

Reported by:
RENEE D. ZEPEZAUER, RPR, CRR
CSR No. 6275
JOB No. 2092580

PAGES 1 - 141

Q Did you ever meet with representatives of Tong Yang or TKY regarding tooling? 4:41:00PM
MS. ROSEN: Objection. Form.
MR. FINLEY: Join.
CHECK INTERPRETER: TKY was not interpreted in Chinese. 4:41:24PM
THE WITNESS: Yes, I know what TKY is. So what did you ask about?
BY MR. HARTLEY:
Q I asked did you ever meet with any representatives of TKY or Tong Yang regarding tooling? 4:41:41PM
MR. FINLEY: Same objection.
MS. ROSEN: Same objection.
THE WITNESS: No.
BY THE VIDEOGRAPHER: 4:42:04PM
Q Did you ever meet with representatives of Gordon regarding tooling?
MS. ROSEN: Same objection.
MR. FINLEY: Same objection.
THE WITNESS: So you are only asking about Gordon? 4:42:23PM
BY MR. HARTLEY:
Q In this question, yes.
A The answer is no.
Q Have you ever met with representatives of 4:42:32PM



Gordon regarding aftermarket sheet metal parts? 4:42:35PM
MR. FINLEY: Objection. Form.
MS. ROSEN: Same objection.
THE WITNESS: No.
BY MR. HARTLEY: 4:42:54PM
Q Have you ever met with representatives of Tong Yang or TKY regarding aftermarket sheet metal parts?
MR. FINLEY: Same objection.
MS. ROSEN: Same objection.
THE WITNESS: Tong Yang and Taiwan Kai Yih. 4:43:27PM
BY MR. HARTLEY:
Q Correct.
A No.
Q Have you ever met with representatives of API regarding aftermarket sheet metal parts? 4:43:35PM
MR. FINLEY: Objection. Form.
THE WITNESS: No.
BY MR. HARTLEY:
Q We spoke earlier about jointly developing new tooling. Was there ever any relationship whereby Jui Li 4:43:59PM produced parts with TKY, Gordon, or AP from a tool that was not jointly developed?
MR. FINLEY: Objection. Form. Foundation.
MS. ROSEN: Join.
MS. JANKOWSKI: Join. 4:44:18PM



CHECK INTERPRETER: "Parts" not interpreted. 4:45:42PM
THE WITNESS: This is about AM business or AM sales business. I don't have much knowledge.
BY MR. HARTLEY:
Q Do you know if there is -- is that the end of 4:46:10PM the answer?
THE INTERPRETER: Yes.
BY MR. HARTLEY:
Q Was there ever an arrangement to jointly produce parts with another manufacturer from an existing 4:46:18PM tool?
MR. FINLEY: Objection. Form. Foundation.
MS. ROSEN: Join.
MS. JANKOWSKI: Join.
CHECK INTERPRETER: "Another manufacturer" not 4:46:45PM interpreted.
THE WITNESS: I am the chairman. I don't know this.
BY MR. HARTLEY:
Q You testified about jointly developing tools 4:47:12PM with other manufacturers. Did you have an appreciation that there were joint arrangements to produce parts from a tool that was already made?
MR. FINLEY: Objection. Form. Foundation.
MS. ROSEN: Join. 4:47:30PM



MS. JANKOWSKI: Join in those objections. 4:47:32PM
THE WITNESS: I am the chairman. I will not know.
BY MR. HARTLEY:
Q Help me understand why being a chairman means 4:48:29PM you don't know the answer to that question.
A This is about the AM business. And the AM business actually account for a small portion of the revenue in my company and me at the level of chairman in my position that is not something I'm supposed to be in 4:49:31PM charge of. Besides in a listed company this is not something the chairman should be looking into because the company has a hierarchy and organizations for people to take up responsibility.
Q Can you help me understand how you knew so much 4:50:02PM about jointly developing new tooling?
MR. FINLEY: Objection. Foundation. Form.
CHECK INTERPRETER: "New" not interpreted.
THE WITNESS: You mean why I knew so much about it, the circumstances. As I said earlier, this kind of 4:50:45PM joint development of tooling to review cost has been going back 10 or 20 years ago and so this industry has been doing so more or less just that back then the quantity or the magnitude, the scale was much smaller and there was no objection on different voices from the 4:52:38PM

