UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**FOND DU LAC BUMPER EXCHANGE INC. et al.,**
      Plaintiffs,

   v.                                   Case No. 09-C-0852

**JUI LI ENTERPRISE COMPANY LTD et al.,**
      Defendants;

**PATRICK TORREY,**
      Plaintiff,

   v.                                   Case No. 11-C-0162

**AUTO PARTS INDUSTRIAL LTD et al.,**
      Defendants;

**FIREMAN'S FUND INSURANCE COMPANY,**
      Plaintiff,

   v.                                   Case No. 13-C-0987

**JUI LI ENTERPRISE COMPANY LTD et al.,**
      Defendants;

**NATIONAL TRUCKING FINANCIAL RECLAMATION SERVICES LLC,**
      Plaintiff,

   v.                                   Case No. 14-C-1061

**JUI LI ENTERPRISE COMPANY LTD et al.,**
      Defendants.

---

## **DECISION AND ORDER**

The direct-purchaser and indirect-purchaser plaintiffs (respectively, DPPs and IPPs) bring these class action proceedings against various manufacturers of

aftermarket sheet metal parts used in automotive repair alleging an anticompetitive conspiracy in violation of federal and state antitrust laws. Plaintiffs have settled with all of the defendant-manufacturers except for Auto Parts Industrial Ltd. and Cornerstone Auto Parts LLC, affiliated companies that the parties refer to collectively as "API." API is currently in default for failing to appear by counsel for most of 2017. API moves to set aside the entry of default. Plaintiffs move for default judgment.

## I. BACKGROUND

On July 8, 2011, API asked me to substitute attorneys from Buchanan Ingersoll & Rooney PC as its counsel of record in this litigation, in place of its counsel from Dykema Gossett PLLC. ECF No. 204. I granted that request, ECF No. 206, and for most of the six years that followed, API appeared by Buchanan's attorneys, who defended it against plaintiffs' claims. Then, on January 23, 2017, one of those attorneys, Cindy Hinkle, filed a verified motion to withdraw as API's counsel of record. ECF No. 995. Hinkle, in an accompanying declaration, attested that API had terminated Buchanan as its counsel on January 5, 2017, which caused a "complete breakdown" in the attorney-client relationship justifying Buchanan's withdrawal as counsel. Hinkle Decl., ECF No. 996, ¶ 3.

On February 6, 2017, during a telephone status conference, I granted Buchanan's motion to withdraw and ordered API to appear by new counsel within 21 days. ECF No. 1001. I also granted DPPs' motion for leave to re-depose API under Federal Rule of Civil Procedure 30(b)(6). *Id.* On April 4, 2017, DPPs asked me to find API in contempt, as it had not appeared by new counsel, as ordered, and as a result, DPPs had not been able to re-depose API, as permitted. ECF No. 1044.

On July 18, 2017, I denied DPPs' motion for contempt. I noted that contempt is only appropriate where "a party violates 'an unambiguous command' from the court." ECF No. 1086, at 2 (quoting *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008)). I then clarified that my order that API appear by new counsel on or before February 27, 2017, was "not a command" but "a deadline after which," if API had not taken appropriate action, "I would infer . . . that [it was] no longer actively participating in this litigation." *Id.* Finally, I cited various cases suggesting that the proper sanction for API's failure to timely appear by counsel, as ordered, was the entry of default followed by default judgment but that default judgment as to API would only be appropriate once this litigation had concluded as to all other parties. *See id.* at 3 (collecting cases). On August 8, 2017, I directed the Clerk of Court to enter default against API. ECF No. 1088, at 2–3.

On October 6, 2017, Jui Li Enterprise Company Ltd., the only remaining defendant not in default, filed a stipulation dismissing IPPs' claims against it, pursuant to the terms of a court-approved settlement agreement between them. ECF No. 1094. One week later, on October 13, IPPs moved for default judgment against API. ECF No. 1096. Then, on November 15, 2017, DPPs moved for preliminary approval of a settlement agreement between them and Jui Li. ECF No. 1100. The following day, November 16, DPPs moved for default judgment against API. ECF No. 1104.