United States. And it was only recently after this 4:52:46PM
litigation from the United States that we, people in the
Taiwan industry, begin to know about this. It's a big
trouble, big problem, and so from this -- these what I
heard here and there, I begin to have more understanding 4:53:15PM
about this case. As to the details of this joint
development programs about the pricings or the
conditions for development or other terms, that I did
not have any involvement so I don't have much knowledge
because at the chairman's -- chairman's position I would 4:53:48PM
not know about the details.
Q Do you believe that Jui Li has violated U.S.
law?
MR. FINLEY: Objection. May call for a legal
conclusion. 4:54:07PM
MS. ROSEN: Join.
MS. JANKOWSKI: Join.
THE WITNESS: I don't understand. May I have
the question again.
(Record read.) 4:54:46PM
THE WITNESS: I don't know.
BY MR. HARTLEY:
Q Who at Jui Li would you ask to learn about
arrangements, if any, regarding existing tooling of
other manufacturers? 4:55:00PM



MR. FINLEY: Objection. Form. 4:55:04PM
MS. ROSEN: Objection. Foundation,
speculation.
MR. FINLEY: Join.
MS. JANKOWSKI: Join in foundation. 4:55:41PM
THE WITNESS: Because vice-president Su, S-u,
already left the company, so I will ask the Associate
Vice-President Li, L-i, or Manager Guan, G-u-a-n.
BY MR. HARTLEY:
Q Why would you ask those individuals? 4:56:19PM
A Because these two individuals are the persons
who are in charge of a relationship with AM customers.
Q Do you understand that they would also be in
charge of Jui Li's relationship with other manufacturers
of aftermarket sheet metal parts? 4:57:00PM
MS. ROSEN: Objection. Misstates the
testimony. Foundation. Speculation.
MR. FINLEY: Join in all those.
MS. JANKOWSKI: Join in those objections.
THE WITNESS: I don't understand what you meant 4:57:54PM
by these two persons in charge of relationship with
other manufacturers.
BY MR. HARTLEY:
Q Okay. Who at Jui Li would you ask to learn
about arrangements, if any, regarding existing tooling 4:58:06PM



with other manufacturers? 4:58:18PM
MR. FINLEY: Objection. Form. Foundation.
MS. ROSEN: Join.
MS. JANKOWSKI: Join.
BY MR. HARTLEY: 4:58:35PM
Q Let me ask a better question. Strike that.
Who at Jui Li would you ask to learn about
arrangements with other manufacturers regarding existing
tooling, if any?
MR. FINLEY: Same objections. 4:58:51PM
MS. ROSEN: Join.
MS. JANKOWSKI: Join.
THE WITNESS: It will be Associate
Vice-President Li and the Manager Guan.
BY MR. HARTLEY: 4:59:28PM
Q Have you ever heard of the term "unification"
with respect to aftermarket sheet metal parts?
MR. FINLEY: Objection. Form. Foundation.
THE WITNESS: You say like joint tooling or
what was the other term, unification? 5:00:21PM
BY MR. HARTLEY:
Q Right. The term "unification." Have you ever
heard of that with respect to aftermarket auto parts?
MS. JANKOWSKI: Objection. Form.
CHECK INTERPRETER: Unification is interpreted 5:00:51PM



as a concept unifying everything and also interpreted 5:00:53PM
into co-sharing of tooling. So the main interpreter is
offering both. And so in that case the witness is not
sure of either.
MR. FINLEY: Okay. Are you going to ask that 5:01:14PM
question again or are you withdrawing it?
MR. HARTLEY: No, I'm going to ask another one.
Yi-Chin, is there a term of art we've used for the word
"unification" in prior testimony that can assist the
interpreter? 5:01:27PM
MS. HO: "He muo."
THE INTERPRETER: "He muo." It's H-e, m-o-u
(sic) for unification.
THE WITNESS: Regarding that I have never heard
of it. 5:02:00PM
BY MR. HARTLEY:
Q Have you ever heard of the term "three-in-one"
regarding aftermarket sheet metal parts?
A Okay. This three-in-one I'm not sure. Could
that mean that three companies cooperate together to 5:02:48PM
develop one set of toolings and each share one-third of
the cost? I'm not sure if that is what you talk about
because I don't have a clear knowledge.
Q Are you aware of whether Jui Li has
participated in any such cooperation? 5:03:25PM