On November 27, 2017, I received a letter from Ronald Finley, an attorney from Beck Bismonte Finley LLP—Jui Li's counsel of record since April 22, 2015, ECF No. 618—advising me that his firm was in the process of finalizing an agreement with API, pursuant to which its attorneys would appear on API's behalf in this litigation. ECF No.

3

1108. Finley's letter also states that, after entering an appearance on API's behalf, he and his colleagues would move to set aside the entry of default against API. *Id.*

On December 5, 2017, Finley and several other attorneys from Beck formally appeared on API's behalf. ECF No. 1115. About two weeks later, on December 21, API moved to set aside the entry of default. ECF No. 1116.

## II. API'S MOTION TO SET ASIDE THE ENTRY OF DEFAULT

By rule, a federal district court "may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c). Ordinarily, to establish good cause to set aside an entry of default, a defendant must show "good cause for [its] inaction, prompt steps to correct the default, and an arguably meritorious defense to the lawsuit." *Parker v. Scheck Mech. Corp.*, 772 F.3d 502, 505 (7th Cir. 2014). API primarily relies on the declaration of Jack Hsieh, an API "Vice President" and "senior manager," in attempting to make these required showings. Hsieh Decl., ECF No. 1119, ¶ 1. I too look to Hsieh's declaration.

### A. Good Cause for the Defendant's Inaction

Hsieh provides the following explanation for API's default: In November 2015, API's board of directors proposed a major capital investment to be funded by the issuance of millions of new shares. Hsieh Decl., ECF No. 1119, ¶ 2. The shareholders approved the proposal, but a group of dissenters challenged it in court the following February. *Id.* ¶¶ 2–3. That April, the court enjoined any shareholder votes upon the newly issued shares pending a decision on the validity of the board's proposal and subsequent action. *Id.* ¶ 4. On June 20, 2016, the board's terms expired. *Id.* ¶ 5. API expected that its shareholders would elect a new board ten days later at its annual

4

shareholders meeting, but due to the pending lawsuit, "the shareholders voted to cancel the election" of a new board. *Id.* ¶ 6.

According to Hsieh, an executor was appointed to run API, but the executor "was only able to engage in transactions, and authorize expenditures, in the regular course of business," meaning that he could not, for example, "authorize any discretionary legal activity," pay "invoices of U.S. counsel," or approve "any settlement except on terms" approved by the prior board. *Id.* ¶¶ 7–8. Hsieh says that, "because [it] could not pay [for] . . . or authorize any legal work," API agreed to terminate Buchanan as its counsel of record in this case, prompting Buchanan's January 2017 motion to withdraw. *Id.* ¶ 9. As discussed above, that motion led to my order that API appear by new counsel, and API's failure to comply with that order resulted in the entry of default against it.

API argues that "[t]he circumstances that led to the default in this case are extraordinary." Defs.' Mem., ECF No. 1117, at 2. After all, API says, "[a]fter six years of litigation, . . . a shareholder suit and . . . injunction, both beyond [API's] control, left [it] without a Board of Directors, unable to either pay its existing counsel in this case or obtain new counsel." *Id.* However, API's characterization of its circumstances does not align with the facts in Hsieh's declaration. According to Hsieh, the injunction in API's shareholder lawsuit only prevented shareholder votes by those holding shares "newly issued" as part of the board's (since-invalidated) capital-investment measure. Hsieh goes on to say that, months after the injunction was entered, those holding earlier-issued shares, whose votes were clearly not enjoined, gathered "to elect a new Board of Directors" but instead "voted to cancel the election." In other words, API's shareholders—that is, its owners—*chose* to not elect a new board pending the outcome

5

of their dispute in court. I will not speculate as to why API's owners decided to hamstring their own company in this way. Whatever their reasons, I will not excuse API from the reasonably foreseeable consequences of its owners' decisions. API defaulted because its shareholders deliberately hobbled it such that it could not proceed before this court, which is not good cause for its inaction.