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Fond Du Lac Bumper Exchange, Inc., and Roberts Wholesale Body Parts, Inc., on Behalf of Themselves and Others Similarly Situated, | ) |
| Plaintiffs, | ) Case No. 2:09-CV-00852-LA |
| vs. | ) |
| Jui Li Enterprise Company, Ltd., et al., | ) |
| Defendants. | ) |

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF JUI-HUANG LU

Taipei, Taiwan

Wednesday, July 22, 2015

VOLUME II

Reported by:

RENEE D. ZEPEZAUER, RPR, CRR

CSR No. 6275

JOB No. 2092598

PAGES 142 - 301

BY MR. HOWARD: 5:04:05PM
Q And with regard to the third principle
cosmopolitanism, is that a principle the company follows
today?
A Yes, we do. Because we cannot just restrict 5:04:32PM
ourself inside Taiwan. We have to go out, to go
international.
Q And that includes in the United States;
correct?
A We have customers in the United States, Europe, 5:04:52PM
and Japan.
Q Since you became chairman has the company made
any efforts to assure that it complies with the laws of
the United States when selling products there?
MR. FINLEY: Objection. Form. May call for a 5:05:25PM
legal conclusion.
THE WITNESS: Yes. We -- yes, we have done so.
We have complied with their law.
MR. HOWARD: Would you read the question back
for the witness, please. 5:05:46PM
(Record read.)
MR. FINLEY: Objection. Asked and answered.
THE WITNESS: We run the company based on these
principles, these three. And so I have specifically
instructed our people when we export AM products, we 5:06:52PM



have to abide by the law. 5:06:58PM
BY MR. HOWARD:
Q Do you have anybody at the company that has any
knowledge of United States antitrust laws?
MR. FINLEY: Objection. Form. Foundation. 5:07:10PM
May call for speculation.
MS. ROSEN: Join in all those.
MS. JANKOWSKI: Join in those objections.
THE WITNESS: In fact, no one.
BY MR. HOWARD: 5:07:46PM
Q Are you familiar with the Taiwan Fair Trade
Commission?
A I'm not.
Q Have you offered any education to any of your
employees in sales or marketing in the area of antitrust 5:08:07PM
or unfair competition?
MR. FINLEY: Objection. Form. Foundation.
MS. ROSEN: Join.
MS. JANKOWSKI: Join in those objections.
CHECK INTERPRETER: "Any" not interpreted. 5:08:43PM
THE WITNESS: Today we are faced with this case
about violating the United States law. In fact, many
years ago I have heard the salespeople talking about it.
And, in fact, even before that there was
never -- before that, there was no exposure to that kind 5:10:59PM



of information, not even from Taiwan's fair trade 5:11:18PM
commission. We have never been exposed to the United
States laws. Relatively speaking we are in backwaters
regarding United States law, especially for people in
this business in this industry. We really have no 5:11:46PM
knowledge about it.
CHECK INTERPRETER: Today this case in
violation of American law is pending. Words about this
situation have been circulated among salespeople for
number of years. The entire Taiwan actually before the 5:12:15PM
words were circulating including the Fair Trade
Commission of the government did not mention the U.S.
antitrust laws. In this regard Taiwan is very backward.
We people in the industry have no idea at all.
THE WITNESS: Allow me to supplement. 5:12:52PM
From the documents here I've been shown I think
you could feel that these four companies of AM parts are
actually doing this business in a hard way and because
there was -- there has been no profit, but we try to
survive, try to keep it going, that's why we came out 5:16:04PM
with this idea of joint development of tooling, and the
largest U.S. customers of these manufacturers is
Keystone and also known as LKQ, and they have a person
stationed in Taiwan to be in charge by the name Chen Wu
Xiong, C-h-e-n W-u X-i-o-n-g, and occasionally one of 5:16:39PM



the Keystone executive would come to Taiwan. I don't 5:16:51PM
know the name of that executive, but according to people
in the company they say he is the vice-president, and
that Keystone person would come to Taiwan to visit these
four manufacturers, and he is aware of that we really 5:17:16PM
had the hard time trying to stay in this business.
However, if these four companies quit doing
sheet metal parts, then there would be no supply -- no
supply in the United States for the body shops for the
non-OE parts required by the insurance companies. 5:17:44PM
And so they wanted us to keep going, but we
really don't want to -- that's why we decided not to
develop too many toolings now as everybody is living a
very painful life. And besides we did not know that was
a violation of the United States. 5:18:41PM
CHECK INTERPRETER: I have two clarification
with the witness. (Chinese spoken.)
The name of the person should be Chen Wu Tzong,
C-h-e-n W-u T-z-o-n-g. (Chinese spoken.)
Also, the Keystone American officer visited 5:19:23PM
Taiwan. I think he is in the position of vice-president
or associate president. He suggest that we join the
developing of tooling to lower costs. They understand
that we have survived with great pains. Actually we
have no idea that this breaks American law. 5:19:59PM