API goes on to compare itself to a claimant in a civil forfeiture case from the 1980s who defaulted while in prison in Germany because (1) his indigence, itself "a result of the United States having seized his entire life savings," effectively precluded him from hiring counsel to represent his interests in litigation in the United States and (2) his lack of "either legal knowledge or access to American legal materials" made it virtually impossible for him to proceed "*pro se* . . . from a foreign country." *United States v. Forty-Eight Thousand, Five Hundred Ninety-Five Dollars*, 705 F.2d 909, 912 (7th Cir. 1983). According to API, this case shows that "good cause" to set aside an entry of default "can arise when foreign legal issues prevented participation in American litigation." Defs.' Mem., *supra*, at 6. API's tortured reading of this case reflects its distorted view of its own circumstances, both of which I reject. Its comparison here fails if only because API did not *lack* funds to hire counsel; its owners simply chose to not empower it to *spend* funds to hire counsel.

As API notes, even if "there is no good *excuse* for [its] inattention to the case," there may still be "good *cause*" to set aside the entry of default. *Sims v. EGA Prod., Inc.*, 475 F.3d 865, 868 (7th Cir. 2007). "A default judgment is a sanction for misconduct during the litigation," and, "[l]ike damages in civil litigation, the sanction should fit the offense." *Id.* Thus, for example, "a $31 million [default judgment] would be excessive"

6

where the defendant's conduct "was negligent . . . rather than deliberate, and the injury (if any) to its adversary was negligible." *Id.* Similarly, "[a] multimillion dollar judgment" may be "too heavy a sanction for a corporation's two-week gap in representation," especially if setting aside the entry of default would not prejudice an opposing party or the court. *JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 793 (7th Cir. 2015).

Here, though, there is no good reason to set aside the entry of default. First, API's gap in representation—again, the result of its owners' choices—lasted for nearly a year. During that time, API missed deadlines and failed to obey my orders, including my order that it designate and make available for a deposition a representative able to testify about the authenticity and business-records status of documents it produced in discovery, a matter first brought before me more than three years ago that, to my knowledge, still has not been meaningfully resolved. Moreover, while API sat idly by, the other remaining parties took up and settled their outstanding issues and claims, thereby effectively ending this litigation. Given the schedule and the active parties' diligent efforts to settle, this litigation likely would have ended months ago but for API's default. Thus, at the least, the legitimate interests of the parties and the court—not to mention the public, *see, e.g.*, *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334–35 (7th Cir. 2012)—in the finality of these proceedings would be prejudiced were I to set aside the entry of default.

Further, API's misconduct predates its default. In June 2016, API agreed to pay $500,000 to settle IPPs' claims against it, but the deal fell through because API and IPPs could not agree on who would pay a 20% tax on the settlement funds to the government of Taiwan. IPPs asked that API pay the tax on top of the $500,000, while

7

API insisted that the tax be paid from, rather than in addition to, that amount. In an attempt to salvage the deal, I ordered "[a]n API representative with settlement authority . . . to appear in person" before me for a settlement conference with IPPs' counsel the following month. ECF No. 924, at 1. Before the conference, API's counsel informed me that Hsieh would appear on its behalf and that they had hired a translator to ensure that the conference would be "effective and efficient." ECF No. 933. The conference failed in large part because Hsieh was unable or unwilling to compromise on API's behalf. At the time, this struck me as merely a surprising and unproductive approach to settlement negotiations. It now appears that Hsieh's recalcitrance was not strategic. Rather, it reflected his (and API's) total incapacity to offer or accept any settlement terms other than those authorized by API's board of directors before its terms expired. As IPPs had already clearly rejected those terms, I cannot imagine what API hoped to accomplish by participating in this conference. That it wasted hours of my time and opposing counsel's time knowing full well but never disclosing that our attempts at settlement would almost certainly prove futile is baffling.

Finally, that plaintiffs seek damages awards against API totaling more than $200 million, in addition to their costs and fees, does not mean that they are entitled to such damages. "Upon default, the well-pled allegations of the complaint relating to liability are taken as true, but those relating to the amount of damages suffered ordinarily are not. Thus, '[d]amages must be proved unless they are liquidated or capable of calculation.'" *Wehrs v. Wells*, 688 F.3d 886, 892 (7th Cir. 2012) (alteration in original) (citations omitted) (quoting *Merrill Lynch Mortg. Corp. v. Narayan*, 908 F.2d 246, 253 (7th Cir. 1990)). Plaintiffs provide expert calculations of the damages to which they believe they

are entitled, but given the complexity of their evidence, I am not prepared to determine the amount of damages without further inquiry. *See* Fed. R. Civ. P. 55(b)(2). In light of API's conduct in this litigation and the fact that it will have an opportunity to dispute plaintiffs' proof on damages, the mere possibility that it could face multimillion dollar damages awards due to its default does not give me "serious pause." *See JMB*, 799 F.3d at 792.