THE WITNESS: May I also add something. 5:20:13PM
MR. HOWARD: Before you say anything, I'd like to just hear the answer, then you can have the floor. Sorry. Thank you.
MR. FINLEY: All right. 5:22:04PM
MR. HOWARD: I don't mean to interrupt you.
THE WITNESS: What I would like to say is the following: This is indeed a very unique opportunity to be able to see you face to face and after so many years involved in the litigations, I would like to make three 5:22:33PM points.
No. 1, we honestly did not know we were in violation of United States law.
No. 2, this industry has been going through a very difficult time that's why we began to do this joint 5:22:58PM development of tooling.
No. 3, now that we have done this things I as the chairman of the Jui Li, I know that the other two companies, Tong Yang and Gordon, have already settled. So here today the two or three of you are representing 5:23:30PM the plaintiffs. I wish you could have a good discussion with our lawyers to talk about settlements. Say as long as the settlement amount is something that's acceptable for Jui Li, I would like to consider a settlement in order to open up a new way for the future. 5:24:09PM



MR. FINLEY: Mr. Howard, we've been on the 5:24:19PM record for an hour and a half. Can we take a short break?
MR. HOWARD: Yes. You may. Can we also before we go off the record, I would like to thank both the 5:24:27PM translators for working so hard and thank the chairman for his last answer.
THE WITNESS: In fact, it's me I should be thanking also.
THE VIDEOGRAPHER: This is the end of tape No. 5:24:55PM 4, Volume 2. We are off the record. The time is 5:25 p.m.
(Recess taken.)
THE VIDEOGRAPHER: This is the beginning of tape No. 5, Volume 2. We are on the record. The time 6:04:05PM is 6:04 p.m. You may proceed.
BY MR. HOWARD:
Q Mr. Chairman, on behalf of all of us, thank you again for your patience and testimony today and we have to finish a very short session now, and what I would 6:04:20PM like to do is to quickly go through some documents and mainly ask you about whether you received them in the course of your business. And after that's translated, I'll ask you a question.
We've placed in front of you Exhibit 9. And I 6:05:32PM



have to put on the record the numbers of the documents. 6:05:35PM Will you tell the witness that, please.
(Exhibit 9 was marked for identification by the court reporter and is attached hereto.)
BY MR. HOWARD: 6:05:54PM
Q And later on that allows all the lawyers to find the document that we've been talking about.
Will you explain that to him, please.
A Okay.
Q Will you please identify for me the nature of 6:06:19PM this document.
A The nature of this document is the following: It is dated December 14 of the Republic year 97. And this is the business trip report of Mr. Li Yi Pei of our company after he visited Taipei. 6:07:20PM
MS. ROSEN: Did you say December 14 or December 4?
THE INTERPRETER: I said 14.
MS. ROSEN: Okay. I just want to confirm. Sorry to .... 6:07:34PM
BY MR. HOWARD:
Q And if I understand how you conducted your affairs as the chairman -- can you translate that, please -- after you receive a report you would put your stamp on it; correct? 6:07:54PM



A Correct. 6:08:01PM
Q And then after you would put the stamp on the document, who would you give it to to return it back to the person who had sent it to you?
MR. FINLEY: Objection. Form. Foundation. 6:08:29PM
THE WITNESS: In general, I would give it to my secretary.
BY MR. HOWARD:
Q And do you know what your secretary would do with the document afterwards? 6:08:35PM
MR. FINLEY: Objection. Form. Foundation.
MS. ROSEN: Just to state on the record it appears Exhibit 3 and Exhibit 9 are the same document. I don't know if that was intentional. It's the same Bates number. 6:08:55PM
MR. HOWARD: I understand. I understand.
MS. ROSEN: Okay. I just want to say that for the record.
MR. HOWARD: Thank you.
CHECK INTERPRETER: "Do you know" not 6:09:10PM interpreted.
THE WITNESS: For a report like this since this one was submitted by Mr. Li Yi Pei of the sales 2 department then this report will be sent back to Mr. Li along with the folder. 6:09:54PM