API fails to show good cause for its default or for judicial action to set aside the entry of default. That is reason enough to deny its Rule 55(c) motion. Still, I will also discuss the steps that API took to correct its default, as courts commonly consider a party's post-default conduct alongside the misconduct that precipitated the entry of default when considering whether to set aside an entry of default. *See, e.g.*, *id.*

### B. Prompt Steps to Correct the Default

Hsieh says that, on June 7, 2017, API's shareholder dispute ended in a "judgment invalidating the capital investment," at which time, API "held its annual shareholders' meeting and was finally able to elect a new Board of Directors." Hsieh Decl., *supra*, ¶ 11. In other words, by its own admission, in June 2017, API was again able to hire counsel, authorize new legal work, and pay for it. I note that, at that point, although I had not yet directed the Clerk of Court to enter API's default, API had already been in default for months. My July 18, 2017, order—which, according to Hsieh, API received, *id.* ¶ 12—makes clear that API was in default as of the end of February 2017, when it failed to meet its deadline to appear by new counsel. *See* 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2692 (4th ed.), Westlaw (updated Apr.

2018) ("The entry [of default] simply is an official recognition of the fact that one party is in default . . . .").

Hsieh describes API's remedial, post-default conduct as follows: On September 18, 2017, the new board of directors met for the first time and "directed management to begin seeking new American legal counsel immediately," even though the board did not yet know about my August 8, 2017, order directing the entry of default against API. Hsieh Decl., *supra*, ¶¶ 14–15. API first learned about that order on October 20, 2017, when it was served with IPPs' motion for default judgment. *Id.* ¶ 16. That November, after API learned that Jui Li had settled with DPPs, it contacted Jui Li's counsel, Beck, about "potential representation." *Id.* ¶ 17. API engaged Beck as counsel on December 1, 2017, and Beck's attorneys appeared on API's behalf a few days later. *Id.* ¶ 18; ECF No. 1115. About two weeks after that, API moved to set aside the entry of default. ECF No. 1116.

API argues that it was only "able to seek new counsel" once its shareholder dispute was resolved, at which point it "moved promptly and retained its present counsel." Defs.' Mem., *supra*, at 2. Yet, according to Hsieh, the shareholder dispute ended in June 2017, and API did not contact its present counsel until that November, more than five months later. Even assuming API did not find out about the entry of default until October 20, it seems to have made no effort to hire new counsel for weeks after that, and when it finally did, another month passed before it actually moved to set aside the entry of default. Moreover, even if API was not aware of the *entry* of default until October 20, Hsieh says that, nearly three months earlier, it received my July 18 order, in which I reiterated that API was required to "appear by new counsel no later

than February 27"; noted that it had not met that deadline or appeared by new counsel since; stated that I would therefore assume it was no longer participating in this litigation; and quoted *United States v. Hagerman*, 549 F.3d 536 (7th Cir. 2008), in which the Seventh Circuit said, "The usual course when a litigant not entitled to litigate pro se loses its lawyer in the midst of the case is to give it a reasonable opportunity to find a new one, and, if it fails, . . . to . . . enter a default judgment," *id.* at 538 (citations omitted). *See* ECF No. 1086. API had already elected a new board of directors by the time it received that order, but nearly eight more weeks passed before the new board first met and directed management to *start* looking for new counsel. In short, API's steps to correct its default were anything but "prompt."

API, citing Hsieh's declaration, insists that "finding adequate representation . . . within its means and able to get up to speed . . . quickly turned out to be difficult." Defs.' Mem., *supra*, at 8. However, Hsieh's declaration provides in relevant part only that API's "[m]anagement concluded that given the advanced stage of the litigation and the complex nature of the case, retaining new counsel *would be* difficult." Hsieh Decl., *supra*, ¶ 17 (emphasis added). In other words, Hsieh does not say that API *tried* to retain new counsel but was unable to do so any faster than it did because it *turned out* that retaining new counsel was, in fact, difficult. Rather, he says only that API's management *thought* it would be difficult to hire new counsel given the nature and stage of the litigation. This perceived difficulty does not excuse API's failure to promptly retain new counsel—or to at least demonstrate that it diligently tried to retain new counsel—as ordered.