Case 2:09-cv-00852-LA Filed 01/05/16 Page 7 of 8 Document 842-6

that testimony? 7:25:18PM
MR. HOWARD: Objection as to form.
THE WITNESS: You are talking about Zu Xiong Chen, that's a Chinese name?
MS. ROSEN: Yes, I am. Thank you. 7:25:48PM
THE WITNESS: Yes, he did. He wanted to disband three-to-one -- three-in-one, two-in-one, four-in-one, even five-in-one, he wanted to disband all of those.
BY MS. ROSEN: 7:26:10PM
Q And focusing on -- strike that.
You don't have any personal knowledge of why Mr. Chen wanted to disband those agreements, do you?
MR. HARTLEY: Object to the form.
THE WITNESS: After I review these documents 7:27:15PM here, it seems these business trip reports indicated that they -- they sold large quantities, but the profit that got allocated was to share equally with other parties, and he felt it was not worthwhile to do so. That's why he wanted to disband the project. And these 7:27:45PM information are written in these reports.
BY MS. ROSEN:
Q So that belief is based on your review of what was written in documents that you reviewed today and not on any recollection of any statements Mr. Chen would 7:28:03PM



have made to you personally? 7:28:09PM
MR. HOWARD: Form.
MR. HARTLEY: Same objection.
CHECK INTERPRETER: "Today" not interpreted.
THE INTERPRETER: Yes, I did. 7:28:51PM
THE WITNESS: I did not have any discussions with this Mr. Chen Zu Xiong about disbanding the project. Not at all.
MS. ROSEN: As of today, does Jui Li still decline to disband the two-in-one agreements? 7:29:17PM
MR. FINLEY: Objection. Foundation. Form.
THE WITNESS: I don't bother with that at all. As I said this morning, I don't care about it. It will be decisions by my younger brother or Mr. Li.
BY MS. ROSEN: 7:30:08PM
Q But as of July, 2011, was it your understanding that Jui Li had declined to disband the two-in-one agreements?
MR. FINLEY: Objection. Foundation. Form.
THE WITNESS: This is what indicated in this 7:30:39PM documents.
BY MS. ROSEN:
Q Chairman Lu, when you referred earlier to the possibility of the company being in violation of U.S. antitrust laws, were you only speaking -- strike that. 7:30:54PM



When you testified earlier about possibly 7:31:01PM violating U.S. antitrust laws, were you speaking for anybody other than Jui Li?
MR. FINLEY: Objection. Misstates prior testimony. 7:31:14PM
MR. HARTLEY: Object to form.
MR. FINLEY: Object to form. Join.
MR. HOWARD: Join. All of them.
THE WITNESS: I did not say that. I did not say that. 7:32:02PM
BY MS. ROSEN:
Q What did you not say?
A I did not say that Jui Li was in violation of antitrust law.
Q And you didn't say that anybody else was in 7:32:26PM violation of antitrust law; correct?
MR. HARTLEY: Object to form.
THE WITNESS: I did not say anything like that.
MS. ROSEN: Okay. No more questions. Thank you. 7:32:45PM
MR. FINLEY: I have a couple follow-up.
MR. HARTLEY: Your microphone works there.
MR. FINLEY: I'd like to sit across from him. It makes it easier, if that's okay with you.
MR. HARTLEY: Yeah. 7:33:04PM



EXAMINATION 7:33:04PM
BY MR. FINLEY:
Q Chairman Lu, I'm just going to ask a couple questions of you too.
Are you the person at Jui Li who makes legal 7:33:16PM decisions in this case?
MR. HARTLEY: Object to form.
MS. ROSEN: Join.
MR. HOWARD: Join.
THE WITNESS: This is a litigation pertaining 7:34:00PM to the AM sales department. So the overall legal issues is being handled by the top person of this AM sales department. That is Associate Vice-President Mr. Li.
CHECK INTERPRETER: This litigation involves AM sales. The AM highest person in charge is Associate 7:34:29PM Vice-President Li.
BY MR. FINLEY:
Q So is that a no? You're not the person at Jui Li who makes legal decisions in this case?
MR. HOWARD: Leading. 7:34:57PM
MR. HARTLEY: Object to form.
MS. ROSEN: Join.
THE WITNESS: That's right. No. Legal issues is handled by Associate Vice-President Li.
BY MR. FINLEY: 7:35:40PM