Additionally, the record suggests that API could have secured, or at least attempted to secure, counsel more quickly than it did. Hsieh says that API did not contact Beck until November 2017 when, "after learning of Jui Li's settlement with [DPPs]", it "concluded that [Beck] might be available as counsel." *Id.* Yet, nothing in the record suggests that Beck was unavailable before then or, even if it was, that API had any particular reason for thinking that it was unavailable. Similarly, representatives of both API and Buchanan assert that API fired Buchanan solely because, while API lacked a board of directors, it was unable "to authorize . . . or to pay for new legal work." *See* Jankowski Decl., ECF No. 1139, ¶ 7. But if that's true, I cannot discern why API did not simply re-engage Buchanan in June 2017 after it elected a new board of directors. That API does not explain whether it explored, or even considered, these clear alternatives to securing counsel reinforces my view that it failed to act promptly to cure its default.

API was not free to make me and plaintiffs "wait 'indefinitely' for [it] to obtain new counsel" at its leisure, nor was it "entitled to grant itself a continuance" by failing to promptly seek and hire new counsel, as ordered. *See JMB*, 799 F.3d at 792 (quoting *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427 (7th Cir. 1985)); *see also Cent. Illinois Carpenters Health & Welfare Tr. Fund v. Con-Tech Carpentry, LLC*, 806 F.3d 935, 937 (7th Cir. 2015) (holding that a defendant is "not free" to default, "keep silent and hope that the equivalent of a stay [will] be afforded retroactively"). API has not shown that it acted with any urgency whatsoever in seeking to cure its default, which is reason enough to deny its motion to set aside the entry of default. Indeed, given API's near-total failure to make either of the first two showings required to justify such relief, I

need not consider whether it has made the third—by showing that it has an arguably meritorious defense to this lawsuit. Thus, for the reasons stated, I will deny API's motion.

### III. PLAINTIFFS' MOTIONS FOR DEFAULT JUDGMENT

"The basic effect of an entry of default . . . is that '[u]pon default, the well-pleaded allegations of a complaint relating to liability are taken as true.'" *VLM Food Trading Int'l, Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (alteration in original) (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prod., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)). Moreover, "[t]he defaulting party cannot contest the fact of [its] liability unless the entry of default is vacated under Rule 55(c)." *Id.* I have already explained why I will not set aside the entry of default against API.

I have also already considered and rejected defendants' numerous, detailed challenges to the sufficiency of the allegations in the plaintiffs' complaints. *See* ECF No. 533 (denying defendants' motion to dismiss IPPs' first amended complaint); ECF No. 129 (denying defendants' motions to dismiss DPPs' first amended complaint); *see also* ECF No. 222 (API's answer to DPPs' second amended complaint). Suffice it to say that defendants, including API, have had several opportunities to argue that plaintiffs' complaints fail to state a claim, they have availed themselves of those opportunities, and I have addressed their arguments. Accordingly, and as a result of its default, API has waived any other such arguments. Thus, for the purposes of default judgment, the complaints' well-pleaded allegations suffice to establish that API is liable for the misconduct alleged, that is, its participation, in violation of federal and state antitrust

laws, in a conspiracy to fix prices on certain aftermarket sheet metal parts and to otherwise engage in anticompetitive conduct affecting the market for those parts.

As noted above, "[o]nce the default is established, and thus liability, the plaintiff still must establish his entitlement to the relief he seeks." *VLM*, 811 F.3d at 255 (quoting *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004)). "Even when a default judgment is warranted . . . , the allegations in the complaint with respect to the amount of the damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Catt*, 368 F.3d at 793 (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). "If the sum is not certain or capable of easy computation, the court may hold whatever hearing or inquiry it deems necessary." Wright et al., *supra*, § 2688; *see Dundee*, 722 F.2d at 1323–24.

In arguing that they are entitled to more than $200 million in damages from API, plaintiffs primarily rely upon reports from their retained economist, Russell Lamb. Although I have considered Dr. Lamb's analysis and reports at various points throughout this litigation and have generally found his work to be both rigorous and reliable, his reports are lengthy and detailed, amounting to hundreds of pages of economic analysis in total. As such, I cannot reasonably say that the amount of damages to which plaintiffs are entitled here is capable of *easy* computation. Also, the disparity between the amount for which IPPs agreed to settle with API two years ago ($500,000) and the amount they now seek in damages ($40 million) suggests that the amount of damages to which plaintiffs are entitled is anything but certain. Accordingly, though I will grant plaintiffs' motions for default judgment, I will not enter judgment until I

have conducted an appropriately searching inquiry into the proper amount of damages to be awarded.

## IV. RELATED MOTIONS

As a final matter, the parties have filed motions ancillary to the issues discussed above that I will now address. First, DPPs move to strike from the record paragraph 8 of the declaration of Gretchen Jankowski, filed by API with its reply brief in support of its motion to set aside the entry of default against it. That paragraph has not underpinned any of my findings or conclusions in this litigation, nor has it influenced my reasoning in any way. Thus, DPPs' motion to strike is unnecessary, and I will deny it for that reason.

Next, IPPs move to seal various exhibits to their brief in opposition to API's motion to set aside the entry of default against it, as well as references to those exhibits in the brief itself. API originally designated these materials confidential, so it bears the burden of demonstrating good cause for withholding them from the public record. General L. R. 79(d)(3) (E.D. Wis.). According to IPPs, API feels that these "documents contain internal sensitive financial and strategic business information that would be harmful to API . . . should it become public." ECF No. 1125, ¶ 4. This motion "does not analyze . . . the propriety of secrecy" or provide "reasons and legal citations" justifying it, so I will "deny [the motion] outright." *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 548 (7th Cir. 2002).

Relatedly, API moves to seal portions of its reply brief in support of its motion to set aside the entry of default against it that reference the same materials subject to IPPs' motion to seal, discussed above. Again, API designated these materials confidential, so it bears the burden of demonstrating good cause for withholding them

from the public record. Again, though, it says only that these "documents contain internal sensitive financial and strategic business information that would be harmful to API should it become public information." ECF No. 1137, at 2. As I said above, this is insufficient. Thus, I will deny API's motion to seal, as well.

Finally, API moves to compel production of a report about claims by and distributions to class members under prior settlement agreements in this litigation arguing, among other things, that there is reason to suspect misadministration of the claims process and that the requested information could "bear[] on class certification and suitability of the class representatives." ECF No. 1161, at 4. API does not have standing to challenge the propriety of claims administration as to settlements to which it is not a party. Moreover, because it is in default, API also lacks standing to challenge class certification or the suitability of the class representatives. API also argues that "the requested information is . . . highly relevant . . . to damages and how many claims have actually been submitted in each state for which a class was certified," *id.*, but this argument is undeveloped and unsupported by legal authority, so I will not consider it. Accordingly, I will deny API's motion for a claims-administration report.

## V. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that API's motion to set aside the entry of default against it (ECF No. 1116) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs' motions for default judgment (ECF Nos. 1095 & 1104) are **GRANTED**, as discussed above.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **August 2, 2018** at **11:30 a.m**. Participants need to call in for the conference as follows:

Dial access number 1-877-336-1839. Then, enter access code (4144803) and security code (1234), when prompted.

**IT IS FURTHER ORDERED** that DPPs' motion to strike paragraph 8 of the declaration of Gretchen Jankowski (ECF No. 1144) is **DENIED**.

**IT IS FURTHER ORDERED** that IPPs' motion to seal exhibits to its opposition brief and references thereto in the brief itself (ECF No. 1125) is **DENIED**. The Clerk of Court shall publicly file the pertinent materials.

**IT IS FURTHER ORDERED** that API's motion to seal portions of its reply brief (ECF No. 1137) is **DENIED**. The Clerk of Court shall publicly file the pertinent materials.

**IT IS FURTHER ORDERED** that API's motion to compel production of a claims-administration report (ECF No. 1161) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 16th day of July, 2018.

s/Lynn Adelman
LYNN ADELMAN
District Judge